# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 18-10123

| | |
|---|---|
| TAMMY CAGLE, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| JUDGE THOMAS ESTES AND | ) |
| BEHAVIORAL HEALTH NETWORK, | ) |
| Defendants | ) |

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

## PARTIES

1.    Plaintiff, Tammy Cagle, is an individual who resides in Glennville, Tattnall

County, Georgia 30427.

2.    Judge Thomas Estes is an individual who at all relevant times was employed as

the First Justice of the Eastern Hampshire District Court, Belchertown, Hampshire

County, Massachusetts and as the presiding Judge of the Pittsfield Drug Court.

3.    Defendant Behavioral Health Network, Inc. ("BHN") is an employer with a

principal place of business at 417 Liberty Street Springfield, Hampden County,

Massachusetts 01104.

## JURISDICTION

4.    Jurisdiction is proper in Federal Court pursuant to 28 U.S.C. §1331. Federal

district courts have original jurisdiction over all civil actions arising under the

Constitution, laws, or treaties of the United States. Plaintiff's claims are based on

violations of federal and state anti-discrimination laws, including Judge Estes',

BHN's, and the Trial Court's violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et. seq.*

5.    Supplemental jurisdiction over the pendant state claims is proper pursuant to 28 U.S.C. §1367.

## VENUE

6.    Venue is proper in the United State District Court for the District of Massachusetts pursuant to 28 U.S.C. §1391.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.    Plaintiff properly exhausted her administrative remedies by filing a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Opportunity Employment Commission (EEOC"), waiting the statutory time period of 90 days as provided by M.G.L. c. 151B, § 9, and removing her case from the MCAD before filing this Complaint and obtaining a "right to sue" letter from the EEOC.

## FACTUAL BACKGROUND

8.    Beginning in 2013, the Trial Court began a long-term strategic plan to develop and expand so-called "specialty courts"—diversionary courts designed to prevent at-risk criminal defendants from recidivating. Specialty courts address underlying social and economic issues that tend to contribute to a person's likelihood to reoffend and provide criminal defendants with increased access and linkage to treatment and community resources. One such of type of specialty court is called drug court.

9.    In each drug court, a designated drug court judge presides over the drug court sessions and leads the team.

10.    Ideally, the team is comprised of a probation officer, drug court coordinator, specialty court clinician, clerk, prosecutor, defense attorney, treatment provider, and law enforcement.

11.    The drug court judge has the apparent authority to choose and retain his drug court team members to insure fidelity to the drug court model in order to further a collaborative and none-adversarial approach in the drug court—in essence he approves the hiring decisions and can make the firing decisions. [1]

12.    The drug court judge, through his or her collaboration with team members, decides whether a particular criminal defendant is eligible to participate in drug court, crafts treatment plans for drug court defendants, and makes the ultimate decisions in drug court cases, including the imposition of incentives or sanctions.

13.    The drug court judge ensures that the drug court team meets regularly to review participant progress and participant needs through regular staff meetings.

14.    The specialty court clinician is emerging as part of recommended best practices for the drug court team.

15.    The specialty court clinician works through the Department of Mental Health ("DMH") Court Clinic system.

---

[1] Recently, in *Deputy Chief Counsel for the Public Def. Div. of the Com. for Public Counsel Services & another v. Acting First Justice of the Lowell Div. of the Dist. Ct. Dept.*, 477 Mass. 178 (2017), the Supreme Judicial Court decided a case involving a drug court judge who, citing the need for a team approach to cases in drug court, removed CPCS attorneys from drug court cases to which they had been assigned and excluded CPCS attorneys from assignment to any new case in the drug court.  The Court held that it was *only* due to the statutory mandated procedure requiring CPCS to assign counsel to indigent clients that the judge could not remove the CPCS attorney from drug court.  Indeed, the Court characterized the ability for the judge, as leader of the drug court team, to use his authority to select the team members as "important," supported by "social science research," and recognized the "desireability and efficacy of a collaborative and nonadversarial approach in the drug court" in making it an "effective intervention for defendants who would otherwise recidivate because of their substance abuse issues."  The inference is that a drug court judge may remove any drug court team member that isnt so-protected. *Deputy Chief Counsel v. Acting First Justice*, 477 Mass. at 183, 187.

16.    The Trial Court has an Interagency Service Agreement with DMH to place clinical professionals in the specialty courts.

17.    DMH subcontracts with BHN to place clinical professionals in specialty courts.

18.    The Trial Court, in collaboration with DMH, assign a court clinician to a specific drug court.

19.    The drug court judge then approves his or her specialty court clinician.

20.    Specialty court clinicians are paid through a grant funded by DMH and the Trial Court.

21.    The specialty court clinician recommends appropriate treatment options to the judge in staff meetings, and informs the drug court team on clinical perspectives.

22.    In 2016, Pittsfield District Court received funding to establish a drug court.

23.    At that time, Judge Estes was working as the First Justice of Eastern Hampshire District Court in Belchertown.

24.    In the summer of 2016, Judge Estes was appointed to preside over the drug court in Pittsfield. Judge Estes would continue to serve as First Justice of Belchertown, and would now take on the additional responsibilities of overseeing the implementation of drug court and of presiding over the drug court once it was established.

25.    He would now work 4 days a week in Belchertown, and one day a week in Pittsfield.

26.    Judge Estes retained his Belchertown District Court chambers and also maintained a shared chamber with a Pittsfield judge when he was presiding in Pittsfield.

27.     In June 2016, Plaintiff, a licensed social worker, applied for a position with BHN to work as a specialty court clinician in Pittsfield drug court.

28.     On June 24, 2016, Dr. Welli Yeh, the Program Director for BHN Adult Court Clinics, emailed Plaintiff that she had been given permission to hire the Plaintiff as a specialty court clinician so long as Judge Estes approved of the hire.

29.     On or about July 2016, Plaintiff met with Judge Estes and Dr. Yeh in Judge Estes' chambers in Belchertown District Court.

30.     Judge Estes approved the hiring of the Plaintiff as a specialty court clinician.

31.     The Plaintiff's role would be to assist in the implementation of the Pittsfield drug court and to thereafter work on the Pittsfield drug court team.

32.     On July 18, 2016, the Plaintiff began working at Judge Estes' direction to assist in the implementation of his drug court in Pittsfield.

33.     Judge Estes, as the leader of the drug court team, set work schedules; for example, the drug court team met regularly, and it was Judge Estes who set the agenda for the meeting as well as deciding when, where, and for how long to meet.

34.     In addition, Judge Estes decided when and where and for how long to conduct staff meetings to discuss the drug court program generally, brainstorm ways to improve, identify upcoming trainings, and reflect on the progress and direction of the program.

35.     The Plaintiff's office was located at the Pittsfield District Court.

36.     On or around August 2016, Judge Estes communicated to the Plaintiff that if she ever needed to "vent" or "needed anything" that she could come to Belchertown District Court to talk to him in his chambers.

37.    At some point thereafter, beginning in August 2016, Judge Estes directed the
       Plaintiff to meet with him individually in his chambers in the Belchertown
       District Court.

38.    Upon information and belief, no other Pittsfield drug court team member met
       privately with Judge Estes in his chambers in Belchertown District Court.

39.    During these meetings, Judge Estes offered a sympathetic ear to Plaintiff, who
       was struggling to convince the probation department to follow the best practices
       of drug court.

40.    Each time Judge Estes met with the Plaintiff, he tried to flatter her by saying he
       enjoyed meeting with her; if, for some reason, they had to miss a meeting, he tried
       to flatter her by saying how much he missed meeting with her.

41.    In October 2016, Pittsfield opened its drug court. The sessions were typically held
       on Thursday mornings.

42.    Between July 2016 through November 2016, Judge Estes was the Plaintiff's only
       supervisor in Pittsfield drug court, and from December 2016 through March 2017,
       he was her only consistent supervisor in drug court.

43.    David DiSessa, Plaintiff's clinical supervisor, met with Plaintiff once a week at a
       restaurant in Westfield to discuss her position. Beginning in December 2016, he
       observed one drug court session each month.

44.    Juliana Reiss, the BHN Director of Forensics, attended two drug court sessions
       between October 2016 through March 2017.

45.    On multiple occasions, both Mr. DiSessa and Ms. Reiss gave Plaintiff positive
       reinforcement indicating that she was performing well at her job.

46.     On or about November 16, 2016, the Plaintiff, Judge Estes, and the other members of the drug court team attended a two-day drug court conference.

47.     After the first day of the conference, the drug court team, including Judge Estes and the Plaintiff, attended a cocktail hour, where they consumed alcoholic beverages.

48.     The drug court team then went to dinner at the hotel restaurant where they continued to consume alcoholic beverages.

49.     After dinner ended, the members of the drug court team, with the exception of Judge Estes and the Plaintiff, left the table to continue drinking at the hotel bar.

50.     While at the table, Judge Estes continued drinking whiskey, and the Plaintiff noticed that he seemed intoxicated.

51.     Judge Estes began looking at the Plaintiff suggestively and suddenly reached out and began rubbing her arm. He told her that she was "adorable" and "attractive."

52.     The Plaintiff dismissed his overtures, and the Plaintiff and Judge Estes left the dinner table to join the drug court team at the hotel bar.

53.     While they were at the hotel bar, Plaintiff asked Judge Estes to walk her to her hotel room.

54.     Judge Estes agreed, and they both boarded the elevator together.

55.     There were other individuals in the elevator, and, without discussion, Judge Estes got off the elevator on the floor where his hotel room was located.

56.     The Plaintiff went to her hotel room, changed into a t-shirt and sweatpants, and tried to watch television, but could not get the remote to operate the television.

57.     She texted Judge Estes, asking if he would like to come over for "conversation only."

58.     Judge Estes replied that he was "beat and sleepy."

59.     The Plaintiff told Judge Estes that she needed help with the television.

60.     He came upstairs, and fixed the issue she was having with the television.

61.     Judge Estes then sat on the bed, crossed his legs, closed his eyes, and appeared to be falling asleep.

62.     The Plaintiff, still wearing her t-shirt and sweatpants, lay on the bed, and continued watching television.

63.     Suddenly Judge Estes stood up and began undressing. He lay down on the bed beside the plaintiff and began kissing her.

64.     Judge Estes pulled down his boxer shorts.

65.     Judge Estes used his hand to push the Plaintiff's shoulders down so that she was positioned above his genital area.

66.     Judge Estes put his hand on the back of Plaintiff's head and made her perform fellatio on him.

67.     The Plaintiff felt shocked and confused.

68.     Immediately after being sexually satisfied, Judge Estes stood up, put his clothes back on, and stated that he had to go to his room.

69.     On November 17, 2016, the Plaintiff left the conference early because she felt uncomfortable, ashamed, and confused about what had transpired the evening before.

70.     The following day, on November 18, 2016, Judge Estes telephoned the Plaintiff to discuss what had happened.

71. During that phone conversation, both Judge Estes and the Plaintiff agreed that alcohol was the reason for their sexual encounter. They agreed they would never engage in sexual conduct again.

72. The Plaintiff expressed concern about how this might affect their work relationship, and wanted to make sure they could still maintain a professional relationship.

73. Judge Estes replied that their working relationship was now changed.

74. Judge Estes further stated that if someone found out about what had happened, "it would be worse for the Plaintiff" in drug court, and that she would "lose credibility" in the eyes of the drug court probation officers if they found out what had happened.

75. Approximately one week later, Judge Estes invited the Plaintiff into his chambers in Belchertown in order to discuss drug court.

76. The Plaintiff traveled from her office in Pittsfield to Belchertown District Court, and met alone with Judge Estes in his chambers during court hours.

77. Judge Estes and the Plaintiff discussed drug court.

78. Suddenly, Judge Estes drew the window blinds closed and shut and locked the door.

79. Judge Estes told the Plaintiff he wanted to continue what they had started on November 16.

80. The Plaintiff began to panic.

81. She told Judge Estes they had already discussed that this was not a good idea.

82. Judge Estes told the Plaintiff that he liked spending time with her.

83. Judge Estes promised the Plaintiff that if she performed oral sex on him now, he would never ask her again.

84. Judge Estes promised the Plaintiff that he would "help her out" to fix the problems she was having with probation, but that he first wanted her to perform oral sex on him.

85. As he spoke, the Plaintiff noticed that Judge Estes' face was flushed and red and he appeared agitated.

86. The Plaintiff was scared.

87. Judge Estes unbuttoned his pants, pulled them down, and then pulled his boxer shorts down.

88. The Plaintiff pushed Judge Estes away with her hand.

89. Judge Estes grabbed the Plaintiff's hand and forced her to touch his penis.

90. As she continued to panic, the Plaintiff tried reasoning with Judge Estes. She stated, "Someone will walk in."

91. Judge Estes pushed the Plaintiff's shoulders down so she was now sitting on a chair.

92. Judge Estes grabbed her head and forced her to perform fellatio on him while he stood above her.

93. The Plaintiff felt pressured to comply with what Judge Estes wanted.

94. After he was sexually satisfied, Judge Estes immediately pulled his boxer shorts and pants up, opened the blinds, and stated, "I'll walk you out."

95. Judge Estes' court staff worked just outside his chambers.

96. Members of Judge Estes' court staff were present when Judge Estes walked with the Plaintiff to the front hallway.

97.   The Plaintiff felt degraded and humiliated.

98.   When they reached the front hallway, Judge Estes informed the Plaintiff he would see her that Wednesday for drug court.

99.   On Wednesday, prior to the drug court session, Judge Estes led a team meeting that Plaintiff, as part of her job, was required to attend.

100.  The Plaintiff felt uncomfortable, ashamed and degraded during that meeting and during the court session that followed.

101.  The Plaintiff continued working as a specialty court clinician for the drug court.

102.  Judge Estes began calling the Plaintiff in order to arrange private meetings in his Belchertown District Court chambers.

103.  Typically, he called her after he left court in the afternoon.

104.  In addition to setting up meetings in his chambers in Belchertown District Court, he often discussed work, his children, and his weekend plans.

105.  They also text messaged each other regularly.

106.  Two or three times a month, the Plaintiff left Pittsfield District Court to attend these meetings in Belchertown.  Altogether, the Plaintiff met with Judge Estes more than ten times in his chambers.

107.  Between November and February, she only met with Judge Estes in his Belchertown chambers during normal court hours.

108.  Often when she arrived in Belchertown, Judge Estes would still be presiding over a session.

109.  Usually the Plaintiff waited in the courtroom until the conclusion of the session, whereupon Judge Estes' court officers would lead the Plaintiff past the bench to his chambers.

110.    There were other times when the Plaintiff waited for Judge Estes in the area
        immediately adjacent to his office, where his court staff worked.

111.    Each time the Plaintiff met with Judge Estes in his chambers, Judge Estes would
        conduct himself in the same way: he would speak to her sympathetically about
        work and about the difficulties she was experiencing with probation, then he
        would abruptly get up, lock the door, draw the blinds, pull down his pants, and
        stand over her while she performed fellatio on him.

112.    The Plaintiff noticed that the probation officers were always kinder towards her
        on the drug court session days immediately following a visit to the Judge's
        chambers.

113.    In December 2016, after she had met with Judge Estes in his chambers more than
        once, the Plaintiff called Judge Estes.

114.    She told him she was not feeling good about herself and that what was happening
        was affecting her personally.

115.    Judge Estes asked her if he could come over to her residence to discuss the
        situation, and the Plaintiff agreed.

116.    When Judge Estes arrived at the Plaintiff's home, he immediately began making
        sexual advances.

117.    This time Judge Estes was even more sexually aggressive towards her than he had
        been in the past

118.    Judge Estes grabbed her breast so hard that it caused a bruise.

119.    Judge Estes grabbed her vagina over her clothes.

120.    Judge Estes made the Plaintiff perform oral sex on him.

121. The next time Pittsfield drug court was scheduled, the Plaintiff noticed that Judge Estes was treating her differently than he did before.

122. Judge Estes did not look at the Plaintiff when she spoke, was dismissive about her clinical treatment ideas, and cut her off and directed questions towards another member of the team.

123. The Plaintiff was paranoid that other members of the drug court team know what was happening, and she felt ashamed about how the Judge treated her in front of the drug court team.

124. The Plaintiff noticed a pattern of conduct at work—whenever she expressed to Judge Estes that she wanted to stop their sexual relationship, he acted coldly towards her at drug court staff meetings and during the drug court sessions.

125. The Plaintiff also noticed that when she did not challenge Judge Estes and obliged his sexual requests, he validated her opinions in team meetings, and defended her treatment decisions to other team members.

126. On or about December 2016, Judge Estes told the Plaintiff he would appreciate it if the Plaintiff sent him "sexy text messages."

127. On or about January 2017, the Plaintiff telephoned Judge Estes again tell him she was not comfortable with what was happening between them.  She conveyed to him she was worried about his relationship with his wife and children. She told him that she believed it was time to stop. She emphasized again that she was not feeling good about herself and that what was happening was affecting her personally.

128. Judge Estes again asked if he could come to her residence to discuss the matter.

129.   When he arrived he again immediately began making sexual advances towards her and told her that the reason she was feeling this way was because he had never "returned the favor." He persuaded her to be able to "return the favor".

130.   The Plaintiff felt uncomfortable and ashamed.

131.   Judge Estes performed oral sex on the Plaintiff, and the Plaintiff made him stop.

132.   One Thursday in January, 2017, after the drug court session concluded, the Plaintiff met with Judge Estes alone in the chambers he shared with another judge in Pittsfield District Court.

133.   During that conversation, Judge Estes described one of the female criminal defendants who had appeared before him that day as being "really cute."

134.   This comment made the Plaintiff feel uncomfortable.

135.   In February 2016, Judge Estes began teaching a class in Belchertown District Court on Tuesday evenings.

136.   Beginning in February, Judge Estes would invite the Plaintiff to Belchertown District Court after court hours, but before his class.

137.   These visits to his chambers in Belchertown were the same—they would discuss work, he would close the door, draw the shades, and then make her perform fellatio on him.

138.   They continued to text message and speak on the phone regularly.

139.   On or about Friday, March 17, 2017, the Plaintiff received a phone call from Director Reiss.

140.   Director Reiss informed the Plaintiff that she was not allowed to return to drug court and that she was being placed on administrative leave effective immediately.   She further stated that there had been a complaint filed against the

Plaintiff, but would not elaborate on who had filed the complaint or what the complaint said.

141. Director Reiss arranged to meet with the Plaintiff the following Tuesday.

142. The Plaintiff texted Judge Estes immediately, who denied knowing anything about her administrative leave.

143. On Tuesday, March 21, the Plaintiff met with Director Reiss and Human Resources Director Claudia Muradian-Brubach at BHN.

144. Director Reiss and Director Muradian-Brubach informed the Plaintiff that she was being removed from drug court, that she would not be able to return to drug court, and that there had been multiple complaints lodged against her.

145. Despite the Plaintiff's repeated urging, neither Director Reiss nor Director Muradian-Brubach described any of these complaints.

146. They informed the Plaintiff that the reason for her removal from drug court was based on her treatment decision to keep a criminal defendant jailed until a treatment bed was made available to him, rather than releasing the defendant back into the community.

147. Judge Estes is the final decision maker of drug court treatment plans, and is the only person in the drug court who can make a custody determination.

148. After she was removed from drug court, the Plaintiff was assigned to an out-patient social work position, which paid less money.

149. The Plaintiff's personnel file contains no written complaints, written warnings, or written disciplinary action taken against Plaintiff during her time in drug court.

150. According to Judge Estes' Position Statement, on or about March 16, 2017, a DMH employee contacted Judge Estes for a general impression of the Plaintiff's

work performance, and Judge Estes replied that the Plaintiff was a "top-notch clinician."

151. Yet, on March 31, 2017, two weeks after this alleged comment to DMH, Mr. DiSessa drafted an email to Director Reiss memorializing a conversation Mr. DiSessa had with Judge Estes on March 30, 2017 where Judge Estes criticized the Plaintiff's work performance.

152. According to Mr. DiSessa, Judge Estes stated that since the Plaintiff left, the "tension [in the courtroom] is gone," and the atmosphere has "completely changed."

153. Judge Estes further stated that he had received "many complaints" about the Plaintiff, including complaints from the clerk's office and correctional officers.

154. Judge Estes stated he thought the Plaintiff had "no people skills, which was hard for someone who was a clinician."

155. On March 31, 2017, Director Reiss forwarded Mr. DiSessa's email to two BHN Human Resource employees, including Director Muradian-Brubach with a note that David DiSessa had received "some disturbing information about the [Plaintiff]" and "that [they] should hold onto [it] in her HR file."

156. Judge Estes continued to receive sexual favors from the Plaintiff in his chambers in Belchertown after she was removed from drug court.

157. The Plaintiff began applying to other social work positions, and used Judge Estes as a reference.

158. On or about April 18, 2017, the Plaintiff quit BHN, and moved to Georgia.

159. Judge Estes continued to receive sexual favors from the Plaintiff in his chambers in Belchertown after she left BHN.

160.     Judge Estes threatened Plaintiff that things would be worse for her if someone
         found out about their sexual relationship.

161.     On or about July 3, 2017, Judge Estes again invited Plaintiff into his chambers.

162.     On July 3, 2017, the Plaintiff went to the Judge's chambers in Belchertown.

163.     Judge Estes closed and locked the door.

164.     Judge Estes took off his judicial robe.

165.     This time there was no conversation: Judge Estes closed the blinds, and
         immediately came over to where the Plaintiff was sitting, pulled his pants down
         and made the Plaintiff to perform oral sex on him.

166.     The Plaintiff did perform fellatio on Judge Estes.

167.     On or around August 4, 2017, Plaintiff filed a Charge of Discrimination with the
         Massachusetts Commission Against Discrimination based on Judge Estes'
         conduct towards her during and after she worked for him in the drug court.

168.     On or around August 2017, Judge Estes was removed from his position as Chief
         Justice of Belchertown District Court and was reassigned to "administrative
         duties" in Holyoke where he is no longer presiding over cases.

169.     As a result of Judge Estes' conduct, the Plaintiff was subject to a severe and
         pervasive, sexually hostile work environment.

170.     As a result of Judge Estes' conduct, the Plaintiff has suffered severe emotional
         distress as well as other damages.

## COUNT I

*Sex Discrimination/Hostile Work Environment Under Title VII*
*against Judge Thomas Estes*

171. Plaintiff restates and realleges the allegations contained in Paragraphs 1-170 as if each were stated herein in their entirety and said allegations are incorporated by reference as if fully set forth herein.

172. Plaintiff was a female employee at BHN contracted to work as a social worker for the Trial Court under the supervision of Judge Estes.

173. Judge Estes discriminated against the Plaintiff based on her sex.

174. Judge Estes' words and actions created an abusive workplace permeated with discriminatory intimidation and sexually offensive behavior sufficiently severe or pervasive to alter the compensation, terms, conditions or privileges of the Plaintiff's employment.

WHEREFORE, Plaintiff demands judgment and damages, including compensatory and punitive damages, and costs and attorneys' fees, to the fullest extent permissible by law.

## COUNT II

*Sex Discrimination/Hostile Work Environment Under Title VII*
*against BHN*

175. Plaintiff restates and realleges the allegations contained in Paragraphs 1-174 as if each were stated herein in their entirety and said allegations are incorporated by reference as if fully set forth herein.

176. Plaintiff was a female employee at BHN contracted to work as a social worker for the Trial Court under the supervision of Judge Estes.

177. Judge Estes discriminated against the Plaintiff based on her sex.

178. Judge Estes' words and actions created an abusive workplace permeated with discriminatory intimidation and sexually offensive behavior sufficiently severe or pervasive to alter the compensation, terms, conditions or privileges of the Plaintiff's employment.

179. The Trial Court and BHN are strictly liable for the conduct of their supervisors.

180. The Trial Court and BHN knew or should have known that Judge Estes was creating a hostile work environment for the Plaintiff, and failed to investigate, or take any action to correct, the hostile work environment.

WHEREFORE, Plaintiff demands judgment and damages, including compensatory and punitive damages, and costs and attorneys' fees, to the fullest extent permissible by law.

## COUNT III

*Sex Discrimination/Hostile Work Environment Under M.G.L. C. 151B*
*against Judge Thomas Estes*

181. Plaintiff restates and realleges the allegations contained in Paragraphs 1-180 as if each were stated herein in their entirety and said allegations are incorporated by reference as if fully set forth herein.

182. Plaintiff was a female employee at BHN contracted to work at a social worker for the Trial Court under the supervision of Judge Estes.

183. Judge Estes discriminated against the Plaintiff based on her sex.

184. Judge Estes, as Plaintiff's supervisor, created an intimidating, hostile, humiliating or sexually offensive work environment such that said conduct unreasonably interfered with Plaintiff's work performance.

WHEREFORE, Plaintiff demands judgment and damages, including compensatory and punitive damages, and costs and attorneys' fees, to the fullest extent permissible by law.

## COUNT IV

*Sex Discrimination/Hostile Work Environment Under M.G.L. C. 151B*
*against BHN*

185. Plaintiff restates and realleges the allegations contained in Paragraphs 1-184 as if each were stated herein in their entirety and said allegations are incorporated by reference as if fully set forth herein.

186. Plaintiff was a female employee for BHN contracted to work for the Trial Court under the supervision of Judge Estes as a social worker.

187. Judge Estes discriminated against the Plaintiff based on her sex.

188. Judge Estes, as Plaintiff's supervisor, created an intimidating, hostile, humiliating or sexually offensive work environment such that said conduct unreasonably interfered with Plaintiff's work performance.

189. The Trial Court and BHN are strictly liable for the conduct of their supervisors.

190. The Trial Court and BHN knew or should have known that Judge Estes was creating a hostile work environment for the Plaintiff, and failed to investigate, or take any action to correct, the hostile work environment.

WHEREFORE, Plaintiff demands judgment and damages, including compensatory and punitive damages, and costs and attorneys' fees, to the fullest extent permissible by law.

## JURY DEMAND

The Plaintiff demands a trial by jury.

> Respectfully submitted,
> Plaintiff, Tammy Cagle,
> By her attorneys,
>
> /s/Leonard H. Kesten
> Leonard H. Kesten, BBO# 542042
> Erica L. Brody, BBO# 681572
> Brody, Hardoon, Perkins & Kesten, LLP
> 699 Boylston Street
> Boston, MA 02116
> 617-880-7100
> lkesten@bhpklaw.com
> ebrody@bhpklaw.com

Dated: January 22, 2018