LEAVE TO FILE GRANTED ON OCTOBER 2, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.  3:18-cv-10123-KAR

TAMMY CAGLE,

        Plaintiff

v.

THOMAS ESTES AND BEHAVORIAL
HEALTH NETWORK INC.,

        Defendants

**PLAINTIFF TAMMY CAGLE'S OPPOSITION TO DEFENDANTS JUDGE ESTES
AND BEHAVORIAL HEALTH NETWORK, INC.'s
MOTIONS FOR SUMMARY JUDGMENT, LEAVE TO FILE GRANTED ON
OCTOBER 2, 2020**

## I.    <u>INTRODUCTION</u>

Between the summer of 2016 and March 17, 2017, Former Massachusetts Trial Court Judge Defendant Thomas Estes ("Judge Estes") groomed, sexually harassed, and had sexual relations with a member of his drug court team, the Plaintiff, Tammy Cagle.[1] This case is about the sexually hostile work environment that his misconduct created, and how that toxic work culture led to both Ms. Cagle's removal from drug court and to her demotion to a position where she suffered a loss of income. Judge Estes now moves for summary judgment, claiming that the Trial Court was not Ms. Cagle's employer, that he was not Ms. Cagle's supervisor, and, that she failed to exhaust her administrative remedies before the Massachusetts Commission Against

---

[1] Judge Estes' misconduct resulted in the Supreme Judicial Court of Massachusetts ordering that that his judgeship be suspended indefinitely. He ultimately resigned from the bench on May 25, 2018.

Discrimination ("MCAD"). Defendant Behavioral Health Network ("BHN") also moves for summary judgment on the basis that it did not know nor should have known of Judge Estes' sexually harassing behavior. The Plaintiff opposes summary judgment based on the following facts that have been adduced during discovery:

(1) Judge Estes is unquestionably Ms. Cagle's supervisor, he participated in her hiring; he set the terms and conditions of her employment, including where she worked and when she worked; he approved her work product; and he participated in her removal. Although he was not named as a specific respondent in Ms. Cagle's Complaint, he unquestionably and fully participated in the MCAD process—he even *signed the position statement*.

(2) BHN knew or should have known that Ms. Cagle was being sexually harassed by Judge Estes because her *de facto* supervisor, BHN employee and specialty court clinician Susan Mailler knew that Ms. Cagle was engaged in an inappropriate relationship with Judge Estes; that it was affecting her ability to perform her job; and that the relationship caused Ms. Cagle's removal from drug court.

In addition, Ms. Cagle's indirect supervisor, BHN's Forensic Director of Specialty Courts Dr. Juliana Reiss ("Dr Reiss") also knew or should have known of the sexual relationship; when she learned that the Probation Department wanted Ms. Cagle removed from drug court, Dr. Reiss obliged on the pretext of a complaint she knew to be baseless. Dr. Reiss never conducted an investigation before she removed Ms. Cagle. She never disciplined Ms. Cagle. Instead, she immediately began preparing to defend against an MCAD charge. In the weeks and months that followed, Dr. Reiss destroyed relevant and likely inculpatory records. After Dr. Reiss learned about the MCAD charge (five months after Ms. Cagle had left BHN), Dr. Reiss created and backdated misleading documents related to Ms. Cagle's removal in order to (a) create the

impression that she had conducted an investigation prior to or contemporaneous with her removal; and (b) to provide a false narrative that Ms. Cagle struggled with performance issues throughout her employment when, in reality, Ms. Cagle *consistently* received praise for her work as a drug court clinician from supervisors, Judge Estes, community stakeholders, and even from Dr. Reiss herself.

BHN also should have known about Judge Estes' sexually harassing conduct because the other members of the drug court team, including the probation department officers and the assigned drug court clerk, suspected that Judge Estes and Ms. Cagle were engaged in a sexual relationship. Assuming that Dr. Reiss and Ms. Cagle's immediate supervisor David Disessa were not already aware of the sexual relationship, if they had bothered to supervise Ms. Cagle in drug court as they were supposed to, they would have become aware that Judge Estes had created a sexually hostile work environment for her.

In short, in the light most favorable to the Plaintiff, Judge Estes was Ms. Cagle's supervisor, and BHN knew or should have known of the sexual harassment, and this Court should deny the Defendants' motion.

## II.    **FACTS**[2]

A. *The Pittsfield Probation Department did not want a drug court to be established there.*

Pittsfield Probation Chief Matt Stracuzzi ("Probation Officer Stracuzzi"), Assistant Chief John Lander (Probation Officer Lander"), and Probation Officer Mark Carnevale ("Probation Officer Carnevale"), (collectively "the Probation Department" or "Probation"), were not involved

---

[2] The Defendant hereby incorporates the facts contained in the following document into this Memorandum: *Defendant's Rule 56.1 Statement Of Undisputed Material Facts And Exhibits In Support Of Their Motion For Summary Judgment* and the *Plaintiff's Additional Statement of Facts* (hereinafter "PSAF"). The Plaintiff refers to Defendant Estes Statement of Facts as "Estes SUF" and to BHN's Statement of Facts as "BHN's SUF")

in the decision to create a drug court at the Pittsfield District Court; the Probation Department did not want a drug court, did not understand drug court, and did not want to give up their autonomy over probationers. (PSAF ¶¶ 10, 21-34). The Probation Department believed that licensed substance abuse treatment facilities were no better at providing substance abuse treatment than the unlicensed Community Correction facility ("Community Corrections"), where criminal defendants ordinarily served their probationary sentences. (PSAF ¶¶ 24-31). The Probation Department relied daily upon Community Corrections to enforce punitive probationary sentences in criminal court. (PSAF ¶¶ 24-25, 30-31).

B. *Judge Estes was Ms. Cagle's supervisor.*

When Judge Estes agreed to start a drug court in Pittsfield, he had to create the entire organization, including hiring the drug court clinician. (PSAF ¶¶ 11-14, 40-49). He had the power to remove any drug court team member (but for criminal defense attorneys representing indigent clients). (PSAF ¶¶ 8, 12, 14, 313). He could also dissolve the drug court. (PSAF ¶ 14). He set the hours of drug court. (PSAF ¶ 13). He dictated where the drug court team met and when their meetings started. (PSAF ¶ 13). He reviewed their performances. (PSAF ¶¶ 101-105, 109, 274).

Judge Estes participated in Ms. Cagle's hiring. The Trial Court has an interdepartmental service agreement the Department of Mental Health ("DMH") whereby DMH acts as a service provider for the Commonwealth's specialty drug courts. (Estes SUF at ¶ 4). DMH contracts with BHN, and BHN, with the Trial Court's approval, provides clinicians to staff the court clinic programs. (BHN SUF at ¶ 3, PSAF ¶ 40).

Ms. Cagle applied to BHN to be the Pittsfield drug court coordinator. (PSAF ¶ 37). In June 2016, BHN's Forensic Services Director Dr. Welli Yeh ("Dr. Yeh") (later replaced by Dr.

Reiss), and the BHN court clinician assigned to the Orange, Springfield, and Greenfield specialty courts, Susan Mailler, interviewed Ms. Cagle. (PSAF ¶ 39).

As part of the specialty court "protocol," the presiding justice of the specialty court approved the hiring of all drug court clinicians. (PSAF ¶ 40). Dr. Yeh recommended Ms. Cagle as a candidate to Judge Estes, and, together, in late June 2016, Judge Estes and Dr. Yeh jointly interviewed Ms. Cagle. (PSAF ¶¶ 41-45). During the interview, they both asked questions about Ms. Cagle's qualifications, and why she wanted to do the job. (PSAF ¶45).

On June 29, 2016, Dr. Yeh wrote an email to Judge Estes, which read: "So what did you think of Tammy? *Does she have your seal of approval* [emphasis added]?" (PSAF ¶ 46). In response, that same day, Judge Estes replied, "I liked her a lot. *Let's hire her* [emphasis added]." (PSAF ¶ 47). Dr. Yeh wrote, back, "Excellent! I'll move forward with the hiring process." (PSAF ¶ 48). Following this email exchange, Dr. Yeh told the DMH Area Forensic Director John Barber ("DMH Director Barber"), the person who oversaw DMH's contract with BHN, that Judge Estes "approved" of Ms. Cagle's hiring. (BHN SUF ¶ 7; PSAF ¶ 50).

On July 1, 2016, Judge Estes emailed the Trial Court's Director of Specialty Courts, Judge Mary Hogan Sullivan. Judge Estes wrote: "Dr. Yeh contacted me about a part-time clinician….Her name is Tammy Cagle. I met with Dr. Yeh and Ms. Cagle earlier this week and I liked her very much…*Dr. Yeh said we could hire her contingent on passing as long as I approved, which I do* [emphasis added]." (PSAF ¶ 49).

In addition to hiring Ms. Cagle, Judge Estes supervised her in court throughout her employment. (PSAF ¶¶ 89-110).  Judge Estes directed Ms. Cagle to meet with him privately in chambers for about five hours of her twenty hours per week. (PSAF ¶ 94).  During these private meetings he often reviewed her performance with her and gave her feedback. (PSAF ¶¶ 101-

106). He approved her work product, such as the drug court manual, a manual that he alone could approve. (PSAF ¶ 105). He mediated conflicts between the drug court team members. (PSAF ¶ 104). He directed her to follow "best practices"—a directive at odds with Dr. Reiss' instruction to put getting along with the Probation Department above all else. (PSAF ¶¶ 223, 331). He projected his belief to others that Ms. Cagle worked for directly for him, and referred to Ms. Cagle as "my case worker." (PSAF ¶ 107).

Judge Estes also participated in the removal of Ms. Cagle. (PSAF ¶¶ 272-275, 307-313, 321). When made aware that DMH Director Barber was investigating her conduct in drug court, and, later, considering removing her, Estes maligned Ms. Cagle, saying that she could not get along well with others, and that "she has a tendency to piss off a lot of people" (PSAF ¶ 274, 311). In the days following her removal, Estes bad-mouthed Ms. Cagle to her immediate supervisor, David Disessa, voicing approval of her removal. (PSAF ¶ 369). Estes told Disessa, now that Ms. Cagle had been removed, "the tension is gone" and that Estes had received "many complaints about her" from the clerk's office and from "correctional officers." (PSAF ¶ 369). Estes also told Disessa that Ms. Cagle had "no people skills" and that the drug court team was feeling "very positively" about removing Ms. Cagle. (PSAF ¶ 369).

In the days and weeks that followed her removal Ms. Cagle relied on Judge Estes assurances that he would speak to Dr. Reiss on her behalf to save her job or to recommend her for another, similar position. (PSAF ¶¶ 316-321). Estes subjectively believed Ms. Cagle was a "top notch" clinician, and that the alleged basis for her removal did not warrant her removal. (PSAF ¶¶ 274, 312). While he led Ms. Cagle to believe he supported her, he instead gaslighted her, and did not intervene on her behalf or advocate for her at all. (PSAF ¶¶ 316-321). As a result, Ms. Cagle was reassigned to a different position with less pay. (PSAF ¶ 358).

Dr. Reiss replaced Ms. Cagle, who had never been disciplined, with Disessa, who had. (PSAF ¶ 367). Disessa engaged in the same general conduct that had previously sparked Probation's ire (advocating for "best practices," conducting evaluations at the women's jail), but Probation never complained about him. (PSAF ¶ ¶372-377). Notably, Disessa also recommended that a drug court participant stay incarcerated until he could be assured a long-term treatment bed rather than be turned out on the street, and even then *Probation never complained about him*, and Disessa *was never removed* from his position. (PSAF ¶¶ 376-377 ). In fact, Probation reported that Disessa was actually "doing well." (PSAF ¶ 372).

B. *Ms. Cagle received no supervision from her direct supervisor at BHN, David Disessa, or from his supervisor, Dr. Reiss. As a result, she sought counsel from Mailler for advice relating to drug court.*

Throughout her employment, BHN did not provide Ms. Cagle with appropriate supervision. (PSAF ¶¶ 54-88).

For the first month and a half of her employment, Ms. Cagle had no immediate supervisor and no supervision from anyone at BHN. (PSAF ¶ 55-56). BHN hired David Disessa on August 1, 2016, and he became Ms. Cagle's direct supervisor. (PSAF ¶ 56). Disessa had no experience creating a drug court, working in a drug court, or supervising drug court clinicians. (PSAF ¶ 57). Soon after he started working for BHN, Disessa went out on medical leave.  (PSAF ¶¶ 59, 82). Consequently, Ms. Cagle did not meet with her supervisor at all until two months after she began her employment with BHN. (PSAF ¶ 59).

In September 2016, when Dr. Reiss was promoted to Forensic Director of Specialty Courts, she became Disessa's supervisor and Ms. Cagle's indirect supervisor. (PSAF ¶ 61). Like Disessa, Dr. Reiss had no experience working in a drug court or supervising drug court clinicians. (PSAF

¶ 62). Like Disessa, Dr. Reiss also did not meet with Ms. Cagle during the first two months of her employment. (PSAF ¶ 128).

Although Ms. Cagle was employed by BHN, her office was located in the Pittsfield District Court, where she worked every day. (PSAF ¶ 54). Disessa worked out of Springfield and "very infrequently" went to Pittsfield. (PSAF ¶ 58). Indeed, Disessa only attended three or four staff meetings during Ms. Cagle's entire employment. (PSAF ¶ 65). Dr. Reiss was also an absent supervisor. While Dr. Reiss maintained an office in Pittsfield, she was only there a few times during Ms. Cagle's tenure. (PSAF ¶ 65). Dr. Reiss did not attend more than two of the Pittsfield drug court staff meetings throughout Ms. Cagle's employment. (PSAF ¶ 66).

Meanwhile, Judge Estes, was on vacation for most July, leaving Ms. Cagle alone in Pittsfield and without *any* supervision at all. (PSAF ¶ 91).

During these first two months at BHN, Ms. Cagle began experiencing difficulties with the Pittsfield Probation Department. (PSAF ¶ ¶ 111-152). As mentioned, the Pittsfield Probation Department did not want a drug court, and did not understand the purpose of drug court. (PSAF ¶¶ 10, 32). The Probation Department disagreed with the "best practices" model advocated by Ms. Cagle and substance abuse experts (and, when he learned about them, by Judge Estes), which recommended that substance abusers should receive treatment at licensed treatment facilities. (PSAF ¶¶ ¶ 3, 21-34).  This position was at incompatible with the Probation Department's view that drug court participants should be "treated" at the unlicensed Office Community Corrections. (PSAF ¶¶ 24-25, 29, 30). Licensed treatment providers in the community observed Pittsfield Probation was "very powerful within the community" and it was "difficult to run up against 'the Probation wall.'"  (PSAF ¶ 154).

Early on, the Pittsfield Probation Department began excluding Ms. Cagle from their drug court planning meetings. (PSAF ¶¶ 112, 122, 130, 141-144). Since she had no supervisor, Ms. Cagle began turning to Clinician Susan Mailler for help navigating her conflicts with the Probation Department. (PSAF ¶¶ 82-88, 120-128,). Unlike Disessa or Dr. Reiss, Mailler had experience creating and working in a drug court. (PSAF ¶¶ 39, 81, 82). Mailler understood Ms. Cagle's issues with Probation because Mailler, herself, experienced the same sort of issues when she had helped create a drug court the year before. (PSAF ¶ 83).

Mailler worked out of Orange, Springfield, and Greenfield courts; however, on one occasion, she came to Pittsfield to observe Ms. Cagle at a drug court staff meeting. (PSAF ¶¶ 81, 82). Ms. Cagle consulted with Mailler weekly and met with her frequently outside of Pittsfield District Court. (PSAF ¶¶ 81-82). Mailler reviewed Ms. Cagle's work and reports, and also assisted her with drug court planning. (PSAF ¶ 82).

Beginning in September 2016, Mailler sought Dr. Reiss' approval to supervise Ms. Cagle. (PSAF ¶ 83). Dr. Reiss approved. (PSAF ¶ 87).  Dr. Reiss testified that Mailler was Ms. Cagle's "informal supervisor." (PSAF ¶ 83). After Ms. Cagle was removed from drug court, Mailler recommended Ms. Cagle for a clinician position in Georgia; the form she filled out stated that Mailler was Ms. Cagle's supervisor. (PSAF ¶¶ 88, 172).

Even though Dr. Reiss had no experience working in drug court, "there was something there that made [her] feel bad for [Ms. Cagle] because of all the struggles with probation….."(PSAF ¶¶ 131, 136, 137, 139, 247). In Dr. Reiss' opinion, the Probation Department's relationship with and advocacy for using the unlicensed Office of Community Corrections as a substitute for a licensed treatment facility was "antithetical" to the mission of drug court. (PSAF ¶ 139). Nonetheless, Dr. Reiss felt that Ms. Cagle should prioritize

building a relationship with Probation, even if that meant it was at the expense of following "best practices." (PSAF ¶¶ 223, 330).

DMH Director Barber also believed that Community Corrections was "antithetical" to the mission of drug court. (PSAF ¶¶ 138-39).

Disessa returned from medical leave in the middle of September 2016. (PSAF ¶ 59). One of his supervisory duties was to observe Ms. Cagle in drug court every week. (PSAF ¶¶ 63-64). Instead, Disessa began meeting with Ms. Cagle at a Friendly's restaurant in Westfield once a week or every other week. (PSAF ¶ 60). During these meetings at Friendly's, Ms. Cagle told Disessa that she was meeting with Judge Estes alone in his chambers in Belchertown. (PSAF ¶ 98). Disessa testified that he took notes during these meetings, but that after Ms. Cagle was removed from drug court, he destroyed these notes. (PSAF ¶ 329).

By December 2016, Disessa's job performance had deteriorated so much that Dr. Reiss put him on a corrective action plan. (PSAF ¶ 72).  Disessa was out of the office for "most of December" in 2016. (PSAF ¶ 73).  In January, both Dr. Reiss and DMH Director Barber were concerned about Disessa's supervision of BHN employees, particularly Ms. Cagle. Dr. Reiss noted, "Make sure Dave [Disessa] is supervising/training…Tammy [Cagle]." (PSAF ¶ 74). On January 26, 2017, Dr. Reiss met with DMH Director Barber, and noted that Barber was worried about Disessa's "minimal contact with [Barber] re[garding] drug courts. (PSAF ¶ 75). Dr. Reiss wrote, "*IS HE SUPERVISING EVERYBODY [emphasis in the original]?" and "What does he talk about in supervision[?] (PSAF ¶ 77).

Dr. Reiss stated that Ms. Cagle was in Pittsfield alone and did not receive the guidance she needed and that the guidance was "off the mark." (PSAF ¶ 79).

C. *Despite BHN's lack of supervision and Probation's bullying, Ms. Cagle received very positive reviews from Disessa, Dr. Reiss, Mailler, Judge Estes, and drug court stakeholders throughout her employment.*

Even though the Probation Department antagonized her, Ms. Cagle received very positive feedback about her job performance throughout her employment from her supervisors, including from Judge Estes, from drug court stakeholders, and even, at one point, from Probation Officer Stracuzzi. (PSAF ¶¶ 156-173).

On September 14, 2016, Dr. Reiss wrote Ms. Cagle an email, which stated:

> I just wanted to let you know that I spoke briefly with [Probation Officer] Matt Stracuzzi in Pittsfield the other day and he had very positive things to say about the drug court and you. He said that he and probation were really happy to have to [sic] drug court and that they thought you were doing great. He liked that you were so enthusiastic and hard-working. Just thought I'd let you know! (PSAF ¶ 157).

Judge Estes consistently told Ms. Cagle that she was doing a "great job." (PSAF ¶ 106). He described her to DMH Director Barber as a "top notch clinician." (PSAF ¶ 274). Estes testified that Ms. Cagle, "seemed to know, like, the best practices. She seemed to know what good treatment was." (PSAF ¶ 171). Ms. Cagle wrote a drug court manual, submitted it to Judge Estes, and he "approved it"; it became the drug court manual used by the Pittsfield drug court. (PSAF ¶ 106). Judge Estes told Disessa "once or twice that he thought [Ms. Cagle] was doing a good job." (PSAF ¶ 109).

In December 2016, Dr. Reiss recommended Ms. Cagle for three different employment positions, two of which were jobs where Ms. Cagle would be treating extremely vulnerable populations of people with substance abuse disorders. (PSAF ¶¶ 162-166). In her recommendations of Ms. Cagle, Dr. Reiss wrote that Ms. Cagle,

> has *done a great job* getting the [drug court] program off the ground *and running smoothly*. In her position *she works collaboratively with probation, the judge, treatment programs, and clinicians* in the Berkshires to get drug court participants

into the types of treatment they require to meet the conditions of their probation…. *She is very hard-working, smart, devoted to her clients, and passionate about her work* [emphasis added]. (PSAF ¶ 164).

In another recommendation she described Ms. Cagle as a *"real go-getter"* who was "*very capable of working in a new start-up program and traveling between multiple sites* (she does quite a bit of traveling for her job with us). *She has a great handle on how to connect clients to community services, such as mental health and substance abuse treatment programs* [emphasis added]. (PSAF ¶ 166).

During the one and only time that Dr. Reiss actually observed Ms. Cagle in drug court in the winter of 2017, Dr. Reiss told Ms. Cagle that she was doing a "good job." (PSAF ¶ 161). During the one and only time that Mailler observed Ms. Cagle, she told Ms. Cagle she was doing a "great job." (PSAF ¶ 82, 160, 164).

On February 16, 2017, Mailler wrote an email to Dr. Reiss praising Ms. Cagle's work in drug court. (PSAF ¶ 164). She explained that the drug court coordinator and the specialty court clinician are typically held by two different employees. She wrote "*In Pittsfield, Tammy has taken on both those roles*, in the absence of a Coordinator, w*hich is pretty remarkable given that they are starting from scratch and absent enthusiasm except for Tammy's*. [emphasis added]." (PSAF ¶ 168). Dr. Reiss replied, "Thank you Susan, very helpful!" (PSAF ¶ 168).

According to Disessa's performance review of Ms. Cagle, dated March 16, 2017 (*the day before Ms. Cagle was removed*): "[She] has been a *tireless employee* for the drug court in Pittsfield. She has been *instrumental in the starting and functioning of a new drug court*. Tammy has been making connections with the providers in the Pittsfield area to help facilitate treatment for the participants in the program [emphasis added]." (PSAF ¶¶ 169-170). Disessa also wrote that Ms. Cagle "consistently meets standards" in the area of demonstrating professional skills,

demonstrating competency in the utilization of the agency's technological systems, and that she demonstrated the ability to provide community-based service. (PSAF ¶ 170).

After Dr. Reiss removed Ms. Cagle from drug court on March 17, 2017, Dr. Reiss spoke with the BHN supervisor of the Sloan Clinic, and recommended that the Sloan Clinic increase Ms. Cagle's number of working hours from 20 to 40. (PSAF ¶ 167). Dr. Reiss acknowledged that in this new role, Ms. Cagle would be working with mental health patients in addition to patients struggling with substance abuse issues—obviously two very vulnerable populations. (PSAF ¶ 167).

Following her removal from drug court, Ms. Cagle began applying for other jobs. In April, 2017, she asked Mailler for a recommendation. Mailler's recommendation gave Ms. Cagle an "Excellent" review in the categories of dependability, energy level, self-directed, team player, problem solving, handles crisis, commitment level, flexibility, attention to detail, and communication skills. She gave her a "good" review in writing skills. (PSAF ¶ 172-173). In the "Comments" section of her recommendation, Mailler wrote that Ms. Cagle was "Very passionate about working in S[ubstance] A[buse] field. Great at research [and] policies[.] *Very good understanding the 'Big Picture[.]' Great work ethic* [emphasis added]." (PSAF ¶ 173).

D. *Judge Estes recognized that Ms. Cagle was a particularly vulnerable employee. He began grooming her and then engaged in a sexual relationship with her.*

As a child, Ms. Cagle was exposed to significant trauma. (PSAF ¶ 53). She was sexually abused from the time she was three to the time she was five, her mother was extremely neglectful, and her mother's boyfriend physically abused her. (PSAF ¶ 53). When she was older, she married a man who routinely physically and sexually abused her. PSAF ¶ 53). As a result, she struggled with alcohol dependence and depression. PSAF ¶ 53).

Judge Estes sensed that Ms. Cagle was a particularly vulnerable employee, and knew that she was having issues with the Probation Department. (PSAF ¶¶ 191-192, 195, 198, 199-202, 203, 204, 202). Judge Estes sought to exploit Ms. Cagle's vulnerabilities by showing favoritism towards her; he invited her to leave her office in Pittsfield and join him in Belchertown for one on one meetings to discuss the planning and implementation of drug court—discussions in which the Probation should have been involved. (PSAF ¶¶ 93-108, 112, 139).  Probation was aware that Ms. Cagle was meeting off-site privately with Judge Estes. (PSAF ¶ 100). As a result, the tensions between Ms. Cagle and Probation increased. (PSAF ¶¶ 111-155). Nonetheless, until November 16, 2016, the drug court Probation Officers continued to turn to Judge Estes for help mediating their problems with Ms. Cagle. (PSAF ¶¶ 104, 113, 202, 215, 216).

It was in against this backdrop that Ms. Cagle attended the drug court conference in Marlborough Massachusetts on November 16-17, 2016. (PSAF ¶ 174). Among those in attendance were Judge Estes, and Probation Officers Lander, Stracuzzi and Carnevale, (collectively, with Ms. Cagle, "the drug court team"). (PSAF ¶ 174).

On the evening of the first day of the conference, the drug court team attended a cocktail hour, where they consumed alcoholic beverages. (PSAF ¶ 176). Next, they went to the hotel restaurant to eat dinner, where they continued to consume alcoholic beverages. (PSAF ¶ 177). After dinner ended, everyone left the table except for Judge Estes and Ms. Cagle. (PSAF ¶ 178). Judge Estes continued to consume alcohol, and appeared intoxicated. (PSAF ¶¶179, 182). He began rubbing Ms. Cagle's arm and told her she looked "adorable" and "attractive." (PSAF ¶ 180). The two left the table and joined the rest of the team at the hotel bar. (PSAF ¶ 182). Estes testified that he drank alcohol for two or three hours. (PSAF ¶ 182).

At the end of the night, Ms. Cagle was playing darts with Probation Officer Carnevale. (PSAF ¶ 183). Judge Estes admits he was "watching" them play. (PSAF ¶ 183). When the game ended, Ms. Cagle asked Judge Estes to walk her to her room. (PSAF ¶ 183). Probation Officer Marc Carnevale heard Ms. Cagle's request. (PSAF ¶ 184). Judge Estes walked with Ms. Cagle to the elevator. (PSAF ¶ 184). Carnevale watched them get on the elevator together. (PSAF ¶ 184).

After Ms. Cagle returned to her room, she texted Judge Estes, and told him that her television remote was not working, and asked him to help her with it. (PSAF ¶ 185). Judge Estes came to Ms. Cagle's room, and fixed the remote control. (PSAF ¶ 186). Ms. Cagle began watching SpongeBob Squarepants, a children's television program. (PSAF ¶ 187). Judge Estes was extremely intoxicated, undressed, and used his hand to push Ms. Cagle's shoulders down so that she was positioned above his genital area. (PSAF ¶ 188). Judge Estes put his hand on the back of Ms. Cagle's head and made her perform fellatio on him. (PSAF ¶ 189). Ms. Cagle felt shocked and confused. (PSAF ¶ 289). Immediately after being sexually satisfied, Judge Estes stood up, put his clothes back on, and stated that he had to go to his room. (PSAF ¶ 289). Ms. Cagle left the conference early the next day; she felt uncomfortable, ashamed, and confused about what had happened. (PSAF ¶ 190).

Judge Estes increased Ms. Cagle's humiliation when, on November 17, he text messaged her that if anyone had seen him enter or leave her room: "I am going to tell people that I walked you to your room, we talked for a minute about drug court and said goodnight. Sound good?" (PSAF ¶ 191). Later that day, he telephoned Ms. Cagle and told her that it would be worse for her in drug court if anyone found out what had happened, and that, if someone did find out, she might lose credibility in the eyes of the drug court probation officers. (PSAF ¶ 192).

E. *Ms. Cagle's work environment becomes toxic after the drug court conference.*

Before the drug court conference, when Probation complained about Ms. Cagle, they did so to Judge Estes. (PSAF ¶¶ 104, 113, 202, 215, 216). Estes assured the Probation Officers that he would "take care of it" and "handle it," but, he admits, he "did not do anything about it." (PSAF ¶¶ 202, 212). After watching Estes interact with Cagle, and seeing the two of them go up to their rooms in the elevator together at the conference, the Probation Officers knew why Estes was so supportive of Cagle. (PSAF ¶¶ 96, 100, 175-184). Following the November 16, 2016 Drug Court Conference, the Pittsfield Probation Officers stopped seeking assistance from Judge Estes to address their problems with Ms. Cagle.  (PSAF ¶¶ 216-218). Now, for the first time, they appealed directly to the Deputy Commissioner of Probation, Michael Coelho. ("Deputy Commissioner Coelho"). (PSAF ¶¶ 217-218).

Immediately following the conference, Probation Officer Stracuzzi called Deputy Commissioner Coelho to complain about a statement that Ms. Cagle allegedly made at the conference. (PSAF ¶¶ 217-218). Stracuzzi alleged Ms. Cagle stated that DMH did not want to use Community Corrections as treatment. (PSAF ¶218). The Deputy Commissioner called DMH Director Barber, who then called Dr. Reiss and told her to "follow up" with Ms. Cagle "and see what she had to say about it." (PSAF ¶¶ 217-219).

On November 22, 2016, Dr. Reiss asked Ms. Cagle about the statement that Stracuzzi alleged she had made. (PSAF ¶¶ 220-221).  Ms. Cagle told Dr. Reiss that, at the Drug Court Conference, employees from the Office of Community Corrections requested to meet with Ms. Cagle and Judge Estes, and they had. (PSAF ¶¶ 220-221). Judges Estes led the meeting and asked questions. (PSAF ¶ 220). During the meeting, Ms. Cagle asked if treatment provided by the Community Corrections was trauma-informed care and noted that Probation wanted to use

Community Corrections as treatment for substance abusers. (PSAF ¶ 220). There was nothing controversial about Ms. Cagle's statements; indeed, as mentioned *supra* pp. 9-10, Dr. Reiss and DMH Director Barber both shared Ms. Cagle's concerns that Community Corrections was "antithetical" to the mission of drug court. (PSAF ¶¶ 26, 28, 30, 32, 33, 34, 136, 139, 144-145, 220, 223).

During their phone conversation, Dr. Reiss offered Ms. Cagle some advice: she told Ms. Cagle "that both [Ms. Cagle] and Judge Estes were new to the Pittsfield Court and could be regarded with suspicion as outsiders if [Ms. Cagle] did not make an effort to accept the points of view of her Pittsfield colleagues." (PSAF ¶ 223). She told Ms. Cagle she wanted Ms. Cagle to be more "political" in drug court. (PSAF ¶ 223). Ms. Cagle asked her if this meant that Dr. Reiss wanted her to be more political and less ethical, and Dr. Reiss replied yes. (PSAF ¶ 223). Ms. Cagle took that to mean that she was "to go along with what Probation wanted and not [do] what was best for the [drug court participants]." (PSAF ¶ 223). Dr. Reiss' "advice" conflicted with how Judge Estes wanted his drug court conducted, which was according to "best practices." (PSAF ¶ ¶ 27, 223).

The following week, in late November 2016, Judge Estes invited Ms. Cagle into his Belchertown chambers. (PSAF  ¶ 193). She agreed to see him. (PSAF ¶ 193).

On the appointed day, Ms. Cagle went to Belchertown Court during court hours, at approximately 2:30 pm. (PSAF ¶ ¶193, 195). She entered his chambers by way of the clerk's office, and walked by court staff. (PSAF ¶ 194). During their meeting, they discussed drug court. (PSAF ¶ 195). At some point, Judge Estes closed the door to his chambers, drew the blinds, and asked her to "continue what they started." (PSAF ¶ 195). He promised her that if she performed oral sex on him, he would never ask her to do it again. (PSAF ¶ 195). He also

promised to "help [her] out" to fix the problems that she was having with the drug court Probation Officers. (PSAF ¶ 195).

Ms. Cagle felt pressured to perform oral sex on Judge Estes. (PSAF ¶ 196). After Judge Estes was sexually satisfied, he told her that he would walk her out. (PSAF ¶ 196). Members of Judge Estes' court staff were present when Judge Estes walked with her to the front hallway. (PSAF ¶ 196). She felt degraded and humiliated. (PSAF ¶ 197).

After this sexual encounter, Judge Estes took additional steps to assist Ms. Cagle in dealing with the bullying treatment of the Pittsfield Probation Department. (PSAF ¶¶ 198-202). Ms. Cagle would call Judge Estes when he was driving home from drug court on Thursdays and tell him about problems she was having with Probation. Judge Estes testified, "Well if [Ms. Cagle] was having a problem, she would tell me what the problem was and I would try to, like, help her navigate the conflict or issue." (PSAF ¶ 199).

When Ms. Cagle sought help from Judge Estes to intervene on her behalf with the Probation Department, he did. (PSAF ¶¶ 198-202, 204). For example, on November 30, 2016, the Probation Officers were antagonizing Ms. Cagle, and Judge Estes intervened on her behalf. (PSAF ¶ 200). On January 26, 2017, Ms. Cagle asked Judge Estes to talk with Probation Officer Lander on her behalf, and he did. (PSAF ¶ 201).

Throughout the winter of 2016/2017, Ms. Cagle continued to perform oral sex on Judge Estes in his chambers. (PSAF ¶ 203). Sometimes she would wait in the courtroom until the court officers would escort her to his chambers. Other times she waited outside his chambers with his court staff. (PSAF ¶ 203).

At his deposition, Judge Estes was asked what his relationship with Ms. Cagle meant to him. He dismissed it as merely "a sexual outlet." for him. (PSAF ¶ 208). He also testified that

the reason he did not have vaginal sex with Ms. Cagle was because, "it seemed like I [would be] crossing a line…." (PSAF ¶ 207). Ultimately, after their last sexual encounter, Ms. Cagle text messaged Judge Estes and wrote, "I don't think I want this to happen anymore. Its one one [sic] sided. I'm not getting anything out of it." Judge Estes replied, "I agree. One sided relationships aren't fair and don't work." Ms. Cagle wrote back: "It also doesn't make the other person feel good about themselves." (PSAF ¶¶ 210- 211).

Between November 2016, and March 2017, Ms. Cagle noticed that whenever she and Judge Estes had a sexual encounter, Judge Estes was kind to her during the next drug court staff meeting; he was receptive to her treatment recommendations, and pushed back against any bullying by the Probation Officers. (PSAF ¶ 204). Whenever she expressed a reluctance to continue performing oral sex on him, Judge Estes acted coldly towards her during the next drug court staffing, siding with the Probation Officers against her on treatment recommendations, and ignoring her when she tried to contribute. (PSAF ¶ 204).

Judge Estes felt that Ms. Cagle wanted to be something "more" to him than merely his "sexual outlet." (PSAF ¶ 206, 208). He testified:

> I think there were times when she was hoping that there would be more to it.
> We had a specific conversation about that once, and I said that that's not ever
> going to happen; we're never going to go out to dinner together; we're never
> going to be openly dating; and, if that's a problem for her, that we should stop
> seeing to [sic] each other, because I didn't – this is all I have to offer, so--
> wanted something more. (PSAF ¶ 206).

One reason Judge Estes was not interested in anything "more" from Ms. Cagle than receiving fellatio in his chambers and at her apartment was because he was married with two children. (PSAF ¶ 205). Estes testified he did not want them to find out. (PSAF ¶ 205). At the beginning of March 2017, Ms. Cagle tried to end their sexual relationship. (PSAF ¶ 209). This added to the "tensions" in drug court. (PSAF ¶ 209).

Of the two meetings Disessa observed during this time frame, Disessa testified, "You could, kind of, feel the tension in the air, but I could not tell what the cause of it was." (PSAF ¶ 225). The tension, according to Disessa, was tension among *all* members of the drug court team, including Judge Estes. (PSAF ¶ 225).

Employees in the Pittsfield courthouse knew what was going on between Ms. Cagle and Judge Estes. Probation Officer Lander told Dr. Reiss that, "*people had suspicions*…. [emphasis added]" (PSAF ¶ 212). The designated Pittsfield drug court clerk, Amy Slattery ("Clerk Slattery") also had suspicions. (PSAF ¶¶ 232-235). Clerk Slattery cautioned Judge Estes to be careful with Ms. Cagle, and appears to have anticipated Ms. Cagle might file a sexual harassment lawsuit. She said,

> I witnessed Tammy [Cagle] texting [Judge Estes] and trying to get into the lobby alone …*I even told him to be careful of who he's sweet to b[e]c[ause] of his position and pointed out the fact that some people will take advantage and only see a payday*… I know she frequently drove to Belchertown to see him…. [emphasis added]" (PSAF ¶ 233).

Ms. Cagle never told Clerk Slattery that she was meeting alone with Estes in Belchertown. (PSAF ¶ 232).

She further claimed that,

> *Ms. Cagle did not seem to recognize any boundaries with [Judge Estes], and would just walk into his lobby as opposed to going through a court officer to gain access to his lobby*. Even when a court office [sic] would stop her and say let me see if the Judge is available, *she would apparently just text the Judge and he would then let her in* [emphasis added]." (PSAF ¶ 235).

Slattery also believed that Judge Estes "never put any real barriers down as a judge and continued to compliment people about how they looked, etc. [emphasis added]." (PSAF ¶ 235). She recalled one instance when she overheard Judge Estes compliment a female staff person's physical appearance and another where Judge Estes hugged her in the workplace. (PSAF ¶ 235).

When she learned that Ms. Cagle had filed a lawsuit relating to Judge Estes' sexual harassment, Clerk Slattery's colleagues noticed that Slattery was visibly angry, and that her reaction was different from every one of her other colleagues. (PSAF ¶ 234).

In addition to the Trial Court staff, Ms. Cagle's *de facto* supervisor, Susan Mailler, also had concerns about how Ms. Cagle's relationship with Judge Estes was impacting Ms. Cagle's work environment (PSAF ¶¶ 227-231). Clinician Mailler testified that she warned Ms. Cagle about meeting with Estes outside of staff meetings, saying "Just *be careful*, because, usually, you know, *you don't* [usually] *have a lot of contact with a judge outside of a staffing, and that may alienate probation* [emphasis added]." (PSAF ¶ 227). She also testified, "I was concerned on [sic] how it would look to probation if she was talking to Judge Estes outside of the staffing." (PSAF ¶ 228).

F.   *The events leading up to Ms. Cagle's removal from drug court.*

Throughout this time, the drug court team continued to meet weekly. (PSAF ¶ 224). Out of the approximately 18 drug court staff meetings that occurred between November 16 and March 17, 2017 (when Ms. Cagle was removed), Disessa attended two meetings, and Dr. Reiss attended one. (PSAF ¶¶ 65, 66). From Dr. Reiss's perspective, this was "a period of quietude [sic], where it seems like everything was going well with her, and then, boom, all of a sudden she—you know, probation can't work with her anymore, and I find out that there have been all of these problems, all along, that no one has filled me in about; all of that." (PSAF ¶ 251). Disessa had been telling Dr. Reiss that "things were going better…she was doing better and things were—things were working more smoothly. (PSAF ¶ 252).

Yet, the "tension" had been building. On March 16, 2017, when Probation Officer Stracuzzi called Deputy Commissioner Coelho for the second time since November, this time it

was to demand Ms. Cagle's removal. (PSAF ¶ 268). The basis for his complaint was bizarre—he argued that Ms. Cagle was somehow responsible for keeping drug court participant in jails--but obviously only the judge had the power to order a person to remain in custody. (PSAF ¶¶ 4, 263, 286). The complaint arose out of a broader issue that the drug court team had been grappling with since drug court's inception: how long drug court participants should be held in custody pending acceptance to a long-term or short-term treatment program. (PSAF ¶¶ 253-254, 261). This issue became more pressing during the winter of 2016-2017; the harsh cold weather in western Massachusetts made finding beds for drug court participants more difficult; patients were not leaving treatment facilities and individuals on waitlists were waiting two or three months for available beds. (PSAF ¶ 254, 261).

The case that prompted Probation Officer Stracuzzi to call Deputy Commissioner Coelho involved a drug court participant named "DS" ("Participant DS"). (PSAF ¶ 258). Participant DS was incarcerated at the time Judge Estes accepted him into the Pittsfield drug court in, February 2017. (PSAF ¶ 258). At that time, Sheriff's Department Drug Court Liaison, Attorney Alex Bianchi, presented Participant DS' case to the drug court team during their weekly Thursday staffing. (PSAF ¶ 256-58). Attorney Bianchi represented that Participant DS wanted to wait in jail for a long-term treatment bed at the Keenan House, and that it would take about five weeks for him to obtain a bed there. (PSAF ¶¶ 256-258).

Two weeks into Participant DS' incarceration, Attorney Bianchi left the Sheriff's Office. (PSAF ¶258). Meanwhile, Ms. Cagle met with Participant DS at the jail to evaluate him, and to discuss possible treatment options with him so that she could present her recommendations to the drug court team. (PSAF ¶¶ 259-260).

Participant DS' treatment options were complicated by the fact that Participant DS was on MassHealth. (PSAF ¶ 255, 258). A local short-term treatment option, Berkshire Medical Center's Clinical Stabilization Services ("CSS"), did not permit individuals on MassHealth to remain in its program for more than two weeks. (PSAF ¶ 255). Thus, unless Participant DS could secure a bed at a long-term treatment within those two weeks, he would be turned out on the street. (PSAF ¶¶ 255, 260). Beds at the Keenan House were taking at least two months to secure. (PSAF ¶ 255, 260-261).

During Ms. Cagle's visit to Participant DS in jail, Participant DS told her that he had overdosed seven times. (PSAF  ¶ 260).Ms. Cagle was concerned that if Participant DS was turned out on the street, he would overdose and die. (PSAF ¶ 260). Ms. Cagle discussed with Participant DS why she did not think that CSS was a good fit for him; specifically, that he could only stay at CSS for two weeks. (PSAF ¶ 260). Participant DS agreed that he did not want to go to CSS. (PSAF ¶ 260). Ms. Cagle offered other residential treatment options to Participant DS that were not in the area. (PSAF ¶ 260). Participant DS indicated he would prefer to wait for a long-term treatment bed at the Keenan House in order to be near his mother. (PSAF ¶ 260).

After meeting with Participant DS, Ms. Cagle was concerned about how long it was taking to obtain a bed for him at the Keenan House. (PSAF ¶ 261). She called Susan Mailler, who told her it was taking a "couple months" to obtain a bed. (PSAF ¶ 261). Mailler told Ms. Cagle that it was taking longer than usual for drug court participants to get beds because it was a harsh winter. (PSAF ¶ 261). Ms. Cagle also called Clinical Director Ellery Sheryll at CSS ("CSS Clinical Director Sheryll"). (PSAF ¶ 262). CSS Clinical Director Sherylll told Ms. Cagle that Keenan House prioritized beds for individuals coming directly from incarceration, and that if Participant DS went from the jail to CSS, Participant DS would not have priority for a bed at the

Keenan House. (PSAF ¶ 262). Ms. Cagle set up a meeting with CSS Clinical Director Sheryll

for March 16, 2016 to discuss this issue further. (PSAF ¶ 262).

During the March 16, 2017 a drug court meeting, the drug court team discussed

Participant DS. (PSAF ¶ 263). Ms. Cagle indicated she was concerned about Judge Estes

ordering Participant DS to CSS because Participant DS would only be allowed to stay at the

facility for two weeks; because Participant DS had already overdosed seven times; and because

Participant DS indicated he preferred to stay in jail awaiting a long-term treatment option so he

could be near his mother. (PSAF ¶ 263). Ms. Cagle also told the drug court team what she had

learned from CSS about Keenan House prioritizing beds for patients being released directly

from custody. (PSAF ¶ 263). Nonetheless, the Probation Officers advocated that Participant DS

be released to CSS. (PSAF ¶ 263). Judge Estes decided to leave the Participant DS in jail to wait

for a long-term treatment bed. (PSAF ¶ 263). Judge Estes was the only person who could make a

decision about whether or not Participant DS remained in custody. (PSAF ¶ 263).

Later that day, Probation Officer Marc Carnavale, called Ms. Cagle a "liar" in front of

other Probation Officers concerning Ms. Cagle's presentation during the drug court meeting.

(PSAF ¶ 264). Probation Officer Lander also yelled at her in front of the other Probation

Officers. (PSAF ¶ 264). Probation Officer Lander stated that he had talked to "Debbie" at the

Keenan House and what Ms. Cagle was reporting about the prioritization of beds was not true.

(PSAF ¶ 264). Ms. Cagle replied that she had not obtained this information from "Debbie," but,

rather, it had been conveyed to her by CSS Clinical Director Sheryll. (PSAF ¶ 264).

Concerned that the Probation Officers disbelieved her, Ms. Cagle decided to invite

Probation Officer Carnavale to the meeting with CSS Director Sheryll scheduled for later that

afternoon so Sheryll could corroborate Ms. Cagle's explanation of how the prioritization of beds

worked. (PSAF ¶ 265). At the meeting, Sheryll reiterated what she had previously conveyed to Ms. Cagle—that an incarcerated person waiting for a treatment bed at Keenan House would lose his status on the waitlist if he first went to a different treatment facility. (PSAF ¶ 265).

Judge Estes was made aware that the Probation Officers were upset about Participant DS being held in custody, but, inexplicably, Probation Officer John Lander said something to him, like, "*Judge this doesn't involve you; don't worry about it* [emphasis added]." (PSAF ¶ 266). Probation Officer Stracuzzi testified, "*I never even thought to consult with Judge Estes*" about this issue [emphasis added]. (PSAF ¶ 267). The Probation Department's response to the events on March 16 can only be described as abnormal; Judge Estes was the *only* person who could release Participant DS from the jail, any discussion about whether the bed was available obviously involved Judge Estes. (PSAF ¶ ¶266-67). Judge Estes claimed he, "had no idea how contentious the relationship between Ms. Cagle and the Probation Officers had become"; clearly this is due to the fact that Probation no longer trusted him to mediate drug court conflicts with Ms. Cagle. (PSAF ¶ 370).

After Ms. Cagle was removed from drug court, Dr. Reiss once asked Probation Officer John Lander, "Why didn't you guys come to me, and tell me about what was going on, if things were so bad?" She testified that, "I vaguely remember [Probation Officer] John Lander saying—I don't really remember what he said. But I do remember asking him that, and not getting a very clear answer." (PSAF ¶ 212).

BHN upper management also found it odd that the Probation Department *never* complained to BHN about Ms. Cagle at all between November 2016 and March 16, 2017. In an email summarizing her understanding of the situation as of March 19, 2017, BHN Vice President Susan West wrote:

> The situation in Pittsfield recently came to a head, resulting in Probation staff going to their Ass't Commissioner (bypassing Julie and John Barber), demanding Tammy's removal. (Probation had not brought any more concerns to us since November, *despite being fully aware of Julie's position and her availability for dialogue*…) [emphasis added]. (PSAF ¶ 355).

As mentioned *supra* pp. 21, after the drug court meeting on March 16, 2017, Probation Officer Stracuzzi appealed directly to Deputy Commissioner of Probation Coelho to complain about Ms. Cagle. (PSAF ¶ 268). Deputy Commissioner Coelho spoke with Director Barber. (¶ 270). Barber called a meeting with Dr. Reiss and the Pittsfield Probation Department for the following day. (PSAF ¶ 270). To Barber, the situation sounded ,"like a house on fire." (¶ 270).

DMH Director Barber also called Judge Estes. (PSAF ¶¶ 271-274). Barber informed Estes he was going to Pittsfield the next day to speak with Probation about the problems they were experiencing with Ms. Cagle and to ask Estes for his general impressions of Ms. Cagle's work. (PSAF ¶¶ 271-274). Estes replied that Ms. Cagle was a "top-notch clinician" but that she could not get along well with others. (PSAF ¶ 274).

Ms. Cagle was not notified of the meeting; neither was Disessa. (PSAF ¶¶ 277-278).

On March 17, 2017, BHN Director Reiss, DMH Director Barber, and Probation Officers Barber, Strauczzi and Lander met to discuss Ms. Cagle. (PSAF ¶ 276). The attendees' memories of the complaints at this meeting differ. (PSAF ¶¶ 279-289). All agree that one of the issues that the Probation Officers raised was Ms. Cagle's conduct was keeping drug court participants incarcerated for longer than they should have been. (PSAF ¶¶ 279-289).

The only semi-contemporaneous document from this meeting comes from a typed "Supervision Note" Dr. Reiss wrote and dated three days later. (PSAF ¶¶ 279-281, 286). However, Dr. Reiss testified she took handwritten notes during this meeting, and that these notes were "on a pad" and that she "probably shredded them, because [she] replaced them later with

the typewritten note." (PSAF ¶¶ 279-281). She testified that she did not remember when she destroyed them, but she "must have written [the 3.17.17] note immediately after the meeting because it was a very detailed note." (PSAF ¶¶ 281).

Although she styled the note a "Supervision Note" and although she knew that BHN considered "Supervision Notes," to be a form of progressive discipline, and even though she knew that all employees and supervisors had to sign off on such notes, Dr. Reiss' typewritten "Supervision Note" dated 3.17.17 was not written on that day and was never signed by Ms. Cagle, and was never included in Ms. Cagle's personnel file. (PSAF ¶¶ 279-283). The first time Ms. Cagle saw this note was when it was produced during discovery in connection with this lawsuit. (PSAF ¶¶ 283).

According to the Dr. Reiss' note, the issue with which the Probation Officers were "most concerned" was that there were several drug court participants who had been held in jail awaiting treatment beds for as many as 50 days. (PSAF ¶ 286). As Dr. Reiss (and Mailler and Cagle) had observed, this was normal, especially during the cold winter months when drug treatment patients did not leave treatment facilities as quickly. (PSAF ¶¶ 253-254, 261)

The Probation Officers also complained that Ms. Cagle had advocated for Participant DS to stay in jail rather than be released to CSS. (PSAF ¶ 286). As mentioned, Ms. Cagle's advocacy had occurred *during a drug court meeting in the presence of the Judge Estes*, and the Probation Officers had *also* had an opportunity to argue their position to the judge. (PSAF ¶ 263). Only Judge Estes could decide whether someone remain incarcerated. (PSAF ¶ 263). Ultimately, Estes disagreed with the Probation Department and ordered Participant DS to remain in jail, *which was where Participant DS wanted to stay*. (PSAF ¶¶ 260, 283).

Probation also claimed that Ms. Cagle received information about treatment beds from an "unreliable source" named "Alex," who was an employee of the Sheriff's department and who had worked for probation temporarily in a training role." (PSAF ¶ 286). This was false. "Alex" was Attorney Alex Bianchi, who was employed by the Berkshire County Sheriff's Office as the liaison to Pittsfield drug court. (PSAF ¶¶ 256, 287). Attorney Bianchi had been involved with the creation of drug court, had attended drug court staff meeting throughout the year, and also attended drug court community meetings. (PSAF ¶¶ 256, 287).

The concept that Ms. Cagle was trying to make drug court participants remain in jail was the diametric opposite of what Ms. Cagle had been advocating for in every single conversation about drug court that Reiss and Barber had *ever* had with her. (PSAF ¶¶ 111-155, 223,290). Yet, neither Reiss nor Barber contacted Ms. Cagle to get her side of the story. (PSAF ¶ 290).

Judge Estes was not consulted about whether what probation was saying was accurate. (PSAF ¶ 291). No one at the Sheriff's Department, Keenan House, or CSS was consulted about whether what the Probation Officers were saying was accurate. (PSAF ¶ 292).

To DMH Director John Barber, it was clear that there was "too much bad blood" between the Probation Department and Ms. Cagle. (PSAF ¶ 293). DMH Director Barber recalled that Dr. Reiss did not want to call Judge Estes. (PSAF ¶ 294). Dr. Reiss testified that she did not recall any discussions about Judge Estes' role, and she had no memory whatsoever of any discussion about anyone talking to Judge Estes. (PSAF ¶ 295). She testified that she did not remember if it occurred to her whether Judge Estes should be informed or consulted with regard to what was going to happen in the drug court. (PSAF ¶ 296).

At the same time that Dr. Reiss and DMH Director Barber were meeting with Pittsfield Probation to discuss their complaints about Ms. Cagle, Judge Estes was leaving the courthouse

on a lunchbreak to drive to Ms. Cagle's apartment to receive fellatio. (PSAF ¶ 304). Even

though Judge Estes knew that Ms. Cagle's was at risk of losing her job, he testified that, at

this point, "it seemed [to him], actually, kind of dangerous for [him] to tell Tammy that [he'd]

gotten a call from John Barber." Instead, after he was sexually satisfied, he left her house without

giving her so much as a clue that her job was in jeopardy. (PSAF ¶ 275, 304). On Estes' drive

back to the courthouse, DMH Director Barber telephoned. Estes and Barber have two very

different perspectives about what transpired during that call. (PSAF ¶¶ 306-307).

DMH Director Barber testified that throughout their conversation, Judge Estes

"rambled." Barber testified:

> I tried to do some small-talk with [Judge Estes], and we—you know,
> again, I think I was trying to feel him out about how things were going and, you
> know, the kind of probation stuff and all that. And, you know, I felt like I wasn't
> getting a lot of information. I think he was, like, "yeah, you know there's been
> some tensions," and something like that; but it wasn't like—he just didn't seem
> like he was really that worried about it.
> Q. About the tensions?
> A. Yes. And so, when it came to me saying that, "Well, it looks like, you
> know, Tammy's not going to be in that position anymore," he said something that
> was rather odd, I thought; he said something like, "Well that's too bad. She's a
> good girl, but she has a tendency to piss off a lot of people," or something like
> that …my visceral reaction was that it was weird that he was calling her a
> girl…but mostly what I remember is that it just seemed like twenty, twenty-five
> minutes, however long this call was, it felt like it was filled with nothing, if you
> know what I mean; like, at the end, I'm like, "What the heck did we talk about?"
> (PSAF ¶ 311).

Judge Estes testified, "I was actually stunned that they removed her. It seemed kind of

extreme to me. I had no idea that was coming…I was very surprised. I guess 'stunned' is an

overstatement. I was surprised….I didn't perceive the problems that she was having to be

dramatic enough to warrant her removal."  (PSAF ¶ 312). Judge Estes did not ask DMH

Director Barber to reverse his decision or even for an explanation. (PSAF ¶ 310). After he had

learned that she was being removed from drug court, Judge Estes testified that, "I didn't think

there was anything I could do and it didn't seem appropriate for me to get involved…" (PSAF ¶ 316). As her supervisor, Judge Estes could have intervened but did not. (PSAF ¶¶ 89-110, 272-275, 307-313, 321).

At deposition when DMH Director Barber was asked what would have happened if Judge Estes objected to the Plaintiff's removal from drug court, his answer was, "I think—hum. I think the answer, really, is: I don't know." (PSAF ¶ 313).

Dr. Reiss testified at deposition that it was John Barber's decision to remove Ms. Cagle from the position. (PSAF ¶ 301). She has previously claimed it was her decision to remove Ms. Cagle from drug court. (PSAF ¶ 303). In any event, after the meeting with probation, Dr. Reiss called Ms. Cagle and told her she was placed on administrative leave until the following week when they would meet. (PSAF ¶ 305). Dr. Reiss refused to tell Ms. Cagle what the complaint was over the phone, but she assured Ms. Cagle that she knew Ms. Cagle loved her job. (PSAF ¶ 305).

Ms. Cagle then telephoned Judge Estes and disclosed to him what Dr. Reiss had said. (PSAF ¶ 306). Ms. Cagle asked Judge Estes whether he knew why she had been removed from drug court (PSAF ¶ 306). Judge Estes claimed he did not. (PSAF ¶ 306).

The next day, on March 18, 2017, Ms. Cagle called Mailler to tell her she was losing her job. (PSAF ¶ 229). Later that day, in a text message, Ms. Cagle wrote, "I'm going to ask Judge Estes to put a call in to [DMH Director] John [Barber] if I have to." (PSAF ¶ 230). In response, Mailler wrote, **"I don't see how that would hurt *unless probation is complaining that you have a personal relationship with the judge that is influencing him* [emphasis added]."** (PSAF ¶ 231).

G. *Dr. Reiss removes Ms. Cagle from drug court*

The following week, Dr. Reiss scheduled a meeting with Ms. Cagle and Human Resources Director Claudia Muradian Brubach ("HR Director Muradian Brubach"). (PSAF ¶ 314). Ms. Cagle asked if she could bring her supervisor, David Disessa, to the meeting, but Dr. Reiss told Ms. Cagle that Disessa was not allowed to attend. (PSAF ¶ 314).

On March 21, 2017, Ms. Cagle met with Reiss and Muradian Brubach. (PSAF ¶ 330). Dr. Reiss told Ms. Cagle she was being removed from drug court because of "problems" with the Probation Department, but did not specify an actual reason. (PSAF ¶ 239, 331). Instead, Dr. Reiss referenced the November phone call and stated, "Remember when I told you should be more political?" (PSAF ¶ 331). Ms. Cagle thought her removal might have something to do with Probation yelling at her on March 16th. (PSAF ¶ 264). She asked Dr. Reiss and HR Director Muradian Brubach to speak with the CSS Clinical Director Sheryll, and that Sheryll would be able to corroborate what Ms. Cagle had said about the prioritization and availability of treatment beds. (PSAF ¶ 332). HR Director Muradian Brubach directed Dr. Reiss to call Sheryll. (PSAF ¶ 333). Dr. Reiss never did. (PSAF ¶ 334). Neither Dr. Reiss nor HR Director Muradian Brubach took notes during this meeting nor did they ever subsequently memorialize what happened at the meeting. (PSAF ¶ 330).

After the March 21st meeting, Ms. Cagle *still* had no idea why she had been removed from drug court. (PSAF ¶¶239,343). She tried to schedule another meeting with Dr. Reiss, but Dr. Reiss avoided meeting with her. (PSAF ¶ 343). Ultimately, Human Resources Director Muradian Brubach directed Dr. Reiss to meet in-person with Ms. Cagle. (PSAF ¶¶ 344-345). The three met again on March 30th; during this second meeting, Ms. Cagle was still not told why she was being removed from drug court and was again assured that she was not being disciplined for her removal. (PSAF ¶ 239, 346).

Still nonplussed, Ms. Cagle told Judge Estes that DMH Director Barber would keep her

on in drug court if Judge Estes asked him to do so. (PSAF ¶ 318). Ms. Cagle also asked Judge

Estes to intervene on her behalf with Dr. Reiss. (PSAF ¶ 319). Judge Estes told her that he

would. (PSAF ¶ 319). He did not. (PSAF ¶¶ 319-321). Instead, he ratified Ms. Cagle's

removal from drug court by telling Dr. Reiss: "Tammy did a lot of good things for this

program. There were some issues. Anyway, we're moving on." (PSAF ¶ 321).

Judge Estes continued to interfere with her employment prospects by badmouthing

Ms. Cagle to Disessa in the week following her removal. (PSAF ¶ 369). He told Disessa that

now that Ms. Cagle had left, "the tension is gone." (PSAF ¶ 369). He also claimed to have

received "many complaints about her including complaints from the clerks [sic] office and

correctional officers." (PSAF ¶ 369). He further told Disessa that Ms. Cagle, "had no people

skills" and that he that he found this "hard" as she was a clinician. (PSAF ¶ 369). Judge Estes

claimed that, "the atmosphere now has completely changed" and that the team felt "very

positively" that Ms. Cagle had been removed. (PSAF ¶ 369).

H.  *Dr. Reiss knew that Ms. Cagle might file an MCAD charge, and she and Disessa
    destroyed relevant and likely inculpatory records related to this case.*

As mentioned *supra* p. 27, Dr.  Reiss knew the Probation Department's complaints did

not make any sense; Ms. Cagle did not keep drug court participants in jail, only Judge Estes did.

Further, Dr. Reiss knew that Ms. Cagle would *never* advocate for unjustified incarceration for

drug court participants because Ms. Cagle was a staunch proponent of "best practices." (PSAF

¶¶ 27, 28, 29, 33, 145, 168-171, 220, 223, 225). Nonetheless, Dr. Reiss did not investigate *any*

of Probation's claims; she refused to disclose to Ms. Cagle why she was being removed; and she

tried to avoid speaking face-to-face with Ms. Cagle. (PSAF 301-346). By April 5, 2017, a week-

and-a-half after Reiss had removed Ms. Cagle from drug court, she met with Vice President of

BHN, Susan West, to discuss the possibility that Ms. Cagle would file a complaint with the

MCAD. (PSAF ¶ 236). This conversation occurred three months before Ms. Cagle filed an

MCAD complaint and while Ms. Cagle was still working for BHN. (PSAF ¶ 340). During the

meeting, Dr. Reiss made the following note in her notebook, "Mass Commission vs.

Discrimination" and "Dave prob[lem]s- Don't put whole hat on Tammy." (PSAF ¶ 236).

On August 9, 2017, during a BHN staff meeting, Dr. Reiss first learned that Ms. Cagle

had filed a sexual harassment charge against BHN at the MCAD. (PSAF ¶ 237-239). Dr. Reiss'

notes from this meeting state, *inter alia*: "Tammy situation[.] David + Susan Mailler…We never

told her why she was being removed[.] Unsafe work envir[onment[.]" (PSAF ¶¶ 238-239).

On October 12, 2017, Dr. Reiss sent an email to her supervisors concerning a recent

correspondence between Susan Mailler and Ms. Cagle. (PSAF ¶ 240). The email reads: "[Ms.

Cagle] has been asking Susan [Mailler] about what she has heard regarding the judge. When

Susan told her by text, 'Nothing just rumors,' Tammy wanted to know what the rumors were and

also asked if she could arrange a time to talk to Susan." (PSAF ¶ 240).

Dr. Reiss produced photocopies of her notebook during discovery. (PSAF ¶ 322). The

notebook is a Five-Star Mead wire-bound notebook. (PSAF ¶ 323). Dr. Reiss wrote on the front

and back of each page. (PSAF ¶ 324). The minimum number of pages in a Five-Star Mead

notebook is 100 pages, yet Dr. Reiss' notebook only contains 90 pages. (PSAF ¶¶ 325-327).

Photocopies of the notebook show that there is paper caught in the wiring, suggesting pages have

been ripped out. (PSAF ¶ 326-327). Altogether, the notebook is missing *twenty pages*. (PSAF

¶¶ 322-327).

DiSessa testified that he also destroyed notes about Ms. Cagle. (PSAF ¶ 329). He

admitted that while he had taken notes during his meetings with her, he had "purged a lot of

files" around the time that she was removed from drug court. (PSAF ¶ 328-29). He testified that his notes had been handwritten and that he had shredded them. (PSAF ¶ 329).

The BHN Employee manual states that, "All Colleagues are responsible for the integrity, timeliness and accuracy of information contained in documents, including…personnel records….No one may falsify information on any record or document." (PSAF ¶ 241).

Yet, in September 2017, six months after Ms. Cagle was removed from drug court, five months after Ms. Cagle had left BHN's employ, and one month after Ms. Cagle had filed an MCAD complaint, Dr. Reiss started writing "Supervision Notes" about Ms. Cagle and backdating them to March 2017. (PSAF ¶¶ 337-365). As mentioned, *supra* p. 26, Dr. Reiss knew that Supervision Notes were the first step in a progressive disciplinary action, and should have been signed by both Ms. Cagle and by Dr. Reiss. (PSAF ¶ 282). These Supervision Notes, written long after Ms. Cagle had left BHN's employ (obviously) were not. (PSAF ¶¶ 283, 337-365). In all, Dr. Reiss wrote at least four "Supervision Notes" in September 2017 that she backdated to March 2017, criticizing Ms. Cagle's job performance. (PSAF ¶¶ 337-365). Dr. Reiss testified that these typed Supervision Notes were actually based on handwritten notes, but also testified that "I really don't remember" when asked when she wrote them. (PSAF ¶¶ 341, 354, 361).

One of these "Supervision Notes," written on September 27, 2017 and backdated to March 30, 2017, related to the second meeting Reiss had with Cagle, on March 30, 2017. (PSAF 349). Dr. Reiss testified that she took handwritten notes during this meeting, but that she did not know where the notes were. (PSAF ¶ 347). No handwritten notes exist related to this meeting in Dr. Reiss' notebook. (PSAF ¶¶347-48). Dr. Reiss testified that she spelled her own name wrong in the note, and that while this was "very strange," she testified that she recalled

writing the document. (PSAF ¶ 358). Dr. Reiss also testified that she did not remember, "when I wrote it…When exactly I sat down to type the note, I don't know." (PSAF ¶354). When confronted about the metadata indicating that the document was created on September 27, 2017, she testified, "I can't explain that. I don't understand it." (PSAF ¶¶ 354-355).

Another "Supervision Note" that was created on September 28, 2017 and backdated to March 31, 2017 detailed a phone conversation Dr. Reiss had with a public defender, now judge, Judge Tyne. (PSAF ¶¶ 359-363). According to the note, Judge Tyne told Dr. Reiss that she regularly attended the drug court sessions and felt that probation treated Ms. Cagle unfairly. (PSAF ¶ 359). Dr. Reiss testified that she did not have a memory of "exactly when I typed [this note]." (PSAF ¶ 361). She testified that, again, her own name was spelled wrong on the note, but that it was not possible that someone else wrote it. (PSAF ¶ 362).

After Ms. Cagle filed her MCAD complaint, Dr. Reiss made efforts to draw into question Ms. Cagle's job performance. (PSAF ¶¶ 364-366). Dr. Reiss created a note on September 28, 2017, regarding Tammy Cagle's Performance Appraisal that she backdated to April 27, 2017. (PSAF ¶¶ 364-365). The note reads:

> David DiSessa conducted Ms. Cagle's performance appraisal and submitted it to both Ms. Cagle and HR without passing it to me first for review. I did not receive this PA until April, 2017. After reviewing this PA, I do NOT approve it and will not sign off on it. Had I had the opportunity to review it I would NOT have said that Ms. Cagle met all performance expectations of BHN. (PSAF ¶ 365).

Dr. Reiss never told David Disessa that he had done anything wrong vis a vis the appraisal. (PSAF ¶ 366).

I.   *Even if Ms. Cagle had wanted to report harassment to Dr. Reiss would not have been receptive to it.*

LEAVE TO FILE GRANTED ON OCTOBER 2, 2020

The BHN employee manual states that BHN Colleagues have an affirmative

responsibility to ensure that our workplace is a safe and healthy place for BHN Colleagues…."

(PSAF ¶ 242). In its handbook, BHN has a sexual harassment policy.  It states:

> The goal of the Behavioral Health Network, Inc. [sic] to promote a
> workplace that is free of sexual harassment. Sexual harassment of employees
> occurring in the workplace or in other settings in which employees may find
> themselves in connection with their employment is unlawful and will not be
> tolerated by this organization….The Behavioral Health Network takes allegations
> of sexual harassment seriously. We will respond promptly to complaints of sexual
> harassment. Where we learn that such inappropriate conduct has occurred, we will
> act promptly to eliminate the conduct and impose such corrective action as is
> necessary including disciplinary action where appropriate." (PSAF ¶¶ 243).

It also states: "When we receive [a sexual harassment] complaint, we will promptly

investigate the allegation fairly and quickly." (PSAF ¶ 244).

By Dr. Reiss' own admission, even if Ms. Cagle had disclosed she was being sexually

harassed by Judge Estes, Dr. Reiss *would not have believed her*. (PSAF ¶¶ 245-246). She

shockingly testified:

> if anything inappropriate happened, then I believed that it was Tammy [Cagle]
> who initiated it, not Estes because I saw no issue with Estes whatsoever…I don't
> remember, again, exactly what I said. But she either initiated, or she made up a
> story or—because I basically said, "Look, I think Tammy is a very
> psychologically unwell person at this point….Whatever went on here, that I – you
> know, if she's alleging that he sexually assaulted her, for example, I don't—I
> wouldn't believe it….I remember saying that she was psychologically not well,
> and that I –I just would not—therefore, would not believe any—you know, I'm
> just speaking for myself—but I would not believe any of the accusations she
> made, because she seemed psychologically unwell. And also because, based on
> my experience with Estes—I mean, what I found out about Estes in this whole
> thing completely floored me, so—you know, I could have kicked myself after,
> when I found out what happened. And, remembering my conversation with Neff,
> like, I couldn't—you know, I wanted to call Neff and say, Look you know, I'm a
> psychologist but Estes fooled me, you know. (PSAF ¶ ¶ 245-246).

She further testified that she permitted Ms. Cagle to work with among the most

vulnerable populations in our society despite the fact that:

> [Ms. Cagle] talks about things she knows nothing about and acts like, you know, she's an expert on things that she has no expertise in whatsoever. She doesn't get along with people well, by and large. She's interpersonally awkward. I mean there was something in the very—in the beginning, you know, I—she was hired, and she was the person we had to work with, but she—we—I tried to make the best of it, but, you know, there was something there that made me feel bad for her because of all the struggles with probation and—but she's not well. (PSAF ¶ 247).

Reiss testified that Ms. Cagle "annoyed" her, and that she continued to allow Ms. Cagle to work for BHN in drug court despite having these character assessments only "[b]ecause I was not her direct supervisor. These were—you know, this was only perception. I was new to this position. *I had many, many other things on my plate* [emphasis added]. And, if it was going well enough, it was okay." (PSAF ¶ 248).

Thus, even if Ms. Cagle had made a sexual harassment complaint to Dr. Reiss, Dr. Reiss would not have taken "allegations of sexual harassment seriously," as BHN claimed she would. (PSAF ¶¶ 243, 245-247). Nor would Dr. Reiss have "respond[ed] promptly]"; indeed, she would not have responded *at all*. (PSAF ¶¶ 244, 245-247). In short, Dr. Reiss was not concerned about whether Ms. Cagle's workplace was a "safe" or "healthy" place for Ms. Cagle. (PSAF ¶¶ 242, 245-247). Dr. Reiss, herself, has acknowledged that Tammy was working in an "unsafe work envir[onment]." (PSAF ¶¶ 239).

III.   **LAW**

"[A] court may grant summary judgment only where there is no genuine issue of material fact." *Perez v. Lorraine Enterprises, Inc.*, 769 F.3d 23, 29 (1st Cir. 2014) (citing Fed. R. Civ. P. 56(a)). "A 'genuine' issue is one on which the evidence would enable a reasonable jury to find the fact in favor of either party." *Id*. (citation omitted).  "A 'material' fact is one that is relevant in the sense that it has the capacity to change the outcome of the jury's determination." *Id.* "When considering the summary judgment record, all reasonable inferences are to be drawn

in favor of the party opposing summary judgment. . . just as all disputed facts are viewed in the light most favorable to him." *Thompson v. Cloud*, 764 F.3d 82, 87 (1st Cir. 2014) (citation, internal quotation marks, and modifications omitted).

Many of Judge Estes and BHN's proffered summary judgment "facts" are presented in the light most favorable to both BHN and Judge Estes, the moving parties, *not* in the light most favorable to Ms. Cagle, as they are required to do.[3]

The Defendants' motions can be distilled down to four arguments: (1) Judge Estes claims he is not responsible for a sexually hostile work environment because the Trial Court was not Ms. Cagle's employer, and he was not Ms. Cagle's supervisor; (2) BHN claims it did not know of the sexual harassment; (3) BHN claims it should not have known of the sexual harassment; (4) Judge Estes maintains that the Plaintiff failed to exhaust her administrative remedies. The Court should deny the Defendants Motions for Summary Judgment for the reasons forth below:

A. *Ms. Cagle was subject to a hostile work environment by her joint employers—BHN and the Executive Office of the Trial Court*

---

[3] For example, BHN attempts to set forth a presentation of the case that Ms. Cagle and the Probation Department's issues stemmed from a simple "lack of communication" on both of their parts. This entirely ignores the compelling evidence that Probation was on notice that Ms. Cagle was having a sexual relationship with Judge Estes, and that *this* rather than some "communication issue" was the source of the tensions with Probation, and why Probation wanted her removed from drug court. (*See supra* pp. 15-18, 25-26). In addition, BHN claims, "Tammy Cagle had issues with her job performance during almost all her short tenure with BHN." (BHN Memo in support of Summary Judgment at p. 6). This claim ignores the consistent praise she received from Disessa, Dr. Reiss, and Clinician Mailler, from Judge Estes, from community providers, and even, *from probation*. (*See supra* at pp.12-14 ). BHN also claims, "Tammy Cagle was alone in her objection to using Community Corrections as a treatment modality for drug court participants…." (BHN Memo in support of Summary Judgment at. p. 7). The record evidence shows that Dr. Reiss and DMH Director Barber believed that Community Corrections was *antithetical* to drug court. (*See supra* at pp. 7-8). Judge Estes' understanding of "best practices" was that Community Corrections was not the place to send substance abusers in drug court. (*See supra* at p. 16). These are just some of BHN's facts that are *not* presented in the light most favorable to the Plaintiff.

Meanwhile, Judge Estes claims, "Estes was not named in the Charge filed with the MCAD…. Further, Plaintiff has not set forth any facts that, other than providing information to the Trial Court, he had an opportunity to participate in the proceedings." This assertion is not only *not* presented in the light most favorable to the Plaintiff, it is a blatant misrepresentation of the record; indeed, Judge Estes *signed the position statement on behalf of the Trial Court.* (PSAF ¶ 380).

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating

"against any individual with respect to [her] compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.

§ 2000e–2(a)(1).  "When the workplace is permeated with discriminatory intimidation, ridicule,

and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift*

*Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted).

To prevail on a hostile environment claim arising from gender-based discrimination, a

plaintiff must show the following:

> (1) that she is a member of a protected class; (2) that she was subjected to
> unwelcome sexual harassment; (3) that the harassment was based upon sex; (4)
> that the harassment was sufficiently severe or pervasive so as to alter the
> conditions of plaintiff's employment and create an abusive work environment; (5)
> that sexually objectionable conduct was both objectively and subjectively
> offensive, such that a reasonable person would find it hostile or abusive and the
> victim in fact did perceive it to be so; and (6) that some basis for employer
> liability has been established.

*Brissette v. Franklin Cty. Sheriff's Office*, 235 F. Supp. 2d 63, 85 (D. Mass. 2003) (quoting

*O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001), *citing Faragher v. City of*

*Boca Raton*, 524 U.S. 775, 787–89 (1998)).

"In order to establish liability under Title VII, plaintiff must present sufficient evidence

to show that the discriminatory conduct at issue can be attributable to her employer." *Acosta v.*

*Harbor Holdings & Operations, Inc.*, 674 F. Supp. 2d 351, 370 (D.P.R. 2009*); see Medina v.*

*Adecco*, 561 F. Supp. 2d 162, 176 (D.P.R. 2008) ("Title VII liability attaches only in the event of

a covered employment relationship."). Title VII defines "employer" as "a person engaged in an

industry affecting commerce who has fifteen or more employees for each working day in each of

twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a

person . . . ." 42 U.S.C. § 2000e(b). "An employer's liability for a hostile work environment

claim depends on the harasser's employment status relative to the victim's . . . ." *Torres-Negrón*

*v. Merck & Co.*, 488 F.3d 34, 40 (1st Cir. 2007). If the hostile work environment was created by

an employee's supervisor, an employer is vicariously liable. *Id.* at 40.

1. *The Trial Court was Ms. Cagle's Joint Employer*

The Plaintiff does not dispute that she was employed by BHN, that she was paid by BHN,

and that BHN was involved in her hiring and firing. Nor does she dispute that Judge Estes was

an employee of the Executive Office of the Trial Court. The evidence adduced during discovery,

however, creates a genuine issue of material fact as to whether a "joint employment relationship"

existed; specifically, whether the Plaintiff was simultaneously an employee of BHN *and* the

Executive Office of the Trial Court. *See Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 163 (1st Cir.

1995) (quoting *Holyoke Visiting Nurses Ass'n v. NLRB*, 11 F.3d 302, 306 (1st Cir. 1993)) ("'A

joint employer relationship exists where two or more employers exert significant control over the

same employees and share or co-determine those matters governing essential terms and

conditions of employment.'").

The seminal decision on joint employment is *Boire v. Greyhound Corporation*, 376 U.S.

473, 481 (1964). In that case, the Supreme Court defined the concept of the "joint-employer" as

a situation in which a company possesses "sufficient control over the work of the employees" of

another company." *Boire*, 376 U.S. at 481. The *Boire* Court described the joint employer

determination as "*essentially a factual issue* [emphasis added]." *Id.*

Applying *Boire* to Massachusetts law under M.G.L. c. 151B, the Massachusetts Appeals

Court, in *Commodore v. Genesis Health Ventures, Inc.*, 63 Mass. App. Ct. 57, 61 (2005) held,

"The basis of a joint-employer finding is simply that one employer which *contracting in good*

*faith with an otherwise independent company*, has retained for itself *sufficient control of the terms and conditions of employment of the employees who are employed by the other employer* [emphasis added]." *Commodore*, 63 Mass. App. Ct. at 62; *see also Wilfert Bros. Realty Co. v. Massachusetts Comm'n Against Discrimination*, No. 0202671, 2006 WL 935105, at *2 (Mass. Super. Mar. 21, 2006); *Stanley v. Gillette Co.,* 2 Mass. Discrimin. L. Rep. 1203, 1205 (1980).

Factors to be considered in determining whether an entity is a joint employer are whether it: 1) supervises the employee's day-to-day activities; 2) controls the employee's work and the extent to which it directs the employee in the details of his job; 3) has the authority to hire or fire employees, 4) promulgates work rules and conditions of employment, 5) controls work assignments; 6) issues operating instructions; 7) issues the employee's paycheck. *See id.* at 62, note 7 (citing with approval factors listed in *Orell v. UMass Memorial Medical Center, Inc.,* 203 F. Supp. 2d, 52, 62-63 (D. Mass. 2002); *see also Stanley*, 2 Mass. Discrimin. L. Rep at 1205, *relying on Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); *Campbell v. Advantage Transp.,* 15 Mass. Discrim. L. Rep. 1601, 1614-617 (1993); *see also MCAD Guidelines on 151B: Sexual Harassment in the Workplace*, Revised January 9, 2017, p. 5. (listing the following factors as indications of supervisory authority: "Undertaking or recommending tangible employment decisions affecting an employee; directing activities, assigning work and controlling work flow; hiring, firing, promoting, demoting or disciplining; altering or affecting an employee's compensation or benefits; evaluating an employee's work load; distributing necessary supplies and tools; giving directions and verifying and fixing mistakes; assisting employees in assigning tasks; and monitoring and evaluating work performance.").

LEAVE TO FILE GRANTED ON OCTOBER 2, 2020

There is ample evidence to suggest that the Executive Office of the Trial Court had a joint employer relationship with Ms. Cagle, and that Judge Estes directly supervised her as the court clinician for the Pittsfield Drug Court.

Judge Estes hired Ms. Cagle as she could not get the position without his approval. (*See supra* at pp. 4-5). Not only did Judge Estes "build" the entire Pittsfield drug court, he also controlled and directed Ms. Cagle's work assignments. (*See supra* at pp. 4-5). He set the hours of drug court. (*See supra* at p. 4). He dictated where the drug court team met, when their meetings started. (*See supra* at pp. 4). He had the authority to dissolve the drug court. (*See supra* at p. 4). He supervised her in court throughout her employment. (PSAF ¶ 89-110).  Judge Estes directed Ms. Cagle to meet with him privately in chambers about five hours of her twenty hours per week. (*See supra* at p. 5).  During these private meetings he often reviewed her performance with her and gave her feedback. (PSAF ¶¶ 101-106, 109, 274). He approved her work product (*See supra* at p. 5-6). He mediated conflicts between the drug court team members. (*See supra* at p. 5-6). He referred to Ms. Cagle as "my case worker." (*See supra* at p. 6). *See Commodore v. Genesis Health Ventures, Inc.*, 63 Mass. App. Ct. at 61-62, note 7; *see also Stanley*, 2 Mass. Discrimin. L. Rep at 1205.

He could also dictate, and did dictate, how he wanted he wanted his drug court team to be run, and insisted that the drug court team follow, "best practices." (*See supra* at pp. 4, 6, 16). BHN directed Ms. Cagle to prioritize her relationship with probation above "best practices." (*See supra* at p. 16). Where there was a conflict between the two directives, Judge Estes' directive governed. (*See supra* at pp. 6, 8).

Judge Estes also had the ability to remove Ms. Cagle from drug court. (PSAF ¶¶ 8, 12, 14, 313). In *Deputy Chief Counsel for the Public Def. Div. of the Com. for Public Counsel*

*Services & another v. Acting First Justice of the Lowell Div. of the Dist. Ct. Dept.*, 477 Mass.

178 (2017), the Supreme Judicial Court decided a case involving a drug court judge who, citing

the need for a team approach to cases in drug court, removed a Committee for Public Counsel

Services ("CPCS") attorney from drug court cases to which they had been assigned and excluded

CPCS attorneys from assignment to any new case in the drug court.  The Court held that it *was*

*only due to the statutory mandated procedure* requiring CPCS to assign counsel to indigent

clients that the judge could not remove the CPCS attorney from drug court. Indeed, the Court

characterized the ability for the judge, as leader of the drug court team, to use his authority to

select the team members as "important," and supported by "social science research." It also

recognized the "desirability and efficacy of a collaborative and non adversarial approach in the

drug court" in making it an "effective intervention for defendants who would otherwise

recidivate because of their substance abuse issues." *Deputy Chief Counsel*, 477 Mass. at 183,

187. The inference is that a drug court judge may remove *any* drug court team member that is not

statutorily protected. *Id.* Ms. Cagle was not statutorily protected. (PSAF ¶¶ 8, 12, 14, 313).

Indeed, Judge Estes admitted he could have had Ms. Cagle removed. (PSAF ¶¶ 8, 12, 14,

313), and Judge Estes and DMH Director John Barber both admitted that Judge Estes could have

prevented her removal. (PSAF ¶¶ 8, 12, 14, 313).

Instead, Judge Estes participated in the decision to remove her. (*See supra* at p. 6, 25, 28

31).  Estes maligned and demeaned her to DMH Director Barber on March 16, 2017 by saying

she was a "top notch" clinician, but that she "could not get along well with others," and, on

March 17, "She's a good girl, but she has a tendency to piss off a lot of people." (PSAF ¶¶ 274,

311). He badmouthed her to Disessa on March 30, by telling him that without Ms. Cagle, the

"tension" in drug court was gone; that the team was happy with the decision; that he had

received "many complaints" about her; and that she "had no people skills." (PSAF ¶ 369).

Ms. Cagle relied on Judge Estes' word that he would speak with Dr. Reiss to save her job

or to recommend her for another similar position. (*See supra* at p. 31). Instead, he all but assured

her removal by telling Dr. Reiss, "Tammy did a lot of good things for this program. There were

some issues. Anyway, we're moving on." (PSAF ¶ 321). As a result, Ms. Cagle was reassigned

to a different position with less pay. ((*See supra* at p. 31).

The fact that the Trial Court did not issue her paycheck is *not* determinative in deciding

whether there is a joint employee relationship. *See Stanley*, 2 Mass. Discrim. L. Rep. at 1205.

The record evidence clearly demonstrates that there is a genuine issue of material fact as

to whether Judge Estes hired the Ms. Cagle, supervised her, and participated in her removal. *See

id.* This Court should hold, as the Supreme Court held in *Boire*, that the joint employer

determination is "a factual issue" for a jury to decide. *Boire*, 376 U.S. at 481 (1964)*.*

> 2.   *There is a genuine issue of material fact as to whether BHN knew or should
>       have known of the sexual harassment*

Since the hostile work environment was created by Judge Estes, who was a non-

employee of BHN, BHN "will be held liable only if it was negligent either in discovering or

remedying the harassment." *Id.* (*citing Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 401 (1st Cir.

2002); *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1074 (10th Cir. 1998)). An employer may be

found to be negligent if it knew or should have known of the harassment and failed to take

corrective action. *See Medina –Rivera v. MVM, Inc.*, 713 F.3d 132, 137 (1st Cir. 2013)

("[B]ecause . . . employers must provide their personnel with a harassment-free workplace, they

may be on the hook for a nonemployee's sexually-harassing behavior under certain conditions –

one of which being that they knew or should have known about the harassment and yet failed to

take prompt steps to stop it."); *Santos P.R. Children's Hosp.*, Civil No. 11-1539 (MEL), 2012 WL 4508122, at *5 (D.P.R. Sept. 28, 2012) (*citing Hernández v. Miranda Vélez*, Civ. No. 92-2701(JAF), 1994 WL 394855, at *8  (D.P.R. July 20, 1994), aff'd, 132 F.3d 848 (1st Cir. 1998)) (same); *Medina*, 561 F. Supp. 2d at 178 ("To prevail under a theory of joint employer liability, plaintiff must show that defendant knew or should have known of the discriminatory conduct and failed to take prompt corrective measures within its control.").

There is a genuine issue of material fact as to whether BHN knew or should have known about the hostile work environment; that is, whether BHN received actual or constructive notice of Estes' sexual harassment of Plaintiff.

a.   *There in a genuine issue of material as to whether BHN knew of the sexual harassment*

"In the context of sexual harassment claims, '[a]ctual notice is established by proof that management knew of the harassment.'" *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 802 (8th Cir. 2009) (*quoting Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003)). "'[A]ctual notice is such notice as is positively proved to have been given to a party directly and personally, or such as he is presumed to have received personally because the evidence within his knowledge was sufficient to put him upon inquiry.'" *Id.* (quoting Actual Notice, BLACK'S LAW DICTIONARY (6th ed.1990)). "[T]he law does not require that plaintiff herself brought her co-worker's alleged misconduct to the attention of [a] supervisor, as long as a supervisor was on notice of it." *Fisher v. Town of Orange*, 885 F. Supp. 2d 468, 476 (D. Mass. 2012) (*citing Crowley*, 303 F.3d at 402).

The facts adduced during discovery demonstrate that BHN supervisors knew, should have known, or suspected the existence of sexual harassment.

Mailler was Ms. Cagle's supervisor and knew of or suspected the existence of the sexual relationship. Beginning in September 2016, Mailler sought approval from Dr. Reiss to supervise Ms. Cagle, and Dr. Reiss approved. (*See supra* at p. 9). Dr. Reiss testified that Mailler was Ms. Cagle's "informal supervisor." (*See supra* at p. 9). After Ms. Cagle was removed from drug court, Mailler recommended Ms. Cagle for a clinician position in Georgia; the form she filled out stated that Mailler was Ms. Cagle's supervisor. (*See supra* at p. 9). Mailler assisted Ms. Cagle with her work, reports, and drug court planning, and even went to Pittsfield to observe her in drug court. (*See supra* at p. 8-9). She also helped Ms. Cagle navigate her conflicts with the Probation Department. (*See supra* at pp. 8-9). *See MCAD Guidelines on 151B: Sexual Harassment in the Workplace*, Revised January 9, 2017, at p. 5.

Mailler's statements to Ms. Cagle about Ms. Cagle's relationship with Judge Estes suggest Mailler's concern that Ms. Cagle's inappropriate relationship with Judge Estes was causing her issues with the Probation Department. (*See supra* pp 18-19). Mailler testified that she had conversations with Ms. Cagle regarding Ms. Cagle meeting with Estes one on one outside of staffing meetings. Mailler warned Cagle, "Just *be careful*, because, usually, you know, *you don't have a lot of contact with a judge outside of a staffing, and that may alienate probation* [emphasis added]." She also testified, "I was concerned on [sic] how it would look to probation if she was talking to Judge Estes outside of the staffing." (*See supra* pp 18-19).

When Ms. Cagle told Mailler that she intended to ask Judge Estes to intervene on her behalf with DMH to save her job, Mailler replied: "I don't see how that would hurt *unless probation is complaining that you have a personal relationship with the judge that is influencing him* [emphasis added]." (*See supra* pp 18-19). This response suggests that Mailler knew about

the sexual relationship. In October 2017, Mailler told Ms. Cagle that she had heard "rumors" about Ms. Cagle and Judge Estes. (PSAF ¶ 240).

In short, in the light most favorable to the Plaintiff, there is ample evidence that (1) Mailler was the Plaintifff's supervisor and (2) that she knew or strongly suspected the existence of the sexual relationship between Ms. Cagle and Judge Estes and (3) that she knew the relationship was affecting Ms. Cagle's workplace.

There is also evidence that Ms. Cagle's indirect supervisor, Dr. Reiss knew, should have known, or suspected about the existence of the sexual relationship. Dr. Reiss' behavior beginning with the March 16, 2017 meeting with Probation can only be described as bizarre.

Prior to March 17, 2012 BHN had consistently given Ms. Cagle consistently positive feedback. Reiss had glowingly recommended Ms. Cagle for additional positions both within and without BHN, and told Ms. Cagle that she was doing a "good job"; in February 2017, Clinician Mailler told Dr. Reiss that Ms. Cagle's had done a remarkable job getting Pittsfield up and running; and on March 16, the day before Ms. Cagle was removed, Disessa had given Ms. Cagle great performance evaluation. (*See supra* pp. 11-14).

Despite all this positive feedback about Ms. Cagle, and even though Dr. Reiss knew that what Probation was reporting to her was not and could not be true (only Judge Estes could make decisions about incarceration), Reiss still took immediate steps to remove Ms. Cagle. (See *supra* at pp. 26-27, 30, 32). Reiss could easily have called CSS or Keenan House or even Ms. Cagle to clarify what had happened, but she did not. (*See supra* at pp. 26-27, 30, 32). Instead, Reiss set up a time to meet with Ms. Cagle and forbade her from bringing her supervisor to the meeting. (*See supra* at p. 30). She disregarded Human Resource Director Muradian Brubach request to call CSS Clinical Director Ellery to clarify what had happened. (*See supra* at p. 30). She never

disciplined Ms. Cagle or told her why she was being removed. (*See supra* at pp. 30-32).  She avoided calling Judge Estes to discuss what had happened. (*See* supra at p 28). She even actively avoided meeting with Ms. Cagle. (*See supra* at p. 31). She never conducted a contemporaneous investigation into the misdeeds that probation alleged Ms. Cagle committed. (*See supra* at pp. 30-34). Instead, she continued to permit Ms. Cagle to treat extremely vulnerable substance abuse patients, and even added hours to her schedule so she was now also treat patients with significant mental health issues. (*See supra* at p. 12).

Dr. Reiss replaced Ms. Cagle, who had never been disciplined, with Disessa, who had. Disessa, like Cagle, advocated for keeping high-risk drug court participants incarcerated until a long-term treatment bed could be found; he told the drug court team that this was better than the participant being turned out on the street. (*See supra* pp 31-32). Yet, Probation never complained about Disessa, and Disessa was never removed; instead, they reported liking Disessa. (PSAF ¶¶ 372, 376-377 ).This is exactly the type of unfair treatment that our sexual harassment laws seek to prevent. *See McDonnell v. Cisneros*, 84 F.3d 256, 259 (7th Cir. 1996) (*citing Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66–67 (1986)) ("When a female worker is sexually harassed by male coworkers or supervisors, the result is to make the workplace less bearable for her because she is a woman than it is for the men who work beside her and, being male, are not harassed.").

On April 5, 2017, a week-and-a-half after Ms. Cagle was removed from drug court, and three months before Ms. Cagle filed an MCAD charge, Dr. Reiss was already anticipating Ms. Cagle might file a sexual harassment complaint. On that date, Dr. Reiss met with BHN Vice President Susan West, and wrote the following note in her notebook, "Mass Commission vs. Discrimination" and then "Dave prob[lem]s- Don't put whole hat on Tammy." (PSAF ¶ 236).

After she learned of the MCAD charge, Reiss wrote: "Tammy situation[.] David + Susan

Mailler…We never told her why she was being removed[.] Unsafe work envir[onment[.]"

(PSAF ¶ 239). In the light most favorable to the Plaintiff, these notes indicate that Dr. Reiss

knew about Ms. Cagle's "unsafe work environment" and failed to correct it.

Despite the fact that Dr. Reiss anticipated the lawsuit, both she and Disessa destroyed

documents related to this case. (*See supra* pp. 27, 32-37; *see also* PSAF ¶ 329). After Ms.

Cagle filed the MCAD complaint and six months after Ms. Cagle had left BHN, Dr. Reiss

created documents to draw into question Ms. Cagle's competence and falsified the dates on

those documents to make it appear that Reiss had conducted a contemporaneous investigation

into Probation's complaint. *See supra* pp. 27, 32-37

The Plaintiff has thus laid the foundation to support an inference of spoliation: she has

proffered evidence sufficient to permit the trier to find that BHN knew of (a) the claim (that is,

the litigation or the potential for litigation), and (b) the document's potential relevance to that

claim. *See Testa*, 144 F.3d at 177. ("We have held with some regularity that a trier of fact may

(but need not) infer from a party's obliteration of a document relevant to a litigated issue that the

contents of the document were unfavorable to that party"). *See, e.g., Blinzler v. Marriott Int'l,*

*Inc.,* 81 F.3d 1148, 1158 (1st Cir.1996); *Anderson v. Cryovac, Inc.,* 862 F.2d 910, 925 (1st

Cir.1988); *Nation–Wide Check Corp. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 217–18

(1st Cir.1982). A factfinder could make a "…permissive negative inference ….that [Dr. Reiss

and Disessa] destroy[ed] document[s] (or permits [them] to be destroyed) when facing litigation,

knowing the document's relevancy to issues in the case, [and did so out] of a sense that the

document's contents hurt [their] position." *See Beil v. Lakewood Eng'g & Mfg. Co.,* 15 F.3d 546,

552 (6th Cir.1994).

From all these facts, a jury could infer that Dr. Reiss knew exactly what was going on (likely because Mailler with whom she spoke weekly, told her), and that she at first dealt with the sexual harassment by actively avoiding Ms. Cagle. After the MCAD complaint was filed, however, Dr. Reiss engaged in an extensive cover-up, backdating documents and pretending that she had engaged in an investigation, to conceal any suggestion that she knew what was going on. *See Ocasio-Hernández*, 640 F.3d at 18 n.6 ("The lack of any plausible alternative justification for the plaintiffs' terminations makes the inference of . . . discrimination from the facts alleged more reasonable.").

   b.  *BHN should have known of Judge Estes' sexual harassment*

"[T]here can be constructive notice [of sexual harassment] in two situations: where an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer, or where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it." *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 294 (3d Cir. 1999) (*citing Zimmerman*, 96 F.3d at 1018–19). In the light most favorable to the Plaintiff, BHN should have known of the sexual harassment—the court staff knew or suspected, Clinician Mailler knew or suspected, and if Disessa and Dr. Reiss did not know, they should have known if they had supervised Ms. Cagle.

Even if the court finds that Clinician Mailler was not in a management role and was merely an employee, in the light most favorable to the Plaintiff, Mailler knew about the sexual relationship and believed it was contributing to a hostile work environment.

The Probation Department also knew. Probation Officer Stracuzzi testified that, "*people had suspicions* [of the sexual relationship].… [emphasis added]." (PSAF ¶ 212). The Probation Department knew that Ms. Cagle met privately with Judge Estes in his Belchertown chambers,

but he met with all other drug court team members in Pittsfield District Court. At the drug court conference, the Probation Department observed an intoxicated Judge Estes flirting with Ms. Cagle, and Probation Officer Carnevale heard Ms. Cagle ask Estes to walk her to her room, and saw them leave together and get on the elevator. (*See supra* at pp. 15-18).

Before the drug court conference, when the Probation Officers complained about Ms. Cagle, however, even though Judge Estes assured the probation officers that he would "take care of it" and "handle it," Estes admitted he "did not do anything about it." (*See supra* at pp. 15-16). After the Drug Court Conference, however, Probation stopped seeking assistance from Judge Estes to address the issues involving Ms. Cagle, and instead appealed directly to Deputy Commissioner Coelho. Probation observed that Judge Estes "hot and cold" conduct towards Ms. Cagle during staffings. Their sexual relationship created a hostile work environment for everyone. (*See supra* pp. 25-29).

In addition, the designated drug court clerk, Amy Slattery also had suspicions that Judge Estes was engaged in a sexual relationship with Ms. Cagle. (*See supra* pp. 19-20). When she learned that Ms. Cagle had filed a lawsuit relating to Judge Estes' sexual harassment, Slattery was visibly angry. She had seen Ms. Cagle texting Judge Estes, witnessed Ms. Cagle trying to get into his lobby alone, knew that Ms. Cagle "frequently" drove to Belchertown to see him. She had observed that Ms. Cagle felt entitled to walk right into Judge Estes lobby without telling the court officers, and if a court officer tried to intervene to see if the judge was available, she would just text the Judge and he would let her into chambers. (*See supra* pp. 19-20). Clerk Slattery specifically warned Judge Estes to "*be careful of who he's sweet to b[e]c[ause] of his position* and pointed out the fact that *some people will take advantage and only see a payday*… [emphasis added]." (*See supra* pp. 19-20). Slattery

felt that Judge Estes  "never put any real barriers down as a judge" and that "Ms. Cagle did not

seem to recognize any boundaries with [Judge Estes]. (*See supra* pp. 19-20).

Thus, the harassment was so pervasive and open that a reasonable employer would have

had to be aware of it, even if Dr. Reiss and Disessa were not. *See Kunin v.Sears Roebuck & Co.*,

175 F.3d 289, 294 (3d Cir. 1999) (*citing Zimmerman*, 96 F.3d at 1018–19).  If Dr. Reiss did not

know about the relationship (and again, we urge the Court that in the light most favorable to

the Plaintiff, she certainly did), it was because both she and Disessa did not appropriately

supervise Ms. Cagle. Out of the approximately 18 drug court staff meetings that occurred

between November 16 and March 17, 2017 (when Ms. Cagle was removed), Disessa attended

two meetings, and Dr. Reiss attended one. (*See supra* pp. 18, 20-21). Of the two meetings that

he did observe, Disessa testified "You could, kind of, feel the tension in the air, but I could not

tell what the cause of it was." The tension, according to Disessa, was tension among *all* members

of the drug court team, including Judge Estes. (*See supra* p. 18). Perhaps if he had attended

more than just two drug court staff meetings and met with Ms. Cagle in the courthouse as he

was supposed to do, he would seen what the probation department had seen and what the

clerk had seen—that Ms. Cagle was likely engaged in inappropriate relationship with Judge

Estes. (*See supra* at pp. 8, 18, 19-20.). Instead, Disessa was utterly absent, both DMH

Director Barber and Dr. Reiss worried that he was not supervising Ms. Cagle, and BHN

disciplined him for his poor job performance. (*See supra* at p. 10).

Perhaps the most troubling testimony to be elicited during discovery—and that is saying

a lot considering the factual issues in this case—came from Dr. Reiss, Ms. Cagle's indirect

supervisor and a clinical psychologist. During her deposition, Dr. Reiss testified that

> if anything inappropriate happened, then I believed that it was Tammy [Cagle]
> who initiated it, not Estes…. But she either initiated, or she made up a story or—

because I basically said, "Look, I think Tammy is a very psychologically unwell person at this point….Whatever went on here, that I – you know, if she's alleging that he sexually assaulted her, for example, I don't—I wouldn't believe it….I remember saying that she was psychologically not well, a*nd that I –I just would not—therefore, would not believe any—you know, I'm just speaking for myself— but I would not believe any of the accusations she made*, because she seemed psychologically unwell [emphasis added]. (PSAF ¶¶ 245-46).

BHN argues that "Cagle had sufficient opportunity to suggest to her supervisors that her relationship with Estes was unwelcome but did not do so." (BHN Memorandum at p. 22). Yet, Dr. Reiss admits that if even if Ms. Cagle came to her and disclosed, she would not have believed her. If this was the type of reporting environment that Reiss created for victims of sexual harassment, is it any wonder that Ms. Cagle never filed a formal complaint?

B. *The Plaintiff's 151B claims against BHN survive for the same reasons as the Title VII claim survives.*

BHN's motion for summary judgment on Count IV (that BHN violated M.G.L. 151B) should be denied for the reasons discussed *supra* pp. 44-52 regarding Plaintiff's Title VII claim. "The approach taken by the Supreme Judicial Court to 'hostile environment' claims brought under the state statute does not differ greatly from the Supreme Court's analysis." *Brissette*, 235 F. Supp. 2d at 85. Section 4(1) of Chapter 151B makes it unlawful: "[f]or an employer, by himself or his agent, because of the sex[ ] . . . of any individual . . . to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." Mass. Gen. Laws ch. 151B, § 4(1). "The statute defines discrimination on the basis of sex to include sexual harassment." *Sauer v. Belfor USA Grp., Inc.*, 205 F. Supp. 3d 209, 214 (D. Mass. 2016) (*citing* Mass. Gen. Laws ch. 151B, § 1(18)).  Sexual harassment is defined as:

sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for

employment decisions; (b) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.

Mass. Gen. Laws ch. 151B, § 1(18).  See also Mass. Gen. Laws ch. 151B, § 4(16A) ("It is unlawful . . . [f]or an employer, personally or through its agents, to sexually harass any employee."). Similar to Title VII, Chapter 151B imposes liability on an employer for the acts of a co- employee or a non-employee only when the employer "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action." *Sauer*, 205 F. Supp. 3d at 218 (quoting White v. N.H. Dep't of Corrs., 221 F.3d 254, 261 (1st Cir. 2000)). *See Noviello v. City of Boston*, 398 F.3d 76, 95 (1st Cir. 2005) ("When coworkers, rather than supervisors, are responsible for the creation and perpetation of a hostile work environment, Title VII and chapter 151B seem essentially coterminous as they relate to employer liability."); *Modern Cont'l/Obayashi v. Mass. Comm'n Against Discrimination*, 833 N.E.2d 1139-40 (Mass. 2005) ("[A]n employer may be held liable for failing to respond reasonably to acts of sexual harassment of which it is aware or reasonably should be aware, even though the harassing acts are perpetrated by someone who is not an agent or employee of the employer.").

 For the reasons previously discussed, the facts adduced during discovery show that BHN either "knew or should have known about the harassment, yet failed to halt it," and the Court should deny BHN's motion for summary judgment as to that claim. *See Noviello*, 398 F.3d at 95.

C. *There are no procedural defects in the Plaintiff's claims because the Defendant was sufficiently on notice of potential liability and had the opportunity to participate in the MCAD proceeding.*

Under the "scope of the investigation" rule, "a claim that is not explicitly stated in the administrative complaint may be asserted in the subsequent Superior Court action so long as it is based on the acts of discrimination that the MCAD investigation could reasonably be expected to

LEAVE TO FILE GRANTED ON OCTOBER 2, 2020

uncover." *Pelletier v. Somerset*, 458 Mass. 504, 514–15 (2010), *citing Everett v. 357 Corp.*, 453

Mass. 585, 602–03 (2009). "The critical question is whether the claims set forth in the civil

complaint come within the 'scope of the EEOC investigation which can reasonably be expected

to grow out of the charge of discrimination.'" *Powers v. Grinnell Corp.*, 915 F.2d 34, 39 (1st

Cir.1990), *quoting Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970).

There are only two purposes to the administrative filing: "(1) to provide the MCAD with

an opportunity to investigate and conciliate the claim of discrimination; and (2) to provide notice

to the defendant of potential liability." *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass.

521, 531 (2001); *see also Everett v. 357 Corp.*, 453 Mass. 585, 600 (2009).

In this case, there can be no doubt that the Plaintiff's MCAD Complaint put Judge Estes

on notice of potential liability. Indeed, on August 17, 2017, Judge Estes, represented by counsel,

participated in a meeting with Trial Court to address the allegations at issue with the MCAD

complaint. (PSAF ¶¶ 378-379). Not only was Judge Estes involved in the preparation of the Trial

Court's position statement, *he signed his name to the position statement*, affirming that that he

reviewed the statement and that the factual information contained in the statement was true to the

best of his knowledge. (PSAF ¶ 380). The argument that Judge Estes somehow did not have an

opportunity to participate in the MCAD process or was not on notice is Rule 11 territory. (PSAF

¶¶ 378-380).

CONCLUSION

WHEREFORE, for the foregoing reasons, this Honorable Court should deny Defendant

Judge Estes' and Defendant BHN's Motions for Summary Judgment.

[signature next page]

Respectfully submitted,

Plaintiff, Tammy Cagle,
By her attorneys,

/s/Leonard H. Kesten
Leonard H. Kesten, BBO# 542042
Erica L. Brody, BBO# 681572
BRODY, HARDOON, PERKINS & KESTEN, LLP
699 Boylston Street, 12th Floor
Boston, MA 02116
617-880-7100
lkesten@bhpklaw.com
ebrody@bhpklaw.com

Date: October 7, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent to those participants indicated as non-registered participants.

/s/ Leonard H. Kesten
Leonard H. Kesten, BBO# 542042

Date: October 7, 2020