UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TAMMY CAGLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:18-cv-10123-KAR |
| | ) | |
| THOMAS ESTES and BEHAVIORAL | ) | |
| HEALTH NETWORK, INC., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER REGARDING DEFENDANT BEHAVIORAL HEALTH
NETWORK, INC.'S MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 85)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

Plaintiff Tammy Cagle ("Plaintiff") alleges that Thomas Estes ("Estes") and Behavioral

Health Network, Inc. ("BHN") (collectively, "Defendants") created a hostile work environment

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title

VIII") and Mass. Gen. Laws ch. 151B ("Chapter 151B").  BHN has moved for summary

judgment on the grounds that it neither knew nor should have known about Estes' alleged sexual

harassment of Plaintiff during her tenure as a specialty court clinician for the Pittsfield Drug

Court (Dkt. No. 85).[1]  The parties have consented to this court's jurisdiction.  *See* 28 U.S.C. §

636(c); Fed. R. Civ. P. 73.  For the reasons that follow, BHN's motion for summary judgment is

GRANTED.

---

[1] Estes has moved for summary judgment in a separate motion (Dkt. No. 82).

II.   BACKGROUND[2]

A.   Massachusetts Drug Courts

The Massachusetts Trial Court Department ("Trial Court") developed specialty drug courts "to provide the option of treatment as an alternative to incarceration in cases where the underlying criminal behavior is thought to be motivated by a defendant's substance abuse" (Dkt. No. 100 at 29 ¶ 1).  *Deputy Chief Counsel for Pub. Def. Div. of Comm. for Pub. Council Servs. v. Acting First Justice of Lowell Div. of Dist. Court Dept.,* 74 N.E.3d 1250, 1252 (Mass. 2017). "Drug courts are defined as 'problem-solving courts that operate under a specialized model . . . ' with the ultimate goal of public safety and reduction of recidivism."  *Id.* (citation omitted).

"The structure of the drug court is informed by 'evidence-based best practices' emphasizing the necessity of a team approach to the development and oversight of the defendant's prescribed course of substance abuse treatment" (Dkt. No. 100 at 29 ¶ 3, at 32 ¶ 27). *Id.* (citation omitted).  The drug court judge leads a team that generally includes a probation officer(s), program coordinator, specialty court clinician, clerk, prosecutor, defense attorney, and treatment providers (Dkt. No. 100 at 29 ¶¶ 2, 3).  *See id.* at 1252-53.  The drug court judge, in collaboration with team members, determines whether a particular criminal defendant is eligible to participate in the drug court and crafts treatment plans for the drug court defendants (Dkt. No. 100 at 7 ¶ 10, at 30 ¶ 4, at 31 ¶¶ 16, 19).  The judge makes the ultimate decisions in a drug court case, including the acceptance of a participant, the imposition of incentives or sanctions, and the

---

[2] Unless another source is cited, the facts are drawn from BHN's Statement of Material Facts (Dkt. No. 87); Plaintiff's Responses to BHN's Statement of Facts and Plaintiff's Statement of Additional Facts (Dkt. No. 100); and BHN's Reply to Plaintiff's Response to Statement of Material Facts (Dkt. No. 103).  In accordance with the summary judgment standard, the evidence is viewed in the light most favorable to Plaintiff, the nonmoving party.  *See Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 820 (1st Cir. 1991).

removal of the defendant from the drug court (Dkt. No. 100 at 30 ¶ 4, at 31 ¶¶ 16, 19, 20).  The

probation department ("Probation") reviews each potentially eligible criminal defendant and

presents each potential referral to the presiding judge for review (Dkt. No. 100 at 31 ¶ 17).[3]  As

part of his evaluation, the presiding judge can require that the defendant be assessed by the

specialty court clinician (Dkt. No. 100 at 31 ¶ 18).  The specialty court clinician assesses each

defendant's viability as a drug court participant, recommends appropriate treatment options for

each defendant, and informs the drug court team on clinical perspectives (Dkt. No. 100 at 9 ¶ 23,

at 30 ¶ 6).  The drug court coordinator "'takes on some of the administrative duties that would

otherwise fall to the probation officer and/or specialty court clinician.  These responsibilities

include fostering a relationship with treatment providers, wrap around services, and community

groups, and assisting with data collection and data entry'" (Dkt. No. 100 at 30 ¶ 7 (citation

omitted)).  The judge can remove any member of the drug court team except a defense attorney

for an indigent defendant who is alleged to have violated the terms of his or her probation (Dkt.

No. 100 at 30 ¶¶ 8, 12).  *See Deputy Chief Counsel for Pub. Def. Div. of Comm. for Pub. Council

Servs.,* 74 N.E.3d at 1258 ("Counsel assigned by CPCS may be removed only for cause after a

hearing.").

    B.    The Pittsfield Drug Court

    During the winter of 2016, Estes, the former First Justice of the Eastern Hampshire

District Court in Belchertown, was appointed to preside over the newly-formed Pittsfield Drug

---

[3] "Typically, a defendant must meet three eligibility criteria for admission to the drug court:  (1) the defendant must have a substance use disorder; (2) the defendant must have been found guilty, pleaded guilty, or admitted to sufficient facts for a continuance without a finding; and (3) the defendant must have been placed on supervised probation." *Deputy Chief Counsel for Pub. Def. Div. of Comm. for Pub. Counsel Servs.,* 74 N.E.3d at 1253.

Court (Dkt. No. 1 ¶ 23; Dkt. No. 100 at 6 ¶ 6, at 30 ¶ 9).  Estes was tasked with "'build[ing] the whole thing'" (Dkt. No. 100 at 30 ¶ 11).  He participated in training sessions, then assisted in hiring the drug court staff and attended staffing and community meetings (Dkt. No. 100 at 30 ¶ 11).  Although the Pittsfield District Court Probation Department did not participate in the decision to form the Pittsfield Drug Court and allegedly opposed its creation, Deputy Chief Probation Officer John Lander and Probation Officer Mark Carnavale were members of the drug court team (Dkt. No. 100 at 7 ¶ 9, at 30 ¶ 10, at 41 ¶ 113).  The Pittsfield team also included two prosecutors, a public defender, treatment providers from the local community, and Plaintiff, who was hired to be the drug court coordinator and specialty court clinician (Dkt. No. 100 at 7 ¶ 9).

      C.      <u>Plaintiff was Hired to be the Specialty Court Clinician for the Pittsfield Drug Court in July 2016</u>

The Department of Mental Health ("DMH") had an interdepartmental service agreement with the Trial Court to provide services to the specialty drug courts (Dkt. No. 100 at 6 ¶ 4).  DMH, in turn, contracted with BHN, a behavioral health and substance abuse service provider, to staff the drug courts with clinicians (Dkt. No. 100 at 5 ¶¶ 1- 3).

Plaintiff applied to be BHN's clinician for the new Pittsfield Drug Court (Dkt. No. 100 at 33 ¶ 37).  John Barber, the DMH Area Program Director, reviewed Plaintiff's resumé (Dkt. No. 100 at 34 ¶ 38).  In June 2016, Dr. Welli Yeh, BHN's Forensic Services Director, and Susan Mailler, a BHN court clinician who was assigned to the Orange, Greenfield, and Springfield specialty courts, interviewed Plaintiff for the drug court position (Dkt. No. 100 at 34 ¶ 39).  In accordance with the specialty court's "'protocol,'" Dr. Yeh needed Estes' approval before she could hire Plaintiff (Dkt. No. 100 at 34 ¶¶ 40, 41).  On June 24, 2016, Dr. Yeh forwarded Plaintiff's resumé to Estes along with a note indicating that the Acting Assistant Commissioner of DMH had given Dr. Yeh the go-ahead to hire Plaintiff if Estes approved despite the fact that

Plaintiff was not yet licensed (Dkt. No. 100 at 33 ¶ 37, at 34 ¶ 42).  Estes and Dr. Yeh interviewed Plaintiff in late June 2016 (Dkt. No. 100 at 34 ¶¶ 44, 45).

On June 28, 2016, Dr. Yeh emailed Estes asking for his impression of Plaintiff and whether she had his "'seal of approval'" (Dkt. No. 100 at 34 ¶ 46).  Estes responded, "'I liked her a lot.  Let's hire her'" (Dkt. No. 100 at 34 ¶ 47).  On July 1, 2016, Estes' email message informed Judge Mary Hogan Sullivan, the Trial Court's Director of Specialty Courts, that he had interviewed Plaintiff, "'liked her very much,'" and agreed that she should be hired as the drug court clinician for the Pittsfield Drug Court contingent on her obtaining her license (Dkt. No. 100 at 35 ¶ 49).  Dr. Yeh of BHN informed Barber that Estes had "'approved'" Plaintiff's hiring as the drug court clinician for the Pittsfield Drug Court (Dkt. No. 100 at 8 ¶ 14, at 33 ¶ 35, at 35 ¶¶ 50, 52).  On July 5, 2016, Dr. Yeh notified Estes and Barber that she had hired Plaintiff for the part-time position (Dkt. No. 100 at 8 ¶ 14, at 35 ¶¶ 51, 52).

Plaintiff began working in the drug court on July 18, 2016 (Dkt. No. 100 at 35 ¶ 54).  Although she was hired by BHN, her office was located in the Pittsfield District Court (Dkt. No. 100 at 35 ¶ 54).  She had no immediate supervisor until BHN hired David DiSessa on August 1, 2016 (Dkt. No. 100 at 8 ¶ 17, at 35 ¶ 56).  DiSessa had no experience with drug courts or supervising drug court team members (Dkt. No. 100 at 36 ¶ 57).  DiSessa first met with Plaintiff at a Friendly's restaurant in Westfield on September 16, 2016 (Dkt. No. 100 at 36 ¶¶ 59, 60).  He continued to conduct his supervisory meetings at the Westfield Friendly's because he worked in Springfield (Dkt. No. 100 at 36 ¶¶ 60, 65).  DiSessa attended three or four staffing meetings during Plaintiff's eight-month tenure at the Pittsfield Drug Court (Dkt. No. 100 at 36 ¶ 65).  Two of those meetings occurred after the court began accepting participants in October 2016 (Dkt. No. 100 at 31 ¶ 15, at 36 ¶ 65, at 54 ¶ 224).  From November 2016 to January 2017, DiSessa's

BHN supervisor and Barber were concerned that DiSessa's supervision of Plaintiff was inadequate (Dkt. No. 100 at 37 ¶¶ 69-77).

Juliana Reiss, Psy.D., who replaced Dr. Yeh as BHN's Forensic Services Director in September 2016, supervised DiSessa and Plaintiff (Dkt. No. 100 at 8 ¶ 18, at 10 ¶ 29, at 36 ¶ 61). Like DiSessa, Reiss did not have experience working in a drug court (Dkt. No. 100 at 36 ¶ 62). Reiss attended two staffing meetings while Plaintiff was employed in the drug court and a "few" of the monthly meetings that Barber held with specialty court clinicians (Dkt. No. 100 at 36 ¶¶ 66-68). Although, like Plaintiff, Reiss had an office in the Pittsfield District Court, Plaintiff alleged that she did not see Reiss every week (Dkt. No. 100 at 10 ¶¶ 29, 30).

When Plaintiff was hired by the drug court, Mailler, a BHN clinician, had been working for a year in the drug courts in Orange and Greenfield and in the mental health specialty court in Springfield (Dkt. No. 100 at 38 ¶ 81). Plaintiff routinely consulted Mailler, who reviewed Plaintiff's work and assisted her with drug court planning (Dkt. No. 100 at 38 ¶¶ 82, 84). Reiss described Mailler as Plaintiff's "'informal supervisor'" and "'mentor'" (Dkt. No. 100 at 38 ¶¶ 86, 87). Mailler characterized herself as Plaintiff's supervisor on an employment recommendation form (Dkt. No. 100 at 39 ¶ 88).

D.      Plaintiff's Participation in Establishing the Framework for the Pittsfield Drug Court from July 2016 to October 2016

Plaintiff's initial duties consisted of developing a drug court manual and researching community treatment options for drug court participants (Dkt. No. 100 at 9 ¶ 22). On July 22, 2016, four days after Plaintiff began working in the drug court, she and Estes participated in a drug court meeting with eighty attendees (Dkt. No. 100 at 39 ¶ 89). Estes directed Plaintiff to speak at the meeting then apologized for putting her on the spot and gave her his personal cell phone number (Dkt. No. 100 at 39 ¶¶ 89, 90).

6

When Estes returned from a three-week vacation on August 15, 2016, Plaintiff requested a meeting to bring him up-to-date on the drug court's status (Dkt. No. 100 at 39 ¶¶ 91, 92). Estes suggested that they meet at the Belchertown District Court (Dkt. No. 100 at 39 ¶ 92).

During the fall of 2016, Plaintiff and Estes met in his Belchertown chambers every week or every other week to discuss the contents of the drug court manual, which required Estes' approval, the substance abuse treatment options in the Pittsfield area, drug court participants, and Plaintiff's job performance (Dkt. No. 100 at 10 ¶ 27, at 39 ¶ 93, at 40 ¶¶ 101, 103-05). Plaintiff spent about five hours of her twenty-hour week at private meetings with Estes in Belchertown (Dkt. No. 100 at 39 ¶ 94). She was the only drug court team member with whom Estes met in his Belchertown chambers (Dkt. No. 100 at 39 ¶ 96). Plaintiff told DiSessa, Mailler, and Lander that she and Estes met privately in Belchertown (Dkt. No. 100 at 39-40 ¶¶ 98, 99, 100).

E.     The Pittsfield Drug Court Began Holding Sessions in October 2016

The drug court accepted its first participant in October 2016 (Dkt. No. 100 at 31 ¶ 15). As the presiding judge, Estes set the court's hours and presided over the weekly drug court sessions on Thursdays (Dkt. No. 100 at 6 ¶ 7, at 31 ¶ 13). "In preparation for each drug court session, the team [was] assembled for a 'staffing,' the purpose of which [was] to review the progress of each drug court defendant who [was scheduled to] appear before the court that day" (Dkt. No. 100 at 7 ¶ 8, at 30 ¶ 5). *Deputy Chief Counsel for Pub. Def. Div. of Comm. for Pub. Council Servs.,* 74 N.E.3d at 1253. Estes scheduled the regular staffing meetings (Dkt. No. 100 at 30 ¶ 5, at 31 ¶ 13).

F.     Plaintiff's Relationship with the Pittsfield District Court's Probation
       Department from August 2016 to March 2017

Because the drug courts focused on treatment, as opposed to punishment, the roles of the probation officers who were members of the drug court team differed from the roles of probation

officers in the traditional criminal courts (Dkt. No. 100 at 31 ¶ 21, at 32 ¶¶ 22, 26).  In the
criminal court setting, probation officers made treatment recommendations, monitored
probationers, and generally had "'much more autonomy'" than they had in the drug courts where
drug court clinicians also recommended treatment programs and participated in the
determination of probationers' sentences (Dkt. No. 100 at 32 ¶¶ 22, 23, at 41 ¶ 117).

There was friction between Plaintiff and the drug court team's probation officers from the
beginning of Plaintiff's tenure in the drug court (Dkt. No. 100 at 15 ¶ 48).  Pittsfield Probation
Chief Matthew Stracuzzi turned to Estes for assistance in addressing the probation department's
relationship with Plaintiff who they viewed as overstepping the boundaries of her position (Dkt.
No. 100 at 16 ¶ 53, at 53 ¶ 214).

While Estes was on vacation in August 2016 during Plaintiff's first month in Pittsfield,
Probation refused her requests to meet to discuss the drug court (Dkt. No. 100 at 41 ¶ 112).  On
August 31, 2016, Plaintiff told Mailler that the Pittsfield Probation Department did not want a
drug court and wanted to exclude her from the courtroom during drug court sessions (Dkt. No.
100 at 42 ¶¶ 120-23).  Plaintiff indicated, "I have to get them to think like a treatment team"
(Dkt. No. 100 at 42 ¶ 123).  Mailler made Reiss aware that Plaintiff was experiencing "'probation
resistance'" (Dkt. No. 100 at 42 ¶¶ 124, 125).  The next day, September 1, 2016, Plaintiff again
sought Mailler's guidance on a Probation-related issue and also contacted Reiss (Dkt. No. 100 at
42 ¶ 126, at 43 ¶ 128).  Plaintiff told Reiss that she and Probation were not working as a team
(Dkt. No. 100 at 43 ¶ 130).  Specifically, she was receiving pushback from Probation in general
and from Stracuzzi in particular (Dkt. No. 100 at 43 ¶ 130).  Plaintiff alleged that the probation
officers were excluding her from participating in the development of drug court treatment plans
and wanted to exclude her from the courtroom during drug court sessions (Dkt. No. 100 at 43 ¶

130).  On September 6 and 16, 2016, Reiss contacted Estes to discuss the need for a meeting to clarify Plaintiff's and Probation's respective roles on the drug court team (Dkt. No. 100 at 43 ¶ 134, at 44 ¶ 139).

From the outset of Plaintiff's employment, Estes sensed "'tension'" and "mistrust" between Plaintiff and the drug court's probation officers, Stracuzzi, Lander, and Carnevale (Dkt. No. 100 at 41 ¶¶ 113, 115).  Estes observed that the probation officers "'cross[ed] the lane into making [treatment] recommendations'" (Dkt. No. 100 at 42 ¶ 118).  He attempted to mediate the conflicts between Plaintiff and Probation by pointing out that it was Plaintiff's job to make treatment recommendations, Probation's responsibility to monitor the participants' progress in treatment, and his job to decide the best treatment option (Dkt. No. 100 at 41 ¶ 116, at 42 ¶ 119). He advised everyone to "stay in their lanes" in order to avoid disagreements (Dkt. No. 100 at 41 ¶ 116).

Plaintiff complained about her relationship with the drug court's probation officers when she met with her supervisor, DiSessa, and at the monthly specialty court clinicians' meetings that Barber convened (Dkt. No. 100 at 16 ¶ 49, at 43 ¶ 133, at 45 ¶ 149).  DiSessa indicated that, during his discussions with Plaintiff at the Westfield Friendly's, she frequently recounted incidents when probation officers "'treated her poorly . . . yelled at her [and] were rude to her'" (Dkt. No. 100 at 43 ¶ 133).  DiSessa noted "'tension'" among all members of the drug court team during the two staffing meetings that he attended between November 2016 and March 2017 (Dkt. No. 100 at 54 ¶ 224, 225).  At the DMH clinicians' meetings, Plaintiff indicated that she and Estes shared similar views with respect to treatment options for drug court participants, but Probation did not understand the purpose of the drug court or the type of treatment that the participants required (Dkt. No. 100 at 45 ¶¶ 149, 150).

The use of the Office of Community Corrections ("CC") as a treatment option for drug court participants was an ongoing source of contention between Plaintiff and the Pittsfield Drug Court's probation officers (Dkt. No. 100 at 44 ¶ 136).  CC was an agency of the Trial Court that offered intermediate sanctions (Dkt. No. 100 at 11 ¶ 35, at 32 ¶ 24).  Prior to the drug court's opening, the Pittsfield Probation Department had a long-standing relationship with CC through the probation officers' daily work monitoring the defendants who were ordered by the court to serve their probationary sentences with CC (Dkt. No. 100 at 11 ¶ 35, at 32 ¶¶ 24, 25).  Contrary to the best practices for drug courts, CC was not a licensed treatment facility and was "'more of a punitive model'" than the facilities that were deemed appropriate to treat drug court participants (Dkt. No. 100 at 33 ¶¶ 29, 30, 33).  Reiss opined that CC "'may have been antithetical'" to the drug court's goals (Dkt. No. 100 at 33 ¶ 34, at 44 ¶¶ 136, 139).  However, the Pittsfield probation officers believed that CC was a suitable substance abuse treatment option for drug court participants (Dkt. No. 100 at 33 ¶ 31).

During Reiss' meeting with DiSessa on September 28, 2016 concerning Probation's relationship with Plaintiff, DiSessa reported on his meeting with Probation on the previous day (Dkt. No. 100 at 44 ¶ 136).  Stracuzzi wanted drug court participants to be treated by CC (Dkt. No. 100 at 44 ¶ 136).  Judge William Rota's September 28, 2016 email message to Estes concerning that meeting indicated:  "'We should chat a bit about your team and [Plaintiff].  I'm not sure they [probation] are playing nice with her. . . It looked like they did not invite her to that meeting yesterday [with Probation, the District Attorney's office, and CC] until someone mentioned her and then [Stracuzzi] ran out to get her mid-meeting'" (Dkt. No. 100 at 44 ¶ 141, at 45 ¶ 144).  Estes agreed with Judge Rota's assessment that "'the team is not playing nice with

[Plaintiff]'" and that it appeared that she was not invited to the meeting (Dkt. No. 100 at 44 ¶ 142).[4]

After a two-day drug court conference on November 16 and 17, 2016, which Estes, Plaintiff, Stracuzzi, Lander, and Carnevale attended, the probation officers complained to Deputy Commissioner of Probation Michael Coelho about Plaintiff's alleged statement concerning CC (Dkt. No. 100 at 49 ¶ 174, at 53 ¶ 217). Coelho, in turn, contacted Barber and reported that Plaintiff said that DMH thought it was a "'bad idea'" for drug court participants to be involved with CC (Dkt. No. 100 at 53 ¶ 218). Barber then reported that information to Reiss and asked her to follow up with Plaintiff (Dkt. No. 100 at 53 ¶ 219). On November 22, 2016, Reiss discussed the matter with Plaintiff, who denied making the statement (Dkt. No. 100 at 53 ¶ 220, at 54 ¶ 221). Plaintiff was not disciplined (Dkt. No. 100 at 54 ¶ 222). Reiss offered Plaintiff advice: "'both [Plaintiff] and . . . Estes were new to the Pittsfield Court and could be regarded with suspicion as outsiders if [Plaintiff] did not make an effort to accept the point of view of her Pittsfield colleagues'" (Dkt. No. 100 at 54 ¶ 223). Reiss directed Plaintiff to be "'more political'" and less ethical when interacting with Probation (Dkt. No. 100 at 54 ¶ 223). Plaintiff interpreted Reiss' comment as a direction to accept Probation's recommendations for drug court participants even if they conflicted with Estes' direction to follow best practices (Dkt. No. 100 at 54 ¶ 223).

---

[4] In addition to Judge Rota, Thomas Stanford, who worked at a treatment facility that served drug court participants, and Jennifer Tyne, the supervisor of the Committee for Public Council Services' ("CPCS") office in the Pittsfield District Court, observed the probation officers' disrespectful treatment of Plaintiff (Dkt. No. 46 ¶¶ 153, 155). Stanford told Reiss that the probation officers were not receptive to Plaintiff's treatment recommendations (Dkt. No. 100 at 46 ¶ 154). Tyne observed that probation officers treated Plaintiff "'poorly, picked arguments with her on irrelevant matter[s] and tended to "push her around"'" (Dkt. No. 100 at 46 ¶ 155, at 71 ¶ 359). According to Tyne, "it was not at all a secret that the probation department did not like [Plaintiff] and that they made her presence within the drug team difficult'" (Dkt. No. 100 at 46 ¶ 155, at 71 ¶ 359).

G.    Plaintiff's Removal from the Drug Court Team in March 2017

The Pittsfield Drug Court's weekly staffing meetings continued from November 2016 to March 2017 (Dkt. No. 100 at 58 ¶ 253).  Reiss and DiSessa were not aware of any problems between Plaintiff and Probation during that period (Dkt. No. 100 at 58 ¶¶ 251, 252, at 69 ¶ 335).

The drug court team discussed Pittsfield Drug Court participant DS's status at a February 2017 staffing meeting, which attorney Alex Bianchi, the Sheriff's Office Liaison to the drug court team, attended (Dkt. No. 100 at 59 ¶¶ 256, 257).  DS was being held at the county jail pending the availability of a treatment bed (Dkt. No. 100 at 59 ¶¶ 255, 258).  Bianchi reported that DS was "'first on the waitlist'" for a bed at Keenan House, a long-term treatment facility, and that there was a five-week waiting period for a bed (Dkt. No. 100 at 59 ¶¶ 255, 258).  Plaintiff met with DS at the jail after the February 2017 staffing meeting and learned his history:  he participated in MassHealth; he had overdosed seven times; and he preferred to be in a residential treatment program that was near his family (Dkt. No. 100 at 59-60 ¶ 260).  Keenan House fit that description (Dkt. No. 100 at 59-60 ¶ 260).

Because DS was still waiting for a treatment bed three weeks later, Plaintiff called Mailler who reported that the waiting period for treatment beds was longer than usual because patients were extending their stays in facilities during the harsh winter (Dkt. No. 100 at 59 ¶¶ 254, 259, at 60 ¶ 261).  Plaintiff also contacted Clinical Director Ellery Sheryll at a short-term in-patient substance abuse treatment facility, the Clinical Stabilization and Support Treatment Center ("CSS"), in Pittsfield (Dkt. No. 100 at 59 ¶ 255, at 60 ¶ 262).  Participants in MassHealth were permitted to stay at CSS for two weeks (Dkt. No. 100 at 59 ¶ 255).  Sheryll allegedly told Plaintiff that Keenan House gave priority to those individuals who came directly from the jail

and if an individual went to CSS first, he would lose his place on Keenan House's waitlist and would go to the end of the list (Dkt. No. 100 at 60 ¶ 262).

At the March 16, 2017 staffing meeting, Probation advocated for DS to be placed at CSS, but Plaintiff supported keeping DS at the jail until a Keenan House treatment bed became available (Dkt. No. 100 at 60 ¶ 263). Plaintiff was concerned that if DS was admitted to CSS and a Keenan House bed was not available when he was released from CSS two weeks later, he would be "back out on the street" and in danger of overdosing again (Dkt. No. 100 at 60 ¶ 263). In addition, DS preferred to stay in jail until a bed became available at a long-term treatment facility near his family (Dkt. No. 100 at 59-60 ¶¶ 260, 263). Estes decided that DS should remain in jail (Dkt. No. 100 at 60 ¶ 263).

Later that day, Carnevale called Plaintiff a "'liar'" and Lander yelled at her in the presence of other probation officers (Dkt. No. 100 at 60 ¶ 264). The probation officers indicated that, according to "'Debbie'" at Keenan House, Plaintiff conveyed false information about treatment at CSS negatively affecting DS's place on Keenan House's waitlist (Dkt. No. 100 at 60 ¶ 264). Plaintiff indicated that she related the information that Sherryl had provided, which Sherryl repeated at a meeting with Plaintiff and Carnevale later that day (Dkt. No. 100 at 60 ¶¶ 264, 265). Estes was aware that the probation officers were angry with Plaintiff after the March 16, 2017 meeting, but Lander told Estes not to worry about it because it did not involve him (Dkt. No. 100 at 60 ¶ 266, at 63-64 ¶ 289).

Without consulting Estes, Stracuzzi called his supervisor, Coelho, and recommended that Plaintiff be removed from her position as the drug court's clinician (Dkt. No. 100 at 18 ¶ 61, at 61 ¶¶ 267, 268). Coelho then called DMH Director Matthew Broderick who reported the complaint to Barber (Dkt. No. 100 at 19 ¶ 63, at 61 ¶ 269). After Barber spoke to Coelho, he

contacted Reiss and Stracuzzi and requested a meeting for the following day because the relationship between Plaintiff and the probation officers sounded like "'a house on fire'" (Dkt. No. 100 at 19 ¶¶ 63, 65, at 61 ¶ 270).

Estes recalled speaking to Barber on March 16, 2017 about the meeting that was scheduled for the next day to discuss the problems between Plaintiff and Probation (Dkt. No. 100 at 61 ¶ 272).  Estes told Barber that Plaintiff was a "'top notch'" clinician but she did not get along well with others (Dkt. No. 100 at 61 ¶ 274).  Estes did not report his conversation with Barber to Plaintiff (Dkt. No. 100 at 61 ¶ 275).

On March 17, 2017, Reiss, Barber, Stracuzzi, and Lander met to discuss Plaintiff without her knowledge (Dkt. No. 100 at 61 ¶ 276, at 62 ¶ 277).  Estes did not attend the meeting (Dkt. No. 100 at 19 ¶ 64).  According to Reiss' Supervision Note, Stracuzzi and Lander were "most concerned that [Plaintiff's] poor communication, misinformation, and [shirking of] her own job responsibilities were disrupting the flow of services to Drug Court participants" who remained incarcerated at the county jail for extended periods while awaiting treatment beds (Dkt. No. 100 at 20 ¶ 68, at 62-63 ¶ 286).  Reiss noted that the probation officers alleged that, in DS's case, Plaintiff received information about Keenan House from Debbie, who was on the staff of that facility, and that Lander received contrary information from the same person (Dkt. No. 100 at 63 ¶ 286).  Lander indicated that Plaintiff's allegedly false representation about Keenan House during the discussion of DS was "'pretty much [his] last straw'" (Dkt. No. 100 at 63 ¶ 288).

Plaintiff was not notified of the complaint or Reiss' Supervision Note despite BHN's policy that an employee must sign a disciplinary note (Dkt. No. 100 at 62 ¶¶ 282, 283, at 64 ¶ 290).  No one contacted Estes, the Sheriff's Department, CSS, or Keenan House to determine the accuracy of the probation officers' representations (Dkt. No. 100 at 64 ¶¶ 291, 292).

Reiss and Barber reported that they were "'kind of blown away . . . '" by what Probation reported at the meeting (Dkt. No. 100 at 19 ¶ 67, at 64 ¶ 293).  They determined that Plaintiff "'didn't seem like . . . a good fit'" for the drug court position and could not return to the Pittsfield Drug Court because there was "'too much bad blood'" (Dkt. No. 100 at 64 ¶ 293).  After their conversation, Barber indicated that Estes should be notified that Plaintiff would be removed from the drug court job because he participated in hiring her (Dkt. No. 100 at 64 ¶ 294).

  Although Reiss testified that it was Barber's decision to remove Plaintiff from her position at the drug court, Reiss' October 23, 2017 email to Barber, which her BHN supervisors had approved, indicated that she and Barber mutually agreed that Plaintiff should be replaced (Dkt. No. 100 at 65 ¶¶ 301-03).  On Friday, March 17, 2017, without first consulting Plaintiff's direct supervisor, DiSessa, Reiss told Plaintiff that she was being placed on administrative leave and could not report to the Pittsfield Drug Court on Monday because there had been "'a complaint'" about her (Dkt. No. 100 at 64 ¶ 298, at 65 ¶ 305).  Reiss refused to discuss the details of the complaint, but told Plaintiff that they would meet during the following week (Dkt. No. 100 at 65 ¶¶ 305, 306).  Plaintiff then called Estes who indicated that he did not know the reason for Plaintiff's removal from her drug court position (Dkt. No. 100 at 65 ¶ 306).

Estes' and Barber's memories differed concerning their March 17 telephone conversation when Barber notified Estes that Plaintiff was no longer assigned to the drug court (Dkt. No. 100 at 65-66 ¶¶ 307-12).  Estes recalled that he was "very surprised" by Barber's announcement that Plaintiff had been removed from her position due to Probation's complaints about her job performance (Dkt. No. 100 at 65 ¶ 308, at 66 ¶ 312).  According to Barber, when he delivered the news during a conversation in which Estes "rambled," Estes allegedly said, "'Well, that's too

bad.  She's a good girl, but she has a tendency to piss off a lot of people'" (Dkt. No. 100 at 21 ¶ 74, at 66 ¶ 311).

Reiss got in touch with Plaintiff on Monday, March 20, 2017 and asked Plaintiff to meet with her and Claudia Muradian Brubach, the BHN Human Resources Director, the next day (Dkt. No. 100 at 66-67 ¶ 314).  Reiss again refused to provide Plaintiff with the reason for her placement on administrative leave and told Plaintiff that her supervisor, DiSessa, could not attend the meeting (Dkt. No. 100 at 66-67 ¶ 314).  During the March 21, 2017 meeting, Reiss did not disclose the reason for Plaintiff's removal from the drug court position but told Plaintiff that there had been "problems" with Probation and referenced her November 2016 conversation when she told Plaintiff to be more "political" (Dkt. No. 100 at 21 ¶ 76, at 68 ¶ 331).  Plaintiff asked Reiss to contact CSS's Clinical Director Sheryll to corroborate the information that Sheryll had conveyed to Plaintiff concerning the availability of treatment beds for incarcerated drug court participants, which Plaintiff had reported during the March 16 drug court team's discussion of DS (Dkt. No. 100 at 68 ¶ 332).  Although Brubach directed Reiss to contact Sheryll, Reiss did not do so (Dkt. No. 100 at 69 ¶¶ 333, 334).

At Plaintiff's request, Estes contacted Judge Hogan Sullivan, the Director of the Trial Court's Specialty Courts, who reported that Plaintiff was removed due to complaints from the probation department and that only Probation and DMH were involved in Plaintiff's dismissal (Dkt. No. 100 at 67 ¶ 317).  Estes also contacted Reiss at Plaintiff's behest (Dkt. No. 100 at 67 at ¶ 319).  On March 23, 2017, Estes allegedly told Reiss that Plaintiff "'did a lot of good things for this program.  There were some issues.  Anyway, we're moving on'" (Dkt. No. 100 at 67 ¶ 321).

Plaintiff met with Reiss and Brubach again on March 30, 2017 in an effort to understand the reason for her removal from the drug court (Dkt. No. 100 at 70 ¶¶ 343, 345).  Reiss and

Brubach did not offer specific reasons for Plaintiff's removal but told her that she was not being disciplined (Dkt. No. 100 at 70 ¶ 346). During Plaintiff's tenure at the Pittsfield Drug Court, she received positive performance reviews from Estes, Stracuzzi, Reiss, DiSessa, and Mailler (Dkt. No. 100 at 38 ¶ 82, at 46-47 ¶¶ 156-73). After Plaintiff's removal from the drug court position, Reiss offered her full-time employment within other BHN departments (Dkt. No. 100 at 22 ¶ 78).

Plaintiff began treating patients with mental health and substance abuse issues at BHN's Sloan Clinic after her March 30, 2017 meeting with Reiss and Brubach (Dkt. No. 100 at 22 ¶¶ 79, 80, at 48 ¶ 167, at 71 ¶ 358). Her salary for the Sloan Clinic work was less than her drug court salary (Dkt. No. 100 at 71 ¶ 358).

DiSessa replaced Plaintiff as the Pittsfield Drug Court's clinician on March 30, 2017 (Dkt. No. 100 at 72 ¶ 367). The next day, DiSessa emailed Reiss and Brubach to memorialize his recent conversation with Estes (Dkt. No. 100 at 72 ¶ 369). According to DiSessa, Estes indicated that the atmosphere surrounding the drug court team had "'completely changed'" since Plaintiff's removal (Dkt. No. 100 at 72-73 ¶ 369). The "tension" was gone (Dkt. No. 100 at 73 ¶ 369). Estes reported that Plaintiff "'had no people skills'" and "'he had received many complaints about her'" from the court clerk's office and from correctional officers (Dkt. No. 100 at 73 ¶ 369). Probation allegedly accepted DiSessa as a member of the drug court team notwithstanding the fact that they had complained about Plaintiff performing the same assessments and recommending that participants remain in custody pending the availability of a treatment bed (Dkt. No. 100 at 73-74 ¶¶ 372-77).

On April 21, 2017, Plaintiff left her position at the Sloan Clinic and began employment as a Program Director with Spectrum Healthcare in Baxley, Georgia (Dkt. No. 100 at 22 ¶ 83).

H.    Estes' Inappropriate Sexual Relationship with Plaintiff

Plaintiff, Estes, and other members of the Pittsfield Drug Court team attended a two-day state-wide drug court conference in Marlboro, Massachusetts on November 16 and 17, 2016 (Dkt. No. 100 at 49 ¶ 174).  Plaintiff and Estes consumed alcohol on the evening of the first day of the conference (Dkt. No. 100 at 49 ¶¶ 176-77, 179, 182).  While they were alone at the dinner table, Estes suddenly began rubbing Plaintiff's arm and told her that she was "'adorable'" and "'attractive'" (Dkt. No. 100 at 49 ¶¶ 178, 180).

Plaintiff asked Estes to walk her to her hotel room at the end of the evening (Dkt. No. 100 at 49-50 ¶ 183).  From her hotel room, Plaintiff sent Estes a text message asking him to come to her room to fix the television's remote control (Dkt. No. 100 at 50 ¶ 185).  Estes complied with Plaintiff's request (Dkt. No. 100 at 50 ¶ 186).  Estes, who was "extremely" intoxicated, undressed and allegedly forced Plaintiff to perform oral sex on him (Dkt. No. 100 at 23 ¶ 86, at 50 ¶¶ 188, 189).  He then went to his hotel room (Dkt. No. 100 at 50 ¶ 189).

Plaintiff left the conference the next day feeling "uncomfortable, ashamed, and confused" about the encounter with Estes (Dkt. No. 100 at 50 ¶ 190).  Estes sent her a text message telling her that if anyone saw him entering or leaving her hotel room on the previous night, he was going to tell them that he walked her to her room, they talked for a minute about drug court and said goodnight.  He asked if that "'[s]ound[ed] good?'" (Dkt. No. 100 at 50 ¶ 191).  Estes also called Plaintiff and told her that it would be "'worse for'" her in drug court and she would lose "'credibility'" with the drug court's probation officers if others learned of the incident in her hotel room (Dkt. No. 100 at 50 ¶ 192).

The following week, Estes invited Plaintiff to his chambers in Belchertown to discuss drug court matters (Dkt. No. 100 at 50 ¶ 193).  She passed the court staff en route to Estes'

chambers (Dkt. No. 100 at 50 ¶ 194).  After they discussed the drug court, Estes closed the door, drew the blinds, and asked her to "'continue what they started'" (Dkt. No. 100 at 51 ¶ 195).  He allegedly promised that if Plaintiff performed oral sex on him, he would not ask her to do it again and would assist her with the problems that she was having with the Pittsfield probation officers (Dkt. No. 100 at 51 ¶ 195).  Feeling "pressured," Plaintiff agreed to Estes' request (Dkt. No. 100 at 51 ¶ 196).  She felt "degraded and humiliated" (Dkt. No. 100 at 51 ¶ 197).  Thereafter, Estes assisted Plaintiff in navigating her relationship with Probation (Dkt. No. 100 at 40 ¶ 106, at 51 ¶¶ 198-201).

From November 2016 to March 17, 2017, the date Plaintiff was placed on administrative leave from her drug court position, Plaintiff performed oral sex on Estes either in his Belchertown lobby or in her Westfield apartment (Dkt. No. 100 at 23 ¶¶ 88, 89, at 51-52 ¶ 203, at 65 ¶ 304).  Plaintiff initiated text message exchanges with Estes that alluded to their sexual relationship (Dkt. No. 100 at 24-25 ¶ 94).  During the drug court staffing meetings that were held after their sexual encounters, Estes allegedly intervened with Probation on Plaintiff's behalf and accepted her treatment recommendations (Dkt. No. 100 at 52 ¶ 204).  On the other hand, if Plaintiff expressed reluctance to perform oral sex, he purportedly sided with Probation concerning treatment decisions and rejected Plaintiff's suggestions (Dkt. No. 100 at 52 ¶ 204).

Plaintiff's and Estes' last sexual encounter occurred in Estes' Belchertown chambers on July 3, 2017 when Plaintiff visited Massachusetts from her home in Georgia (Dkt. No. 100 at 24 ¶ 92).  After that liaison, Plaintiff send Estes a text message saying that she wanted to end their relationship because it was one-sided (Dkt. No. 100 at 52 ¶ 210).  Estes agreed (Dkt. No. 100 at 52 ¶ 211).

III.   LEGAL STANDARD

The purpose of summary judgment is "'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) (citation omitted).  "Summary judgment is appropriate when, based on the pleadings, discovery, and disclosure materials in the record, 'there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp. 3d 104, 111 (D. Mass. 2015) (quoting Fed. R. Civ. P. 56(a), (c)).  "A 'genuine' dispute is one that, based on the supporting evidence, 'a reasonable [fact finder] could resolve . . . in favor of the nonmoving party,' and a 'material' fact is one that has 'the potential to affect the outcome of the suit under the applicable law.'" *Id.* at 111-12 (quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (citations and quotation marks omitted)).

When reviewing a motion for summary judgment, the court views the facts "in the light most favorable to the non-moving party." *Zambrana–Marrero v. Suarez–Cruz*, 172 F.3d 122, 125 (1st Cir. 1999).  "If the moving party satisfies the burden of showing, based on evidentiary material, that there is no genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate by reference to specific provable facts 'that a reasonable jury could return a verdict for the nonmoving party.'" *Ruggiero,* 137 F. Supp. 3d at 112 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient to establish a genuine dispute of material fact.  *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

IV.   ANALYSIS

A.   Count II:  Sex Discrimination/Creation of a Hostile Work Environment in Violation of Title VII

20

Plaintiff alleges that her employer, BHN, violated Title VII's prohibition against sexual harassment by failing to remedy the hostile work environment to which she was subjected by Estes.  BHN argues that it is entitled to summary judgment because it cannot be held liable for harassment of which it had no actual or constructive knowledge.

Under Title VII it is unlawful for an employer

> to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(a)(1).  An employee can prove discrimination under Title VII by establishing that sexual harassment created a hostile work environment.  *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.") (citations and internal quotation marks omitted); *McDonnell v. Cisneros*, 84 F.3d 256, 259 (7th Cir. 1996) ("When a female worker is sexually harassed by male coworkers or supervisors, the result is to make the workplace less bearable for her because she is a woman than it is for the men who work beside her and, being male, are not harassed.") (citing *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66–67 (1986)).

To succeed under Title VII with a claim of discrimination based on a hostile work environment, a plaintiff must show:

> "(1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established."

*Brissette v. Franklin Cty. Sheriff's Office*, 235 F. Supp. 2d 63, 85 (D. Mass. 2003) (quoting *O'Rourke v. City of Providence,* 235 F.3d 713, 728 (1st Cir. 2001), citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787–89 (1998)).   For purposes of BHN's summary judgment motion, BHN does not dispute that Plaintiff was subjected to a hostile work environment (Dkt. No. 102 at 5).   Instead, BHN challenges the sufficiency of Plaintiff's evidence concerning its knowledge of the circumstances in which she was working.

"In order to establish liability under Title VII, plaintiff must present sufficient evidence to show that the discriminatory conduct at issue can be attributable to her employer."  *Acosta v. Harbor Holdings & Operations, Inc.,* 674 F. Supp. 2d 351, 370 (D.P.R. 2009).   Although BHN did not employ Estes, it does not take contest Estes' possible status as Plaintiff's supervisor or coworker under a joint employment theory (Dkt. No. 86 at 18).   In any event, an employer may be subject to liability for harassment by a non-employee if the plaintiff shows that her employer either knew or should have known of sexual harassment and failed to address it.  *See Roy v. Correct Care Sols., LLC*, 914 F.3d 52, 68 (1st Cir. 2019) ("Liability for a discriminatory environment created by a non-employee 'depends on whether the employer knew or should have known of the hostile work environment and took reasonable measures to try to abate it.'") (quoting *Gardner v. CLC of Pascagoula, LLC*, 894 F.3d 654, 663 (5th Cir. 2018)); *Medina v. Adecco*, 561 F. Supp. 2d 162, 178 (D.P.R. 2008) ("To prevail under a theory of joint employer liability, plaintiff must show that defendant knew or should have known of the discriminatory conduct and failed to take prompt corrective measures within its control.").   BHN contends that it is entitled to judgment as a matter of law because Plaintiff has failed to sustain her burden to show that BHN's "management-level employees" had either actual or constructive knowledge of

22

the inappropriate relationship Estes initiated and maintained with her.  *Rivera v. Telefonica de P.*

*R.,* 913 F. Supp. 81, 87 (D.P.R. 1995).

>    1.    Plaintiff has not developed evidence that BHN had actual notice of
>          the alleged sexual harassment.

"An employer has actual notice of harassment when sufficient information either comes

to the attention of someone who has the power to terminate the harassment, or it comes to

someone who can reasonably be expected to report or refer a complaint to someone who can put

an end to it."  *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 802 (8th Cir. 2009)

(citing *Young v. Bayer Corp.,* 123 F.3d 672, 674 (7th Cir. 1997)).  "In the context of sexual

harassment claims, '[a]ctual notice is established by proof that management *knew* of the

harassment.'"  *Id.* (alteration in original) (quoting *Watson v. Blue Circle, Inc.,* 324 F.3d 1252,

1259 (11th Cir. 2003)).  "There is no actual knowledge until someone 'with authority to address

the problem' is notified."  *Sharp v. City of Houston,* 164 F.3d 923, 929 (5th Cir. 1999) (citation

omitted).

There is no evidence that Plaintiff notified BHN of the inappropriate relationship.

Although Plaintiff signed the Acknowledgment of Receipt of BHN's employment policies,

including its sexual harassment policy, on July 18, 2016, she did not file a sexual harassment

complaint with BHN during her BHN employment (Dkt. No. 100 at 26 ¶¶ 96-98, at 57 ¶ 243).

Estes did not tell anyone about the inappropriate relationship and Plaintiff did not report it to

anyone with whom she had a professional relationship, including Barber, Reiss, DiSessa, or

Mailler, or any member of the Pittsfield Drug Court team (Dkt. No. 100 at 26 ¶¶ 99, 100, 101, at

27 ¶ 103, 104, at 28 ¶¶ 109, 110).[5]

---

[5] Plaintiff points to evidence that Reiss viewed Plaintiff as a "'psychologically unwell person'" to
support her contention that Reiss would not have believed Plaintiff if she had reported Estes'

2.      Plaintiff has not developed sufficient evidence of BHN's constructive knowledge of the alleged sexual harassment.

Plaintiff makes the following arguments to support her claim that BHN had constructive notice of the sexual harassment:  (a) Mailler sent Plaintiff a  message from which it can be inferred that she suspected the inappropriate relationship; (b) if Reiss and DiSessa had adequately supervised Plaintiff, they would have discovered the inappropriate relationship; (c) BHN removed Plaintiff from her drug court position despite her positive performance reviews and without adequate investigation; and (d) Reiss and DiSessa's destruction of their notes related to Plaintiff could give rise to an inference they knew she intended to file a sexual harassment complaint.  Plaintiff's proffered evidence in support of these contentions does not meet the standard that is necessary to defeat summary judgment.

"Constructive notice may be found where an employee provides management level personnel with enough information to raise a probability of harassment in the minds of a reasonable employer, or where the harassment is so severe and pervasive that under the facts of the case, 'a reasonable employer would have had to be aware of it.'"  *Vizcarrondo-Gonzalez v. Perdue,* CIVIL NO. 16-2461 (PAD), 2020 WL 1459070, at *14 (D.P.R. Mar. 20, 2020) (quoting *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 294 (3d Cir. 1999)).  *See Zimmerman v. Cook Cty. Sheriff's Dep't*, 96 F.3d 1017, 1018 (7th Cir. 1996) ("The plaintiff must prove that the employer was negligent in having failed to discover and prevent [the harassment].").  "This standard strikes an appropriate balance between protecting the rights of the employee and the employer by faulting the employer for turning a blind eye to overt signs of harassment but not requiring it to

---

alleged harassment (Dkt. No. 99 at 52-53; Dkt. No. 100 at 57-58 ¶¶ 245-29).  Plaintiff could, however, have complained to another BHN supervisor, such as DiSessa or Mailler, who functioned as her informal supervisor.

attain a level of omniscience, in the absence of actual notice, about the misconduct."
*Vizcarrondo-Gonzalez,* 2020 WL 1459070, at *14.  Plaintiff does not contend that Estes'
harassment "was so open and pervasive that a reasonable employer could not have been ignorant
of it" (Dkt. No. 109 at 38-39).  *Kunin,* 175 F.3d at 295.  Thus, in order to survive summary
judgment, Plaintiff must present evidence that BHN had "'enough information to make a
reasonable employer think there was some probability that she was being sexually harassed.'"
*Vizcarrondo-Gonzalez,* 2020 WL 1459070, at *14 n.35 (quoting *Zimmerman,* 96 F.3d at 1019). !

        Estes urged Plaintiff to keep their relationship a secret by telling her that it would be
"'worse for'" her in drug court and she would lose "'credibility'" with the probation officers if
others learned the truth about their November 16, 2016 encounter in her hotel room (Dkt. No.
100 at 50 ¶ 192).  After this first sexual encounter, Estes and Plaintiff hid their activities from
others by engaging in relations either in Estes' Belchertown chambers or in Plaintiff's apartment
in Westfield (Dkt. No. 100 at 23 ¶¶ 88, 89, at 51-52 ¶ 203, at 65 ¶ 304).  There is no evidence
that anyone from the Pittsfield Drug Court or BHN was present in Belchertown when Estes
engaged Plaintiff in relations in his chambers.  *See Baker v. Int'l Longshoremen's Ass'n*, Civil
Action No. CV205-162, 2009 WL 368650, at *8–9 (S.D. Ga. Feb. 13, 2009) ("'the remoteness of
the location of the harassment as compared to the location of management'" is a relevant factor in
determining constructive notice of sexual harassment) (quoting *Miller v. Kenworth of Dothan,
Inc.,* 277 F.3d 1269, 1278-79 (11th Cir. 2002)). !!!

        Plaintiff told DiSessa, Mailler, and Lander that she and Estes met privately in
Belchertown (Dkt. No. 100 at 39 ¶ 98, at 40 ¶¶ 99, 100).  Without more, knowledge of private
meetings between professional colleagues of the opposite sex is not notice of probable sexual
harassment.  There were no reports that Plaintiff and Estes engaged in overt conduct that

suggested a sexual relationship or shared their intimate text messages with BHN employees or members of the drug court team.  Consequently, the information about the private meetings, by itself, was insufficient to provide BHN with constructive notice that Plaintiff was being sexually harassed.   !

> a.   *Mailler's conversations with Plaintiff do not show that BHN had constructive notice of an inappropriate relationship between Plaintiff and Estes.*

Plaintiff alleges that a factfinder could infer from two of her conversations with Mailler that Mailler suspected that Plaintiff and Estes were engaged in an inappropriate relationship (Dkt. No. 99 at 46-47, at 50).

For purposes of the summary judgment motion, BHN does not dispute that Mailler functioned as Plaintiff's de facto supervisor (Dkt. No. 109 at 28).  Plaintiff turned to Mailler for guidance in dealing with her disagreements with Probation because Mailler had been working as a specialty court clinician in the Greenfield and Orange Drug Courts for about a year when Plaintiff was hired in July 2016 (Dkt. No. 100-58 at 10, 14).  In response to Plaintiff's report of her discussions with Estes concerning drug court matters, Mailer warned, "'Just be careful, because, usually . . . you don't have a lot of contact with a judge, outside of a staffing, and that might alienate [P]robation'" (Dkt. No. 100-58 at 18-19).

On March 20, 2017, Plaintiff and Mailler discussed Plaintiff's placement on administrative leave from the Pittsfield Drug Court via text messages.  Their conversation, in pertinent part, was as follows:

Plaintiff:  I found out through a source that [P]robation made complaints to DMH.

Mailler:  That explains things – so John [Barber] is taking action more so than Julie [Reiss].

. . .

Plaintiff:  I'm going to ask [J]udge [E]stes to put in a call to John [Barber] if I have to.

Mailler:  *I don't see how that would hurt unless [P]robation is complaining that you have a personal relationship with the judge that is influencing him.*

Plaintiff:  That would be untrue.  [H]e treats us all the same.  He makes his decisions on the bench.  Which is [sic] always been in favor of the defense attorney.

(Dkt. No. 108-1 at 35) (emphasis added).

According to Plaintiff, Mailler's response concerning a possible "personal relationship" between Plaintiff and Estes was sufficient evidence from which a reasonable factfinder could infer that Mailler suspected that they were engaged in an inappropriate relationship.  In the court's view, this text message exchange does not reflect "enough information to raise a probability [of belief in] sexual harassment in the mind of a reasonable employer . . ." so as to create a triable issue.  *Kunin,* 175 F.3d at 294.  When Mailler communicated with Plaintiff on March 20, 2017, Mailler knew that Plaintiff and Estes had private discussions about drug court matters and that those discussions might have been resented by Probation (Dkt. No. 100 at 40 ¶ 99; Dkt. No. 100-58 at 19).  Mailler testified that she had "no idea" about the inappropriate relationship between Plaintiff and Estes (Dkt. No. 100-58 at 21-23).  The text message does not suggest otherwise.

Given the steps that Estes and Plaintiff took to keep the relationship a secret, it is not surprising that Plaintiff's support for her contention that Mailler had sufficient knowledge of sexual harassment is limited to Mailler's "personal relationship" statement and her knowledge of Plaintiff's and Estes' private meetings.  To sustain her burden of proof, a plaintiff "'must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.'" *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1st Cir. 2000) (quoting *McCarthy v. NW Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir. 1995).  The evidence on which Plaintiff relies is not sufficient to

support a reasonable inference that Mailler believed that Estes probably was sexually harassing Plaintiff, particularly when Mailler's text message is viewed in the context of Plaintiff's report that Probation was responsible for her discharge and Mailler's earlier warning that Plaintiff's private meetings with Estes might further alienate Probation.  Plaintiff's contrary contention requires "impermissible guesswork and speculation." *Justiniano v. Walker,* 986 F.3d 11, 29 (1st Cir. 2021).  "Conclusions that rest wholly on speculation are insufficient to defeat a motion for summary judgment." *Ahern v. Shinseki,* 629 F.3d 49, 58 (1st Cir. 2010).

          b.     *Plaintiff's inadequate supervision theory is not supported in law or fact.*

Plaintiff next argues that if Reiss and DiSessa had adequately supervised Plaintiff in the Pittsfield Drug Court instead of being notably absent, they should and would have known of Plaintiff's and Estes' inappropriate relationship (Dkt. No. 99 at 50-53).

Plaintiff did not work in BHN's offices or at a location controlled by BHN.  The parties agree that Reiss and DiSessa, Plaintiff's indirect and direct supervisors respectively, did not regularly observe Plaintiff's work in the Pittsfield Drug Court (Dkt. No. 100 at 36 ¶¶ 65, 66). Plaintiff points to no caselaw in this or any other jurisdiction holding that the "knew or should have known" standard can be satisfied by what is essentially a claim of negligent supervision of an employee who worked remotely where there is no evidence of willful blindness to sexually harassing conduct.  Moreover, because Estes and Plaintiff hid their relationship from coworkers, Plaintiff has no evidence tending to show that if Reiss and DiSessa had attended more staffing meetings and drug court sessions, they would have observed conduct that would have put them on notice of a hostile work environment.  *See Nash v. Electrospace Sys., Inc.,* 9 F.3d 401, 404 (5th Cir. 1993) ("The record . . . contains no evidence that [the offensive] conduct took place in public, under the eye of co-workers or supervisors.  It thus appears that the company did not

know nor should it have known of [the] offensive [behavior]."); *Long v. Tillotson Health Care Corp.,* 968 F. Supp. 751, 754 (D.N.H. 1997) ("the very clandestine nature of [the employee's] conduct undermines plaintiff's assertion that [her employer] should have known of the harassment.").

According to Plaintiff, if Reiss and DiSessa had exercised reasonable care by being at the courthouse more often, they might have learned of the sexual harassment from probation officers or Drug Court Session Clerk Amy Slattery (Dkt. No. 99 at 51-52). The record does not support this contention. Reiss testified that after Plaintiff filed an MCAD complaint alleging sexual harassment by Estes, she asked Lander whether he had "'any idea'" about the inappropriate relationship between Plaintiff and Estes (Dkt. No. 100 at 52-53 ¶ 212). He responded, "'[P]eople had suspicions but . . . nothing was enough to make anybody talk about it'" (Dkt. No. 100 at 53 ¶ 212). Rumors and conjecture are insufficient to overcome summary judgment. *See Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir. 1989). Plaintiff also alleges that Carnevale heard her ask Estes to walk her to her hotel room on November 16, 2016 and saw them enter the elevator in the hotel lobby (Dkt. No. 100 at 49-50 ¶¶ 183, 184). However, Plaintiff's own testimony is insufficient to establish that Carnevale heard or saw what Plaintiff alleges he heard and saw. *See Celotex Corp.,* 477 U.S. at 323; Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Plaintiff further suggests that a factfinder could reasonably infer that Probation knew about the inappropriate relationship because probation officers complained to Estes about Plaintiff before the November conference (to no avail) but stopped conferring with him after the conference and because Estes' treatment of Plaintiff during staffing meetings changed depending on whether she had agreed to his requests for sex (Dkt. No. 100 at 52 ¶ 204,

at 53 ¶¶ 214-16).  But, even if Carnevale witnessed the events in the hotel lobby and even if probation officers suspected an inappropriate relationship, there is no evidence that any probation officer voiced his or her observations or suspicions to BHN, Plaintiff's employer.  *See Acosta,* 674 F. Supp. 2d at 370.

Plaintiff also points to evidence from Slattery to support the argument that drug court team members knew of the inappropriate relationship.  Slattery knew that Plaintiff and Estes met privately in Estes' Pittsfield lobby and in Belchertown (Dkt. No. 100 at 55-56 ¶¶ 233, 235).  According to Slattery, Plaintiff did not follow the proper procedure for entering Estes' chambers by seeking permission from the court staff before entering (Dkt. No. 100 at 56 ¶ 235), and if a court officer tried to prevent Plaintiff from entering, she texted Estes who permitted her to enter (Dkt. No. 100 at 55-56 ¶¶ 233, 235).  Like other witnesses who knew about the private meetings, Slattery did not report overhearing suggestive conversations or observing behavior indicating an inappropriate relationship.  Slattery related her observations to a trial court investigator after Plaintiff filed the MCAD complaint, but there is no evidence that she conveyed information to BHN while Plaintiff was employed at the drug court (Dkt. No. 100 at 55-56 ¶¶ 233, 235).

Assuming solely for the sake of argument that Reiss and DiSessa had an obligation to oversee Plaintiff's workplace in person, the totality of the evidence on which Plaintiff relies is insufficient to support her theory that they would have known that she was experiencing a hostile work environment if they had visited Pittsfield more often.  *See Sharp,* 164 F.3d at 931 ("constructive knowledge inquires into what the [employer], in the exercise of reasonable care, *should have known.*").  *Compare Cotto v. Gen. Acc. Ins. Co. of P.R. Ltd.,* 975 F. Supp. 410, 415 (D.P.R. 1997) (plaintiff's supervisor's observation of employee's suggestive behavior toward the plaintiff was sufficient to permit a jury to conclude that if the supervisor had exercised

reasonable care, she should have discovered that the employee was sexually harassing the plaintiff).

      c.    *There is no evidence of a connection between Plaintiff's discharge from the drug court and Estes' relationship with her.*

!

    Plaintiff also argues that a factfinder could infer Reiss' knowledge of Plaintiff's and Estes' inappropriate relationship because she decided to remove Plaintiff from her drug court position in March 2017 (Dkt. No. 99 at 47-48).  Plaintiff contends that because there was no legitimate reason for her removal, Reiss's knowledge of the inappropriate relationship is the only explanation for the employment action.  This theory would require a fact finder to "pile inference on inference, and engage in sheer speculation, to make [that] inferential leap." *Paraka v. Univ. of Rochester,* 136 F. Supp. 3d 481, 486 (W.D.N.Y. 2015).  Such "conjecture cannot take the place of proof in the summary judgment calculus." *Bennett v. Saint–Gobain Corp.,* 507 F.3d 23, 31 (1st Cir. 2007)

    Even under the plaintiff-favorable summary judgment standard, there is no evidence of a connection between the inappropriate relationship and Plaintiff's reassignment.  Rather, the record evidence shows that Plaintiff's reassignment was the culmination of her contentious relationship with the probation officers, which spanned her entire tenure at the drug court. Probation allegedly opposed the creation of the Pittsfield Drug Court (Dkt. No. 100 at 30 ¶ 10, at 42 ¶ 122).  Plaintiff met with resistance from Probation almost immediately after she began working as the drug court clinician in July 2016 (Dkt. No. 100 at 15 ¶ 48, at 41 ¶¶ 111, 114).  In August and September 2016, Probation challenged Plaintiff's participation in treatment decisions and wanted to exclude her from appearing at the drug court sessions (Dkt. No. 100 at 42 ¶¶ 120, 122, 123, 126, at 43 ¶¶ 130, 135, at 44 ¶¶ 141, 142).  There is uncontroverted evidence from which it can be inferred that the probation officers viewed Plaintiff as encroaching on their

31

prerogative of recommending treatment for defendants (Dkt. No. 100 at 30 ¶ 6, at 33 ¶ 36, at 41 ¶¶ 116, 117). Plaintiff and Probation were at odds over whether CC was an appropriate treatment provider for drug court participants (Dkt. No. 100 at 33 ¶¶ 29- 31, 33, at 44 ¶ 136, at 45 ¶ 144). Probation excluded Plaintiff from discussions of CC's role in the drug court (Dkt. No. 100 at 44 ¶¶ 136, 141-42, at 45 ¶ 144). Immediately after the November 2016 drug court conference, the probation officers contacted Coelho and accused Plaintiff of announcing that DMH thought it was a "'bad idea'" to treat drug court participants through CC (Dkt. No. 100 at 53 ¶¶ 217, 218).

The tension between Plaintiff and Probation resulted in Probation initiating Plaintiff's removal from the drug court team in March 2017. Drug court participant DS, who was in custody awaiting the availability of a treatment bed, was the subject of the drug court team's staffing meeting on March 16, 2017 (Dkt. No. 100 at 59 ¶¶ 255, 258, at 60 ¶ 263). Plaintiff and Probation disagreed concerning whether DS should be released from custody for treatment at CSS, a short-term facility, or whether he should remain at the jail while waiting for an available bed at Keenan House, a long-term facility (Dkt. No. 100 at 59 ¶ 255, at 60 ¶ 263). Estes agreed with Plaintiff's recommendation that DS remain in custody while awaiting an available bed at Keenan House (Dkt. No. 100 at 60 ¶ 263). After the drug court session, the probation officers called Plaintiff a "'liar'" and accused her of presenting false information about the availability of a bed at Keenan House for DS if he was admitted to CSS from the jail (Dkt. No. 100 at 60 ¶¶ 262-64). Lander described that as "'his last straw'" (Dkt. No. 100 at 63 ¶ 288). Stracuzzi started the removal process by contacting his supervisor, Coelho, and recommending that Plaintiff be discharged from her drug court position (Dkt. No. 100 at 18 ¶ 61, at 61 ¶¶ 267, 268). After hearing Probation's list of grievances about Plaintiff's job performance at a March 17, 2017

meeting, Barber and Reiss agreed to remove Plaintiff from her position at the drug court (Dkt. No. 100 at 20 ¶ 68, at 62-63 ¶ 286, at 65 ¶ 301-03).

The conflict between Plaintiff and Probation was evident as early as July 2016 when Plaintiff began working at the drug court. That was three to four months before Estes initiated his first sexual encounter with Plaintiff. There is a veritable avalanche of evidence that Probation's dissatisfaction was the reason for Plaintiff's removal from the drug court position and it is uncontroverted. Even under the plaintiff-favorable view of the evidence, Plaintiff has failed to sustain her burden of presenting evidence from which it can reasonably be inferred that Probation, Barber, or Reiss knew or reasonably should have known about the inappropriate relationship in March 2017 or that the relationship played a role when they decided to remove Plaintiff from the drug court.

> d.    *Reiss' and DiSessa's destruction of their notes do not give rise to an inference that they knew of sexual harassment.*

Finally, Plaintiff contends that Reiss' and DiSessa's destruction of their handwritten notes permits the inference that they knew about Estes' inappropriate relationship with Plaintiff (Dkt. No. 99 at 48-50). BHN argues that, although it may have anticipated litigation after Plaintiff's discharge from the drug court, there is no basis for the inference that Reiss and DiSessa knew the litigation would be based on a claim that Estes had created a hostile working environment.

"Spoliation can be defined as the failure to preserve evidence that is relevant to pending or potential litigation." *Jimenez-Sanchez v. Caribbean Rests, LLC*, 483 F. Supp. 2d 140, 143 (D.P.R. 2007). "[A] trier of fact may (but need not) infer from a party's obliteration of a document relevant to a litigated issue that the contents of the documents were unfavorable to the party." *Testa v. Wal–Mart Stores, Inc.,* 144 F.3d 173, 177 (1st Cir. 1998). "Before such an inference can materialize, the sponsor of the inference must proffer evidence sufficient to permit

the trier of fact to find that the party against which the inference is sought to be made knew of (1) the litigation or the potential of litigation and (2) the potential relevance of the missing evidence to the litigation." *Jimenez-Sanchez,* 483 F. Supp. 2d at 143 (citing *Testa,* 144 F.3d at 177). *See Booker v. Mass. Dept. of Pub. Health,* 612 F.3d 34, 45-46 (1st Cir. 2010).

According to Plaintiff, Reiss destroyed twenty pages of handwritten notes, including her notes of the March 17, 2017 meeting with Barber, Stracuzzi, and Lander concerning Plaintiff, and her notes of her March 30, 2017 meeting with Plaintiff and Brubach (Dkt. No. 100 at 62 ¶¶ 279-81, at 68 ¶¶ 322-27, at 70 ¶¶ 345-47).  DiSessa, who made notes about Plaintiff, allegedly "shredded" his handwritten notes "around March of 2017" (Dkt. No. 100 at 68 ¶¶ 328-29).  In support of her argument that BHN knew of the potential for litigation when the notes were destroyed, Plaintiff focuses on a note Reiss wrote during her meeting with BHN Vice President Susan West on April 5, 2017, nineteen days after Plaintiff was removed from her drug court position (Dkt. No. 100 at 37 ¶ 70, at 56 ¶ 236).  The handwritten note said, "'Mass. Commission vs. Discrimination'" and "'Dave prob[lem]s-Don't put the whole hat on [Plaintiff]'" (Dkt. No. 100 at 56 ¶ 236).

Although this is some evidence that Reiss suspected that Plaintiff was a disgruntled employee who might file a complaint with the MCAD based on her removal from her drug court assignment, there is no basis for Plaintiff's contention that Reiss or DiSessa were aware that any such complaint would allege sexual harassment by Estes.  When Reiss placed Plaintiff on administrative leave on March 17, 2017, Reiss indicated that she knew that Plaintiff loved her job at the drug court (Dkt. No. 100 at 65 ¶ 305).  Plaintiff expressed her dissatisfaction with Reiss' and Brubach's failure to explain the reasons for her removal from the drug court and to follow BHN's procedures, which required a written warning before she was placed on

administrative leave and the attendance of her supervisor, DiSessa, at the March 21, 2017 meeting with Reiss and Brubach (Dkt. No. 100 at 66 ¶ 314, at 68 ¶ 331, at 70 ¶ 346).  In addition, Plaintiff points out, Reiss did not contact Sheryll to corroborate the information that Plaintiff gave to the drug court team about DS on March 16, 2017 even though Plaintiff and Brubach asked Reiss to make that inquiry (Dkt. No. 100 at 68-69 ¶¶ 332-34).  Given those facts along with the evidence that Plaintiff had received positive performance reviews and was never disciplined for her drug court work, Reiss was reasonably concerned that she might file an MCAD complaint.  Viewing the evidence in the light most favorable to Plaintiff, it might fairly be inferred that Reiss and DiSessa knew of the potential for litigation when they destroyed their notes (Dkt. No. 100 at 38 ¶ 82, at 46-49 ¶¶ 156-73, at 70 ¶ 346).  Nonetheless, in the absence of evidence that anyone employed by BHN had a reason to suspect that Estes was harassing Plaintiff, Reiss' concern about a possible MCAD complaint and the destruction of contemporaneous notes cannot be transformed into evidence from which a factfinder could infer that the notes would have reflected knowledge about Estes' misconduct.[6]  *See Testa*, 144 F.3d at 177 (a suitable foundation must exist before an inference can be drawn that destroyed documents would have been relevant to a pending claim, and would have hurt a party's position).

In sum, after extensive discovery including numerous depositions, Plaintiff has not developed evidence from which a reasonable jury could find that BHN knew or should have

---

[6] Plaintiff also makes a spoliation argument concerning Reiss' Supervision Notes reflecting discussions of Plaintiff's job performance.  Although the notes were dated March and April 2017, an examination of computer metadata appears to indicate that Reiss wrote them on September 28 and 29, 2017 and backdated them (Dkt. No. 100 at 69 ¶¶ 337-39, at 70 ¶¶ 349, 350, at 71 ¶ 359, at 72 ¶¶ 360, 364-65).  If the later dates are accurate, the notes were written after Plaintiff filed her MCAD complaint on August 2, 2017 and BHN filed its position statement on September 20, 2017.  Even if the notes were intended to shore up BHN's account of Plaintiff's work in the drug court and BHN's reasons for removing her, the notes do not fill the evidentiary gap as to BHN's knowledge of Estes' harassing conduct (Dkt. No. 100 at 70 ¶ 340).  *See Testa,* 144 F.3d at 177.

known that Estes was harassing Plaintiff.  Accordingly, BHN is entitled to summary judgment on Count II.

      B.     <u>Count IV:  Sex Discrimination/Creation of a Hostile Work Environment in Violation of Mass. Gen. Laws ch. 151B</u>

!

Plaintiff contends that BHN's motion for summary judgment on Count IV should be denied for the same reasons she advanced to deny the motion on the Title VII claim (Dkt. No. 99 at 53-54).  The Massachusetts Supreme Judicial Court's approach to hostile work environment claims brought under Mass. Gen. Laws ch. 151B, § 4(1) is, in all relevant respects, the same as the Supreme Court's approach to Title VII claims.  *See Martinelli v. Bancroft Chophouse, LLC,* 357 F. Supp. 3d 95, 102 (D. Mass. 2019) (citing *Ponte v. Steelcase, Inc.,* 741 F.3d 310, 319 n.9 (1st Cir. 2014)).

"[Chapter 151B] defines discrimination on the basis of sex to include sexual harassment." *Sauer v. Belfor USA Grp., Inc.,* 205 F. Supp. 3d 209, 214 (D. Mass. 2016) (citing Mass. Gen. Laws ch. 151B, § 1(18)).  *See also* Mass. Gen. Laws ch. 151B, § 4(1), (16A).  Like Title VII, Chapter 151B imposes liability on an employer for harassment by a co-worker or a non-employee only if the employer "'knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action.'"  *Sauer,* 205 F. Supp. 3d at 218 (quoting *White v. N.H. Dep't of Corrs.,* 221 F.3d 254, 261 (1st Cir. 2000)).  *See also Posada v. ACP Facility Servs., Inc.*, 389 F. Supp. 3d 149, 157 (D. Mass. 2019) ("Under both Title VII and Chapter 151B, when a co-worker (rather than a supervisor) is responsible for creating a hostile work environment, the employer is liable for the co-worker's misconduct only if the harassment is causally connected to the employer's negligence.  'Typically, this involves a showing that the employer knew or should have known about the harassment, yet failed to take prompt action to stop it.'") (quoting *Noviello v. City of Boston,* 398 F.3d 76, 95 (1st Cir. 2005)); *Modern*

36

*Cont'l/Obayashi v. Mass. Comm'n Against Discrimination*, 833 N.E.2d 1139-40 (Mass. 2005) ("[A]n employer may be held liable for failing to respond reasonably to acts of sexual harassment of which it is aware or reasonably should be aware, even though the harassing acts are perpetrated by someone who is not an agent or employee of the employer."). As is set forth above, there is no evidence from which it can reasonably be inferred that BHN was negligent in failing to discover that Estes was harassing Plaintiff. Accordingly, BHN is entitled to summary judgment on Count IV.

V.    CONCLUSION

For the foregoing reasons, BHN's motion for summary judgment on Counts II and IV is GRANTED (Dkt. No. 85).

It is so ordered.

March 24, 2021                                    /s/ Katherine A. Robertson
                                                 KATHERINE A. ROBERTSON
                                                 U.S. MAGISTRATE JUDGE

!