UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TAMMY CAGLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:18-cv-10123-KAR |
| | ) | |
| THOMAS ESTES and BEHAVIORAL | ) | |
| HEALTH NETWORK, INC., | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM AND ORDER REGARDING DEFENDANT THOMAS ESTES' MOTION
FOR SUMMARY JUDGMENT</u>
(Dkt. No. 82)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION

Plaintiff Tammy Cagle ("Plaintiff") alleges that Thomas Estes ("Estes") and Behavioral

Health Network, Inc. ("BHN") (collectively, "Defendants") created a hostile work environment

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title

VIII") and Mass. Gen. Laws ch. 151B ("Chapter 151B").  Estes has moved for summary

judgment on the remaining Chapter 151B claim on the grounds that he was not Plaintiff's

employer and that she did not exhaust her administrative remedies as to him (Dkt. No. 82).[1]  The

parties have consented to this court's jurisdiction (Dkt. No. 28).  *See* 28 U.S.C. § 636(c); Fed. R.

Civ. P. 73.  For the reasons that follow, Estes' motion for summary judgment is DENIED.

II.     BACKGROUND

---

[1] The court granted BHN's summary judgment motion in a separate order (Dkt. No. 118).

A.      Factual Background[2]

1.      Massachusetts Drug Courts

The Massachusetts Trial Court Department ("Trial Court") developed specialty drug courts "to provide the option of treatment as an alternative to incarceration in cases where the underlying criminal behavior is thought to be motivated by a defendant's substance abuse" (Dkt. No. 100 at 29 ¶ 1).  *Deputy Chief Counsel for Pub. Def. Div. of Comm. for Pub. Council Servs. v. Acting First Justice of Lowell Div. of Dist. Court Dept.,* 74 N.E.3d 1250, 1252 (Mass. 2017). "Drug courts are defined as 'problem-solving courts that operate under a specialized model . . . ' with the ultimate goal of public safety and reduction of recidivism."  *Id.* (citation omitted).

"The structure of the drug court is informed by 'evidence-based best practices' emphasizing the necessity of a team approach to the development and oversight of the defendant's prescribed course of substance abuse treatment" (Dkt. No. 100 at 29 ¶ 3, at 32 ¶ 27). *Id.* (citation omitted).  The drug court judge leads the team that generally includes a probation officer(s), program coordinator, specialty court clinician, clerk, prosecutor, defense attorney, and treatment providers (Dkt. No. 100 at 29 ¶¶ 2, 3).  *See id.* at 1252-53.  The drug court judge, in collaboration with team members, determines whether a particular criminal defendant is eligible to participate in the drug court and crafts treatment plans for the drug court defendants (Dkt. No.

---

[2] Unless another source is cited, the facts are drawn from Estes' Local Rule 56.1 Statement of Material Facts (Dkt. No. 84); Plaintiff's Response to Estes' Local Rule 56.1 Statement of Material Facts and Plaintiff's Statement of Additional Material Facts in Support of Her Opposition to the Defendants' Motions for Summary Judgment (Dkt. No. 100); and Plaintiff's Response to Estes' Local Rule 56.1 Statement of Material Facts, with Estes' replies to Plaintiff's responses, and Estes' Response to Plaintiff's Statement of Additional Material Facts in Support of Her Opposition to the Defendants' Motions for Summary Judgment (Dkt. No. 115).  In accordance with the summary judgment standard, the evidence is viewed in the light most favorable to Plaintiff, the nonmoving party.  *See Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 820 (1st Cir. 1991).

100 at 30 ¶ 4).  The judge makes the ultimate decisions in a drug court case, including the acceptance of a participant, the imposition of incentives or sanctions, and the removal of the defendant from the drug court (Dkt. No. 100 at 30 ¶ 4, at 31 ¶¶ 16, 19, 20).  The probation department ("Probation") assesses each potentially eligible criminal defendant and presents each potential referral to the presiding judge for review (Dkt. No. 100 at 31 ¶ 17).  As part of his evaluation, the presiding judge can require that the defendant be evaluated by the specialty court clinician (Dkt. No. 100 at 31 ¶ 18).  The specialty court clinician assesses each defendant's viability as a drug court participant, recommends appropriate treatment options for each defendant, and informs the drug court team on clinical perspectives (Dkt. No. 100 at 30 ¶ 6). The drug court coordinator "'takes on some of the administrative duties that would otherwise fall to the probation officer and/or specialty court clinician.  These responsibilities include fostering a relationship with treatment providers, wrap around services, and community groups, and assisting with data collection and data entry'" (Dkt. No. 100 at 30 ¶ 7 (citation omitted)).  Estes has testified that "'maybe'" the presiding judge could discharge a member of the drug court team who was "'not doing their job'" (Dkt. No. 100 at 30 ¶ 12).

> 2.    The Pittsfield Drug Court

During the winter of 2016, Estes, the former First Justice of the Eastern Hampshire District Court in Belchertown, was appointed to be the presiding justice of the newly formed Pittsfield Drug Court (Dkt. No. 1 ¶ 23; Dkt. No. 100 at 30 ¶ 9).  Estes was tasked with "'build[ing] the whole thing'" (Dkt. No. 100 at 30 ¶ 11).  He participated in training sessions, then assisted in hiring the drug court staff and attended staffing and community meetings (Dkt. No. 100 at 30 ¶ 11).  Although the Pittsfield District Court Probation Department did not participate in the decision to form the Pittsfield Drug Court and allegedly opposed its creation, Chief

Probation Officer Matt Stracuzzi, Deputy Chief Probation Officer John Lander, and Probation Officer Mark Carnavale were members of the drug court team (Dkt. No. 100 at 30 ¶ 10, at 41 ¶ 113, at 49 ¶ 174). The Pittsfield team also included two prosecutors, a public defender, treatment providers from the local community, and Plaintiff, who was hired to be the drug court coordinator and specialty court clinician (Dkt. No. 100 at 29 ¶ 3).

3.      The circumstances of Plaintiff's hiring.

The Department of Mental Health ("DMH") contracted with the Trial Court to provide services to the specialty drug courts in Orange, Greenfield, and Springfield (Dkt. No. 115 at 2 ¶¶ 4, 5). DMH, in turn, contracted with BHN to provide clinicians to the drug courts (Dkt. No. 115 at 2 ¶¶ 5, 8).

Plaintiff applied to BHN for the position of drug court coordinator/specialty court clinician in the new Pittsfield Drug Court (Dkt. No. 100 at 33 ¶¶ 35, 37). John Barber, the DMH Area Forensics Director, who managed DMH's drug court contracts, reviewed Plaintiff's resumé (Dkt. No. 100 at 34 ¶ 38; Dkt. No. 115 at 2 ¶ 7). In June 2016, Dr. Welli Yeh, BHN's Forensic Services Director, and Susan Mailler, a BHN court clinician who was assigned to the Orange, Greenfield, and Springfield specialty courts, interviewed Plaintiff for the drug court position (Dkt. No. 100 at 34 ¶ 39). Yeh notified Plaintiff by e-mail that Estes' approval was required before she could hire Plaintiff (Dkt. No. 100 at 34 ¶ 41). On June 24, 2016, Yeh forwarded Plaintiff's resumé to Estes along with a note indicating that the Acting Assistant Commissioner of DMH had given Yeh the go-ahead to hire Plaintiff if Estes approved despite the fact that Plaintiff was not yet licensed (Dkt. No. 100 at 33 ¶ 37, at 34 ¶ 42). Estes met with Yeh and Plaintiff in his Belchertown lobby thereafter (Dkt. No. 100-54 at 27-28).

On June 28, 2016, Yeh e-mailed Estes asking for his impression of Plaintiff and whether she had his "'seal of approval'" (Dkt. No. 100 at 34 ¶ 46). Estes responded, "'I liked her a lot. Let's hire her'" (Dkt. No. 100 at 34 ¶ 47). On July 1, 2016, Estes sent an e-mail message to Judge Mary Hogan Sullivan, the Trial Court's Director of Specialty Courts, indicating that he had met Plaintiff, "'liked her very much,'" and agreed that she should be hired as the Pittsfield Drug Court's clinician contingent on her obtaining her license (Dkt. No. 100 at 35 ¶ 49). Yeh informed Barber that Estes had "'approved'" Plaintiff's hiring as the drug court clinician (Dkt. No. 100 at 33 ¶ 35, at 35 ¶¶ 50, 52). On July 5, 2016, Yeh notified Estes and Barber that Plaintiff had accepted the part-time drug court position (Dkt. No. 100 at 35 ¶ 52; Dkt. No. 115 at 4 ¶ 16).

Plaintiff began working in the drug court on or about July 18, 2016 (Dkt. No. 100 at 35 ¶ 54; Dkt. No. 115 at 3 ¶ 11). Although she was a BHN employee, her office was in the Pittsfield District Court (Dkt. No. 100 at 35 ¶ 54; Dkt. No. 115 at 3 ¶ 11). During Plaintiff's tenure at the drug court, Estes referred to her as "'my case worker'" (Dkt. No. 100 at 40 ¶ 107).

          4.     Plaintiff's participation in establishing the Pittsfield Drug Court from July 2016 to October 2016

According to Plaintiff, she and Estes participated in a drug court meeting with eighty attendees shortly after she began working in the drug court (Dkt. No. 100 at 39 ¶ 89; Dkt. No. 100-48 at 2). The next day, Estes apologized for putting her "on the spot" at the meeting and provided his personal cell phone number in an e-mail message (Dkt. No. 100 at 39 ¶¶ 89, 90; Dkt. No. 100-48 at 2). When Estes returned from a three-week vacation on August 15, 2016, Plaintiff requested a meeting to bring him up to date on the drug court's status (Dkt. No. 100 at 39 ¶¶ 91, 92). Estes suggested that they meet at the Belchertown District Court (Dkt. No. 100 at 39 ¶ 92).

Plaintiff and Estes met for about five hours in his Belchertown chambers every week or every other week to discuss Plaintiff's drafts of the drug court manual, which required Estes' approval, the substance abuse treatment options in the Pittsfield area, and drug court participants (Dkt. No. 100 at 33 ¶ 36, at 39 ¶¶ 93, 94, at 40 ¶¶ 101, 103, 105).  According to Plaintiff, he also praised her job performance and mediated her conflicts with other drug court team members (Dkt. No. 100 at 40 ¶¶ 104, 106).  Estes told BHN employee David DiSessa, Plaintiff's immediate supervisor, that Plaintiff was doing a "'good job'" (Dkt. No. 100 at 36 ¶ 57).

5.     The Pittsfield Drug Court Began Holding Sessions in October 2016

The drug court accepted its first participant in October 2016 (Dkt. No. 100 at 31 ¶ 15; Dkt. No. 115 at 2 ¶ 6).  "In preparation for each drug court session, the team [was] assembled for a 'staffing,' the purpose of which [was] to review the progress of each drug court defendant who [was scheduled to] appear before the court that day" (Dkt. No. 100 at 30 ¶ 5).  *Deputy Chief Counsel for Pub. Def. Div. of Comm. for Pub. Council Servs.,* 74 N.E.3d at 1253.  Estes scheduled the regular staffing meetings (Dkt. No. 100 at 30 ¶ 5, at 31 ¶ 13).  As the presiding judge, Estes set the court's hours and presided over the weekly drug court sessions (Dkt. No. 100 at 31 ¶ 13).  In his view, he supervised everyone who was present at the drug court session (Dkt. No. 100 at 41 ¶ 110).

6.     Estes' Inappropriate Sexual Relationship with Plaintiff

Plaintiff, Estes, and other members of the Pittsfield Drug Court team attended a two-day state-wide drug court conference in Marlboro, Massachusetts on November 16 and 17, 2016 (Dkt. No. 100 at 49 ¶ 174).  Plaintiff and Estes consumed alcohol on the evening of the first day of the conference (Dkt. No. 100 at 49 ¶¶ 176-77, 179, 182).  Plaintiff alleges that Estes suddenly began rubbing her arm and told her that she was "'adorable'" and "'attractive'" when they were

alone at the dinner table (Dkt. No. 100 at 49 ¶¶ 178, 180).  Plaintiff asked Estes to walk her to her hotel room at the end of the evening (Dkt. No. 100 at 49-50 ¶ 183).  From her hotel room, Plaintiff sent Estes a text message asking him to come to her room to fix the television's remote control (Dkt. No. 100 at 50 ¶ 185).  Plaintiff alleges that Estes, who was "extremely" intoxicated, came to her room, undressed, and forced her to perform oral sex on him (Dkt. No. 100 at 50 ¶¶ 186, 188, 189).

Later, Estes sent Plaintiff a text message telling her that if anyone saw him entering or leaving her hotel room on the previous night, he was going to tell them that he walked her to her room, they talked for a minute about the drug court, and said goodnight.  He asked if that "'[s]ound[ed] good?'" (Dkt. No. 100 at 50 ¶ 191).  Estes also called Plaintiff and told her that it would be "'worse for'" her in drug court and she would lose "'credibility'" with the drug court's probation officers if others learned of the incident in her hotel room (Dkt. No. 100 at 50 ¶ 192).

The following week, Estes invited Plaintiff to his chambers in Belchertown to discuss drug court matters (Dkt. No. 100 at 50 ¶ 193).  After they discussed the drug court, Estes closed the door, drew the blinds, and asked her to "'continue what they started'" (Dkt. No. 100 at 51 ¶ 195).  He allegedly promised that if Plaintiff assented to his request, he would not ask her to do it again and would assist her with the problems that she was having with the Pittsfield probation officers (Dkt. No. 100 at 51 ¶ 195).  Feeling "pressured," Plaintiff performed oral sex on Estes (Dkt. No. 100 at 51 ¶ 196).  She described feeling "degraded and humiliated" (Dkt. No. 100 at 51 ¶ 197).  Thereafter, Estes assisted Plaintiff in navigating her relationship with Probation (Dkt. No. 100 at 40 ¶ 106, at 51 ¶¶ 198-201).

From November 2016 to March 17, 2017, the date on which Plaintiff was placed on administrative leave from her drug court position, Plaintiff alleged that she performed oral sex on

Estes either in his Belchertown chambers or in her Westfield apartment on a number of occasions (Dkt. No. 100 at 51-52 ¶ 203, at 65 ¶ 304).  After their last liaison in July 2017, Plaintiff send Estes a text message saying that she wanted to end their relationship because it was one-sided (Dkt. No. 100 at 52 ¶ 210).  Estes agreed (Dkt. No. 100 at 52 ¶ 211).

       7.      Plaintiff's Removal from the Pittsfield Drug Court in March 2017

From the outset of Plaintiff's tenure as the Pittsfield Drug Court's clinician, the probation officers disagreed about the scope of her role and the appropriate treatment options for drug court participants (Dkt. No. 100 at 41-46 ¶¶ 111-55).  The conflict culminated in Probation's initiation of Plaintiff's removal from the drug court after the court's March 16, 2017 session (Dkt. No. 100 at 60 ¶ 263).  Without consulting Estes, Stracuzzi accused Plaintiff of subpar job performance and asked the Deputy Commissioner of Probation to remove her from the drug court position (Dkt. No. 100 at 60 ¶¶ 263-64, at 61 ¶¶ 267-69, at 63 ¶ 286).  The Deputy Commissioner, in turn, contacted DMH (Dkt. No. 100 at 61 ¶¶ 267, 269).  Barber asked to meet with Dr. Juliana Reiss, BHN's Forensic Service Director, and Stracuzzi on March 17, 2017 (Dkt. No. 100 at 36  ¶ 61, at 61 ¶ 270).  During a telephone call on March 16, 2017 Estes told Barber that Plaintiff was a "'top notch'" clinician but she did not get along with others (Dkt. No. 100 at 61 ¶ 274).

After Reiss and Barber heard Probation's criticisms of Plaintiff's job performance on March 17, 2017, Reiss and Barber decideded that Plaintiff should be removed from her position at the drug court (Dkt. No. 100 at 41 ¶ 113, at 61 ¶ 276, at 63 ¶ 286, at 65 ¶¶ 301-03).  Although Estes was not consulted about Plaintiff's removal, Barber indicated that Estes should be notified of their decision because he "'was part of the hiring'" process (Dkt. No. 100 at 64 ¶¶ 291, 294).

When Barber contacted Estes on March 17, Estes did not ask Barber to explain or reverse the decision (Dkt. No. 100 at 65-66 ¶ 307-12).  According to Estes, "'I didn't think there was anything I could do and it didn't seem appropriate for me to get involved . . . I'm sure the affair was on my mind.  Like, if I went to bat for her, and tried to get her job back.  But it didn't seem like I had any role in that decision.  Like it was done.  They didn't ask me'" (Dkt. No. 100 at 67 ¶ 316).  He allegedly told Barber that Plaintiff was "'a good girl, but she has a tendency to piss off a lot of people'" (Dkt. No. 100 at 66 ¶ 311).  On March 23, 2017, Estes told Reiss that Plaintiff "'did a lot of good things for this program.  There were some issues.  Anyway, we're moving on'" (Dkt. No. 100 at 67 ¶ 321).

On Friday, March 17, 2017, Reiss notified Plaintiff that she was being placed on administrative leave and could not return to the drug court on Monday because there had been a "'complaint'" about her (Dkt. No. 100 at 64 ¶ 298, at 65 ¶¶ 304, 305).  On March 21, 2017, Reiss and Claudia Muradian Brubach, BHN's Human Resources Director, notified Plaintiff of her removal from her position at the Pittsfield Drug Court (Dkt. No. 100 at 68 ¶¶ 330, 331).  Thereafter, BHN reassigned Plaintiff to its Sloan Clinic (Dkt. No. 115 at 4-5 ¶¶ 20, 21).

        8.     Plaintiff's Massachusetts Commission Against Discrimination charge and subsequent filings.

On or about August 2, 2017, Plaintiff filed a charge of discrimination ("Charge") with the Massachusetts Commission Against Discrimination ("MCAD") and the United States Equal Employment Opportunity Commission (Dkt. No. 115 at 5 ¶ 22).  BHN and the Trial Court were named as the "employer . . . or state/local governmental agency who discriminated against Plaintiff" (Dkt. No. 84-7).  The Charge indicated that BHN hired Plaintiff to be a clinical coordinator and assigned her to the specialty drug court team (Dkt. No. 84-7 ¶¶ 1, 2).  According to the Charge, "Judge Thomas E.," the "head" of the drug court team who "had control over

9

[Plaintiff's] tasks and could control [her] employment status," subjected Plaintiff to sexual harassment through an inappropriate sexual relationship (Dkt. No. 84-7).

The Trial Court, through its Labor Counsel and Deputy Labor Counsel, filed its Position Statement on September 25, 2017 (Dkt. No. 100-42 at 23).  Estes certified and affirmed, under oath, that he had reviewed the Trial Court's position statement "and that the factual information contained [therein was] supported by the business records of the Trial Court and therefore truthful to the best of [his] knowledge" (Dkt. No. 100-42 at 24).  Estes signed the Affirmation under the penalties of perjury (Dkt. No. 100-42 at 24).

On January 22, 2018, Plaintiff filed the complaint in the instant case asserting that Estes and BHN had violated Title VII (Counts I and III) and Mass. Gen. Laws ch. 151B (Counts III and IV) (Dkt. No. 1).  Estes moved to dismiss the Title VII claim against himself on the grounds that there is "no individual liability" under that statute (Dkt. No. 29).  Plaintiff stipulated to the dismissal of Count I (Dkt. No. 35).  Plaintiff filed suit against the Trial Court in the Suffolk Division of the Massachusetts Superior Court Department on October 22, 2019 (Dkt. No. 84-9; Dkt. No. 116-2).

III.   LEGAL STANDARD

The purpose of summary judgment is "'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) (citation omitted).  "Summary judgment is appropriate when, based on the pleadings, discovery, and disclosure materials in the record, 'there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'"  *Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp. 3d 104, 111 (D. Mass. 2015) (quoting Fed. R. Civ. P. 56(a), (c)).  "A 'genuine' dispute is one that, based on the supporting evidence, 'a reasonable [fact

finder] could resolve . . . in favor of the nonmoving party,' and a 'material' fact is one that has 'the potential to affect the outcome of the suit under the applicable law.'" *Id.* at 111-12 (quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (citations and quotation marks omitted)).

When reviewing a motion for summary judgment, the court views the facts "in the light most favorable to the non-moving party." *Zambrana–Marrero v. Suarez–Cruz*, 172 F.3d 122, 125 (1st Cir. 1999). "If the moving party satisfies the burden of showing, based on evidentiary material, that there is no genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate by reference to specific provable facts 'that a reasonable jury could return a verdict for the nonmoving party.'" *Ruggiero,* 137 F. Supp. 3d at 112 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient to establish a genuine dispute of material fact. *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

IV.    ANALYSIS

A.    <u>Count III:  Sex Discrimination/Hostile Work Environment in Violation of Mass. Gen. Laws ch. 151B</u>

1.    There is a genuine question as to whether the Trial Court was Plaintiff's joint employer and Estes was her supervisor.

Subsections (1) and (16A) of Chapter 151B, § 4 make it unlawful "[f]or an employer, personally or through its agents, to sexually harass any employee." Mass. Gen. Laws ch. 151B, § 4(16A).[3]  *See also* Mass. Gen. Laws ch. 151B, § 4(1) (it is unlawful "[f]or an employer, by

---

[3] Chapter 151B defines sexual harassment as:

sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (b) such advances, requests

himself or his agent, because of the . . . sex . . . of any individual . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .").  There is no dispute that Plaintiff was employed and paid by BHN and that BHN was involved in hiring her and removing her from the drug court position (Dkt. No. 99 at 40).  Likewise, there is no dispute that as a judge, Estes was employed by the Massachusetts Trial Court and that sovereign immunity bars a federal court suit against the Trial Court and Estes in his professional capacity (Dkt. No. 99 at 40).  Plaintiff claims that whether the Trial Court was her joint employer and whether Estes functioned as a supervisor who may potentially be liable for sexual harassment under Chapter 151B, present genuine questions of material fact (Dkt. No. 99 at 40-44).  Estes contends that BHN employed and supervised Plaintiff and that "this case lacks any of the indicia that is usually required to conclude that a party is a 'joint employer'" (Dkt. No. 114 at 5-8).  The court disagrees with Estes.

"The Supreme Court defined the concept of a 'joint-employer' as a company possessing 'sufficient control over the work of the employees' of another company."  *Commodore v. Genesis Health Ventures, Inc.*, 824 N.E.2d 453, 456 (Mass. App. Ct. 2005) (quoting *Boire v. Greyhound Corp.,* 376 U.S. 473, 481 (1964)). ‼

> Factors to be considered in determining whether an entity is a joint employer are whether it: 1) supervises the employee's day-to-day activities, 2) has the authority to hire or fire employees, 3) promulgates work rules and conditions of employment, 4) controls work assignments and 5) issues operating instructions.

---

or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.  Discrimination on the basis of sex shall include, but not be limited to, sexual harassment."  Mass. Gen. Laws ch. 151B, § 1(18).

For the limited purpose of the motion for summary judgment, Estes does not dispute that his relationship with Plaintiff might constitute sexual harassment.

*Orell v. UMass Mem'l Med. Ctr., Inc.*, 203 F. Supp. 2d 52, 62–63 (D. Mass. 2002) (citing *Rivas v. Federacion de Asociaciones Pecuarias de P.R.,* 929 F.2d 814, 820 (1st Cir. 1990)).[4]  "No one factor is outcome determinative.  Rather, all the facts of an employment relationship must be weighed to determine whether that relationship fits within the confines of the employer-employee arrangement."  *Ferrer Marrero v. Misey Rest., Inc.,* Civ. No. 17-1911 (MDM), 2019 WL 6833824, at *11 (D.P.R. Dec. 13, 2019).  The joint employer determination is "'essentially a factual issue.'"  *Commodore,* 824 N.E.2d at 456 (quoting *Boire,* 376 U.S. at 481).  Here, the admissible evidence is sufficient to create a triable issue as to whether the Trial Court, through Estes, "exercise[d] control over an important aspect of [Plaintiff's] employment."  *Orell,* 203 F. Supp. 2d at 62.

The Massachusetts Supreme Judicial Court has described a judge's inherent powers as follows:

> [T]he concept of inherent judicial powers, "whose exercise is essential to the function of the judicial department, to the maintenance of its authority, [and] to its capacity to decide cases" [flows from Articles 11 and 29 of the Massachusetts Declaration of Rights].  *Gray v. Comm'r of Revenue*[*,* 665 N.E.2d 17, 22 (Mass. 1996)].  Inherent judicial authority is "not limited to adjudication, but includes certain ancillary functions such as rule-making and judicial administration, which are essential if the courts are to carry out their constitutional mandate."  *O'Coin's, Inc. v. Treasurer of the C[ty.] of Worcester, . . .* 287 N.E.2d 608, 611 ([Mass.]1972).

*First Just. of Bristol Div. of Juv. Ct. Dep't v. Clerk-Magistrate of Bristol Div. of Juv. Ct. Dep't*, 780 N.E.2d 908, 916 (Mass. 2003) (first alteration in original).  "The scope of inherent judicial authority reaches beyond traditional adjudicatory powers and encompasses (but is not limited to)

---

[4] Massachusetts courts generally apply "Federal case law that construes Federal antidiscrimination statutes in interpreting G.L. c. 151B . . . ."  *Brown v. F.L. Roberts & Co.*, 896 N.E.2d 1279, 1285 (Mass. 2008).

the court's power . . . to control and supervise personnel within the judicial system [including] a judge's power 'to control [a court's] own proceedings, the conduct of participants, the actions of officers of the court, and the environment of the court.'" *Id.* (quoting *Chief Admin. Justice of the Trial Court v. Labor Relations Comm'n,* 533 N.E.2d 1313, 1317 (Mass. 1989)).  For example, trial court judges have the inherent authority to supervise, direct, and assess the work of the clerks, assistant clerks, and probation officers who assist them in carrying out their judicial functions.  *See id.* at 922.

> a.   *There is sufficient evidence that Estes supervised Plaintiff's day-to-day activities, controlled her conditions of employment and assignments, and issued instructions for the operations of the Pittsfield Drug Court.*

There is substantial evidence that, as the presiding judge and leader of the Pittsfield Drug Court team, Estes directly supervised Plaintiff's day-to-day activities in her role as the drug court's clinician.  Estes had the ultimate authority to determine a defendant's eligibility as a drug court participant, a participant's course of treatment, sanctions, and a participant's removal from the drug court (Dkt. No. 100 at 30 ¶ 4, at 31 ¶¶ 16, 19, 20).  As the drug court's clinician, Plaintiff provided "key support" to Estes' accomplishment of those tasks by assessing a defendant's viability as a drug court participant and recommending treatment options (Dkt. No. 100 at 30 ¶ 6, at 31 ¶ 18, at 33 ¶ 36; Dkt. No. 100-1 at 13).  Estes instructed Plaintiff to conform the drug court's operations to the "'best practices'" that had been established for the drug courts (Dkt. No. 100 at 32 ¶ 27, 28, at 54 ¶ 223).  *See Teamsters Local Unions Nos. 75 & 200 v. Barry Trucking, Inc.,* 176 F.3d 1004, 1008-09 (7th Cir. 1999) (the determination of a joint employment relationship included an examination of which party issued operational instructions); *Asia v. Res-Care, Inc.,* 59 F. Supp. 3d 260, 266 (D. Mass. 2014) (whether an entity issued operating instructions was a factor in determining joint employment).

14

During most weeks, Plaintiff spent about five hours, or twenty-five percent of her twenty-hour drug court workweek, addressing drug court matters with Estes in his Belchertown chambers (Dkt. No. 100 at 39 ¶ 94). She assisted him in "'build[ing]'" the Pittsfield Drug Court (Dkt. No. 100 at 30 ¶ 11, at 40 ¶¶ 101-08). Estes referred to Plaintiff as "'my case worker'" (Dkt. No. 100 at 40 ¶ 107). In July 2016, shortly after Plaintiff began working in Pittsfield, Estes allegedly directed her to address about eighty drug court meeting attendees (Dkt. No. 100 at 39 ¶ 89). During working sessions in Estes' Belchertown chambers, they reviewed Plaintiff's draft of the drug court manual for Pittsfield Drug Court participants, which required Estes' approval (Dkt. No. 100 at 39 ¶ 93, at 41 ¶ 105). In addition, they discussed available substance abuse treatment options in the Pittsfield community and individual drug court participants. According to Plaintiff, Estes reviewed her job performance, gave her feedback, and mediated conflicts between her and other members of the drug court team (Dkt. No. 100 at 40 ¶¶ 101-04). Estes allegedly praised Plaintiff's performance to her BHN supervisor (Dkt. No. 100 at 36 ¶ 57, at 40 ¶¶ 106, 109). *See Ahanotu v. Mass. Turnpike Auth.,* 466 F. Supp. 2d 378, 392 (D. Mass. 2006) (directly supervising an employee and conducting performance reviews are factors that favor finding a joint employment relationship).[5]

Estes controlled Plaintiff's work schedule. He established the Pittsfield Drug Court's hours and scheduled the regular staffing meetings during which drug court team members

---

[5] Notwithstanding the fact that Plaintiff spent about twenty-five percent of her workweek with Estes in his Belchertown lobby, Estes contends that he did not control Plaintiff's day-to-day activities because "[s]he independently interacted with members of the Probation Department and other stakeholders absent [his] direction or knowledge . . . " (Dkt. No. 114 at 6). Estes does not point to any authority for his position that a possible joint employer must direct and supervise an employee at all times. *See Asia,* 59 F. Supp. 3d at 266–67 ("The record also suggests that Compton, an Alutiiq Employee, directed and supervised [p]laintiff's activities for at least a portion of her employment.").

reviewed the progress and needs of each participant who was scheduled to appear before the court that week (Dkt. No. 100 at 30 ¶ 5, at 31 ¶ 13). *See Doe v. McDonald's USA, LLC*, CIVIL ACTION NO. 19-05925, 2020 WL 7133520, at *3 (E.D. Pa. Dec. 3, 2020) ("conditions of employment" include work hours).

###### b.   *Estes' authority to hire or fire Plaintiff.*

The evidence, when viewed in the light most favorable to Plaintiff, is sufficient to show that Estes participated in the decision to hire Plaintiff for the drug court position. *See Deputy Chief Counsel for Pub. Def. Div. of Comm. for Pub. Council Servs.,* 74 N.E.3d at 1258 (the drug court judge has authority to select the drug court team members except the public defender for an indigent defendant). The Trial Court contracted with DMH to provide specialty court clinicians and DMH, in turn, contracted with BHN to fill the positions (Dkt. No. 115 at 2 ¶¶ 4, 5, 8). Estes maintains that, as a matter of law, the Trial Court cannot be deemed to be Plaintiff's joint employer because it did not directly contract with Plaintiff's employer, BHN (Dkt. No. 114 at 7-8). While a joint employer may contract to obtain services from the employee's primary employer, *see, e.g., Boire,* 376 U.S. at 474, 481; *Torres-Negrón v. Merck & Co.,* 488 F.3d 34, 40 n.6 (1st Cir. 2007), a direct contractual relationship is not a factor in determining joint employer status. *See Orell,* 203 F. Supp. 2d at 62-63 (listing the factors). Rather, the test is whether, based on the facts, an entity "possesses sufficient control over the work of an employee of another company." *Ahanotu,* 466 F. Supp. 2d at 392. Under the liberal construction afforded to Chapter 151B, employees of an employer such as the Trial Court, which does not contract directly with the entity that provides services, should not be insulated from liability for discrimination under Chapter 151B. *See Beaupre v. Cliff Smith & Assoc.,* 738 N.E.2d 753, 764-65 (Mass. App. Ct. 2000) (Mass. Gen. Laws ch. 151B, § 9 mandates that "the provisions of the chapter must be

construed liberally for the accomplishment of its purposes - one of which was to discourage and penalize discriminatory conduct, including sexual harassment, by individuals - and the explicitly declared policy of the Commonwealth that all persons have the right to be free from sexual harassment.") (citing Mass. Gen. Laws ch. 214, § 1C); *Sarvis v. Bos. Safe Deposit & Tr. Co.*, 711 N.E.2d 911, 920 (Mass. App. Ct. 1999) ("In holding that a corporation may be vicariously liable under G.L. c. 151B, § 4 . . . for a supervisory employee's sexual harassment of a subordinate, the Supreme Judicial Court . . . concluded that § 4 was to be afforded a liberal construction to accomplish its statutory purposes.") (citing *College–Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination,* 508 N.E.2d 587, 591-94 (Mass. 1987)); *see also Pizza v. Hop Head Farms, LLC,* 20 C 4791, 2021 WL 463102, at *3-4 (N.D. Ill. Feb. 9, 2021) (a formal contractual relationship was not required for joint employer status under the applicable state law because courts did not include the existence of a contract as an element in the assessment of the joint employment relationship).  Estes' argument that he was not Plaintiff's supervisor because he lacked "actual authority" to "bind the Trial Court" contractually (Dkt. No. 114 at 5) is, therefore, beside the point.    !

After Yeh and Mailler interviewed Plaintiff for the drug court position, Yeh notified Plaintiff that Estes' approval was a prerequisite for her hiring (Dkt. No. 100 at 34 ¶ 41).  Estes received Plaintiff's resumé and Yeh's e-mail message indicating that although Plaintiff was not yet licensed, Yeh had DMH's approval to hire Plaintiff if Estes approved (Dkt. No. 100 at 33 ¶ 37, at 34 ¶ 42).  After Estes met with Plaintiff and Yeh (Dkt. No. 100-54 at 27-28), Yeh inquired of Estes, "'So what did you think of [Plaintiff]?  Does she have your seal of approval?'" (Dkt. No. 100 at 34 ¶ 46).  Estes responded by e-mail, "'I liked her a lot.  Let's hire her'" (Dkt. No. 100 at 34 ¶ 47).  In a July 1, 2016 e-mail to the Trial Court's Director of Specialty Courts, Estes

indicated that he had met Plaintiff, "'liked her very much,'" and approved her to be the Pittsfield

Drug Court's clinician (Dkt. No. 100 at 35 ¶ 49). Yeh did not hire Plaintiff until after she

received Estes' approval (Dkt. No. 100 at 34 ¶ 48, at 35 ¶ 50). When Barber and Reiss decided

to remove Plaintiff from her drug court position in March 2017, Barber acknowledged that Estes

"'was part of the hiring'" (Dkt. No. 100 at 64 ¶ 294).[6]

   Even viewing the evidence in the light most favorable to Plaintiff, a reasonable factfinder

could not conclude that Estes participated in the decision to remove Plaintiff from her position

with the drug court. All of the evidence is to the effect that her removal was initiated by

Probation and finalized by DMH and BHN. Those facts, however, are not dispositive. The

question is whether the Trial Court, through Estes, had some "authority" to hire or remove

Plaintiff. *See Asia,* 59 F. Supp. 3d at 266 (there was evidence that the putative joint employer

had "at least some authority" over hiring); *Orell,* 203 F. Supp. 2d at 62-63; *see also Deecy Prods.*

*Co. v. Welch,* 124 F.2d 592, 596 (1st Cir. 1941) ("'[I]t is not necessary that the employer actually

direct or control the manner in which the services are performed; it is sufficient if he has the right

to do so. The right to discharge is also an important factor indicating that the person possessing

that right is an employer.'") (citation omitted)). ‼Barber was unsure whether Estes could have

overruled the decision to remove Plaintiff (Dkt. No. 100 at 66 ¶ 313). Estes stated that the

presiding justice was the supervisor of everyone in the courtroom in certain respects and that a

drug court judge might have the authority to dismiss a member of the drug court team who was

---

[6] Estes disputes the admissibility of the evidence supporting his authority to hire Plaintiff claiming that "based on testimony of the people with actual knowledge of the process, . . . BHN and DMH made the final decision, and that [his] inclusion was a courtesy and only a courtesy" (Dkt. No. 114 at 6-7; Dkt. No. 115 at 3-4 ¶¶ 12-14). Estes' statements about Plaintiff's hiring were contained in e-mail messages he sent and are admissible as statements of a party opponent (Dkt. No. 100 at 34 ¶ 47, at 35 ¶ 49). *See* Fed. R. Evid. 801(d)(2).

"'not doing their job'" (Dkt. No. 100 at 30 ¶ 12, at 41 ¶ 110).  Estes has pointed to no statute that limits a presiding judge's authority to fire a drug court clinician.  *Compare* Mass. Gen. Laws ch. 185C, § 8 ("clerks shall have responsibility for the internal administration of his office, including the selection, appointment, and management of personnel, staff services and record keeping."); Mass. Gen. Laws ch. 185C, § 11 ("The clerk of a division of the housing court department may appoint 1 or more assistant clerks who shall be removable at his pleasure."); Mass. Gen. Laws Ann. ch. 276, § 83(m) ("A first justice may recommend to the commissioner of probation the initiation of disciplinary proceedings against a probation officer so promoted under this section; provided, however, that such probation officer shall receive a hearing by the commissioner of probation prior to being discharged . . . .").

Estes argues that his oversight of Plaintiff's work "was [nothing] more than what would be expected of a judge controlling his or her session" and that the Trial Court "could not be deemed a joint employer of all of [the drug court team's] members" (Dkt. No. 114 at 6, 7).  On the record before the court, a jury could find that Estes "exercise[d] control over an important aspect of [Plaintiff's] employment" and, consequently, could find that the Trial Court was her joint employer and that he functioned as a supervisor of her work.  *Orell,* 203 F. Supp. 2d at 62. Estes has not explained how his relationship with other drug court team members is relevant to that fact-based determination.  *See Ferrer Marrero,* 2019 WL 6833824, at *11 ("The 'joint employer' doctrine seeks to hold an entity liable to an employee of another entity if the evidence shows that it *sufficiently* had power over the employee in question.").

Even if Estes did not remove Plaintiff from her drug court position, a reasonable fact finder considering the sum of the relevant evidence could find that the Trial Court, through

Estes, had sufficient control over the terms and conditions of Plaintiff's work to be considered a joint employer for purposes of Chapter 151B.

       2.      Estes can be held personally liable for violating Chapter 151B.

Estes makes two related arguments in support of his request for summary judgment on Count II.  He claims, first, that Plaintiff sued him in his official capacity, not his individual capacity, and, second, that even if the complaint states a claim against him in his individual capacity, Chapter 151B does not provide for individual liability (Dkt. No. 114 at 10-12).  Both contentions are unpersuasive.

"In many [§ 1983] cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both." *Kentucky v. Graham,* 473 U.S. 159, 167 n.14 (1985).  "[C]ourts may examine 'the substance of the pleadings and the course of proceedings in order to determine whether the suit is for individual or official liability.'" *Powell v. Alexander,* 391 F.3d 1, 22 (1st Cir. 2004) (quoting *Pride v. Does,* 997 F.2d 712, 715 (10th Cir. 1993)). "'Throughout, the underlying inquiry remains whether the plaintiff's intention to hold a defendant personally liable can be ascertained fairly.'" *Id.* (quoting *Biggs v. Meadows,* 66 F.3d 56, 61 (4th Cir. 1995)).  *Powell's* reasoning is not limited to § 1983 actions.  *See Mason v. Mass. Dept. of Envtl. Prot.,* 774 F. Supp. 2d 349, 359-60 & nn.86, 87, 88 (D. Mass. 2011) (FMLA).

Estes had "fair notice" that he was being sued in his individual capacity.  *Powell,* 391 F.3d at 23.  "Under the 'course of proceedings' test, courts are not limited by the presence or absence of language identifying capacity to suit on the face of the complaint alone." *Id.* at 22. ‼ Estes is the only individually named defendant (Dkt. No. 1).  *See Gaetani v. Hadley*, Civil Action No. 14-30057-MGM, 2015 WL 113900, at *2 (D. Mass. Jan. 8, 2015) (the fact that the plaintiff's complaint named the defendants separately from the Commonwealth or the Trial Court

indicated an intention to sue the defendants in their individual capacities).  Further, Estes treated

the complaint as naming him in his individual capacity when he moved to dismiss the Title VII

claim under Fed. R. Civ. P. 12(b)(6) (Dkt. Nos. 29-30).  *See Fantini v. Salem State Coll.,* 557

F.3d 22, 30 (1st Cir. 2009) ("there is no individual employee liability under Title VII.").  Estes'

pleadings show that he was on notice of his potential individual liability under Chapter 151B.

Relying on Mass. Gen. Laws ch. 151B § 4(1) and (16A), Estes claims that the SJC "'has

not yet established whether supervisors are subject to [individual] liability'" (Dkt. No. 114 at 10).

Although the SJC has not weighed in on the subject, the Massachusetts Appeals Court has found

supervisors and employees to be personally liable for violating Chapter 151B.  Several sessions

of this court have distinguished Chapter 151B from Title VII and have followed suit.

The Massachusetts Appeals Court has stated that, unlike Title VII, Chapter 151B "does

not limit the categories of persons who may be individually liable."  *Beaupre,* 738 N.E.2d at 764.

"To the contrary, the plain language of the statute provides on its face for individual personal

liability in several sections . . . ."  *Id.*

> Those sections are § 4(1), the general prohibition against employment
> discrimination by an individual employer "because of . . . sex," sexual harassment
> being a form of sex discrimination, [Mass. Gen. Laws ch.] 151B, § 1(18); . . . §
> 4(4A), making it unlawful for any person to "coerce, intimidate, threaten, or
> interfere with another person in the exercise or enjoyment of any right granted or
> protected by this chapter," one such right being freedom from sexual harassment,
> [Mass. Gen. Laws ch.] 214, § 1C, and [Mass. Gen. Laws ch.] 151B §§ 1(18), 4; . .
> . and § 4(16A), making it unlawful for an individual employer "to sexually harass
> any employee."

*Id.* at n.16.[7]  "By its distinctly crafted terms, [Chapter] 151B applies not only to employers acting

through their principals and agents, but also to . . . any person who interferes with another's right

---

[7] Estes' contention that *Beaupre* was a "clumsy decision whose precedential value should be
limited" (Dkt. No. 114 at 12) ignores the multiple decisions of sessions of this court that have

to work free of unlawful discrimination and retaliation." *Ruffino v. State St. Bank & Tr. Co.*, 908 F. Supp. 1019, 1048 (D. Mass. 1995) (citing Mass. Gen. Laws ch. 151B § 4A).  Consequently, supervisors may be individually liable for unlawful harassment under Chapter 151B.  *See Posada v. ACP Facility Servs., Inc.,* 389 F. Supp. 3d 149, 156, 159 (D. Mass. 2019) (allegations in the complaint were sufficient to state plausible Chapter 151B claims against plaintiff's co-workers and supervisor in their personal capacities); *Soni v. Wespiser,* 239 F. Supp. 3d 373, 385 (D. Mass. 2017) ("Unlike Title VII, Chapter 151B allows for recovery against individual defendants found liable for discrimination under the statute."); *Comley v. Media Planning Grp.,* 108 F. Supp. 3d 6, 15 (D. Mass. 2015) ("Chapter 151B, unlike its cognate federal statutes, provides for individual personal liability.") (citing *Beaupre,* 738 N.E.2d at 764); *Martin v. Irwin Indus. Tool Co.,* 862 F. Supp. 2d 37, 40-41 (D. Mass. 2012) (supervisors and non-supervisory employees may be found liable under Chapter 151B); *Sisco v. DLA Piper LLP,* 833 F. Supp. 2d 133, 146 (D. Mass. 2011) ("Unlike Title VII, Chapter 151B explicitly imposes liability on individuals") (citing Mass. Gen. Laws ch. 151B, §§ 4(4A), (5)); *Orell,* 203 F. Supp. 2d at 65 (allegations were sufficient to state a claim against plaintiff's supervisor individually for age and disability discrimination in violation of Chapter 151B) (citing *Beaupre,* 738 N.E.2d at 764); *Chatman v. Gentle Dental Ctr.,* 973 F. Supp. 228, 232 n.8 (D. Mass. 1997) ("Unlike Title VII, Chapter 151B creates individual liability for various kinds of discrimination (including sexual harassment) with respect to employers as well as persons other than employers."). !!

Moreover, even if Estes did not function as a supervisor of Plaintiff's work for the drug court, he may be found liable for sexual harassment.  Section 4(4A) of Chapter 151B makes it

agreed with *Beaupre* and overlooks the SJC's acknowledgment of *Beaupre's* holding.  *See Thomas v. EDI Specialists, Inc.,* 773 N.E.2d 415, 420 (Mass. 2002).

unlawful "[f]or any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter . . . "  Mass. Gen. Laws ch. 151B, § 4(4A).  Subsections 1 and 16A are among the provisions that protect an individual's right to work in an environment free of sexual harassment.  *See Posada,* 389 F. Supp. 3d at 156-57.  In 2008, the Massachusetts Appeals Court found that a general contractor "who [was] on notice of unlawful discriminatory acts by its supervisor, directed toward an employee of a subcontractor at a unitary work site, and [who] fail[ed] to take reasonably adequate remedial action [was] liable under [Mass. Gen. Laws ch.] 151B, §4(4A)" notwithstanding the absence of an employment relationship between the general contractor and the subcontractor's employee.  *Thomas O'Connor Constructors, Inc. v. Mass. Comm'n Against Discrimination (O'Connor),* 893 N.E.2d 80, 89 (Mass. App. Ct. 2008).  Since then, relying on § 4(4A), other courts have found that a defendant may be held liable for harassing conduct in the workplace absent an employment relationship with the plaintiff.  In *Barton v. Clancy*, 632 F.3d 9 (1st Cir. 2011), for example, the court noted that "in certain factual circumstances, the MCAD and at least one Massachusetts appellate decision have interpreted [Chapter 151B] § 4(4A) to impose liability on 'any person' for interference with the plaintiff's right to work in an environment free of unlawful harassment, even where that person is not the plaintiff's employer or employer-agent."  *Id.* at 21 (citing *O'Connor,* 893 N.E.2d at 89; *Local Union No. 12004,* 2004 WL 1852966, at *37 (MCAD July 28, 2004)).  *See Jones v. Montachusett Reg'l Transit Auth.*, No. 4:19-CV-11093-TSH, 2020 WL 1325813, at *8 (D. Mass. Feb. 7, 2020), *adopted sub nom. Jones v. Montachusetts Reg'l Transit Auth.*, 4:19-cv-11093, 2020 WL 1333097 (D. Mass. Mar. 4, 2020) ("Massachusetts courts have held that [Mass. Gen. Laws ch. 151B, § 4(4) and (4A)] extend to non-employer defendants and individual defendants") (citing *Lopez v. Mass.*, 978 N.E.2d 67, 77 (Mass. 2012));

*Soni,* 239 F. Supp. 3d at 384-85 (declining to dismiss Chapter 151B claims against plaintiff's

former employers for harassment that occurred after plaintiff left their employ because "§ 4(4A)

does not require the existence of an 'employment relationship' to impose liability."); *McLaughlin*

*v. City of Lowell,* 992 N.E.2d 1036, 1058 n.34 (Mass. App. Ct. 2013) (subsection 4A "is best

understood as a device through which an individual falling outside the scope of the definition of

'employer' may otherwise be liable for conduct which the antidiscrimination statute aims to

prevent.").  Consequently, even if the Trial Court was not Plaintiff's joint employer and Estes

was not functioning as her supervisor, he may still be found liable for sexual harassment that

occurred in the workplace.

> 3.    The Trial Court's sovereign immunity does not preclude Plaintiff's
>       suit against Estes.

The instant case is comparable to *Murphy v. Mass. - Exec. Office of the Trial Court,* 335

F. Supp. 3d 137 (D. Mass. 2018).  The plaintiff in *Murphy* was an employee of the Worcester

County Family and Probate Court who sued the Trial Court and his supervisor, Steven Abraham,

the Worcester County Registrar of Probate, for discrimination in violation of federal and

Massachusetts laws including Chapter 151B.  *Id.* at 140-41.  Abraham argued that the court was

required to dismiss the Chapter 151B claim against him "because the underlying claim against

the Commonwealth [was] dismissed due to sovereign immunity."  *Id.* at 146.  The court

disagreed.  *Id.* at 146-47.  "While the Commonwealth has sovereign immunity against the

underlying discrimination claim, it does not follow that this court may not adjudicate a derivative

yet distinct claim against . . . Abraham."  *Id.* at 147.

Plaintiff's Suffolk Superior Court case against the Trial Court, which raises claims for sex

discrimination/hostile work environment and retaliation under Chapter 151B, was commenced

almost two years after Plaintiff filed the complaint in the instant case (Dkt. No. 1; Dkt. No. 84-9;

Suffolk Superior Court Docket No. 1984CV03294).  The parties do not dispute that the litigation

in the state court has not reached the summary judgment stage.  Although Estes claims that he

will be at a disadvantage in the instant case because his former employer, the Trial Court, is not a

party (Dkt. No. 114 at 3-4), he points to no authority, and the court is not aware of any, that bars

this court from hearing the claims against him in the instant case before the claims against the

Trial Court are heard in the state court.  To the contrary, it is black letter law that "[c]oncurrent

federal-state jurisdiction over the same controversy does not generally lessen the federal courts'

'virtually unflagging obligation . . . to exercise the jurisdiction given them.'"  *Jiménez v.

Rodríguez-Pagán*, 597 F.3d 18, 27 (1st Cir. 2010) (quoting *Colorado River Water Conservation

Dist. v. United States*, 424 U.S. 800, 817 (1976)).

      B.    <u>Plaintiff's MCAD Charge Adequately Identified Estes</u>

Estes raises alleged deficiencies in Plaintiff's MCAD Charge, which she filed while she

was representing herself, to support his contention that Plaintiff failed to exhaust her

administrative remedies.  Specifically, he argues that the Charge did not name him as a

respondent, failed to reference the Trial Court's status as Plaintiff's "joint employer," and

precluded a suit against him in his individual capacity (Dkt. No. 83 at 4; Dkt. No. 114 at 3, 10).

These contentions too are unpersuasive.

"Under Massachusetts law, a plaintiff alleging employment discrimination must file a

complaint with the MCAD prior to bringing a civil action."  *Preston v. Second Wind, Inc.*, 824 F.

Supp. 2d 247, 250 (D. Mass. 2011).  "The purpose of the administrative filing is '(1) to provide

the MCAD with an opportunity to investigate and conciliate the claim of discrimination, and (2)

to provide notice to the defendant of potential liability.'"  *Pelletier v. Town of Somerset*, 939

N.E.2d 717, 727 (Mass. 2010) (quoting *Cuddyer v. Stop & Shop Supermarket Co.*, 750 N.E.2d

928, 936 (Mass. 2001)).  *See Fant v. New England Power Serv. Co.,* 239 F.3d 8, 11 (1st Cir.

2001) ("The purpose of mandatory submission to the MCAD process is to provide notice to the

prospective defendant and to encourage conciliation and settlement of disputes.").  "[T]he

MCAD complaint and potential investigation establish the scope of any subsequent filing in the

Superior Court." *Pelletier*, 939 N.E.2d at 727.  "Under the 'scope of the investigation' rule, 'a

claim that is not explicitly stated in the administrative complaint may be asserted in the

subsequent Superior Court action so long as it is based on the acts of discrimination that the

MCAD investigation could reasonably be expected to uncover.'" *Id.* (quoting *Everett v. 357

Corp.,* 904 N.E.2d 733, 748 (Mass. 2009)).  In cases where, as here, an employee without legal

representation files an MCAD charge*,* "the administrative charge is liberally construed in order

to afford the complainant the benefit of any reasonable doubt." *Lattimore v. Polaroid Corp.*, 99

F.3d 456, 464 (1st Cir. 1996).

     Plaintiff's failure to name Estes as a respondent in the Charge does not bar her claim

against him.  *See Aung v. Ctr. for Health Info. & Analysis*, CIVIL ACTION NO. 14-14402-PBS,

2016 WL 884878, at *2 (D. Mass. Mar. 8, 2016) ("[C]aselaw has held that the failure to name an

individual as a respondent before MCAD is not necessarily dispositive."); *Preston*, 824 F. Supp.

2d at 250 (same).  A charge must contain "[a]ppropriate identification of . . . the person(s)

alleged to have committed the discriminatory acts," a "concise statement of the alleged

discriminatory acts," and facts "sufficient to support the claim."  804 Mass. Code Regs. §

1.04(6).[8]  "[T]he MCAD 'complaint' form only asks the aggrieved person to list the

---

[8] The regulations require the complaint to contain:

    (a) The date(s) on which the unlawful discriminatory acts occurred; or, when the
    acts are of a continuing nature, the period of time during which acts occurred and
    the specific date of the last discriminatory act;

'EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY OR STATE/LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME' [and] it will be the rare party who lists an individual in response to this query." *Horney v. Westfield Gage Co.,* 95 F. Supp. 2d 29, 36 n.2 (D. Mass. 2000).  This is particularly the case when the complaining party is not represented by counsel.  Here, the Charge, when "read as a whole," adequately identified Estes ("Judge Thomas E.") as the "head" of the drug court team, and sufficiently described his allegedly harassing conduct (Dkt. No. 84-7 ¶¶ 2-7).  *See Chatman,* 973 F. Supp. at 234; *see also Horney,* 95 F. Supp. 2d at 36 (the failure to name the defendant as a respondent on the MCAD charge did not constitute grounds for dismissing a Chapter 151B suit against him in his individual capacity); *Chapin v. Univ. of Mass. at Lowell*, 977 F. Supp. 72, 77 (D. Mass. 1997) (the MCAD charge's reference to "the failure of 'management and other officials overseeing the Police Department' to remedy the harassment" was sufficient to permit the plaintiff to proceed against the unnamed police chief).

Plaintiff has presented sufficient evidence that Estes had notice of his potential liability for sexual harassment and an opportunity to conciliate the charge with the MCAD.  *See Chatman*, 973 F. Supp. at 235.  During a meeting attended by Estes' attorney, the Chief Justice of the District Court, the Regional Administrative Justice, and the Deputy Court Administrator,

---

(b) A concise statement of the alleged discriminatory acts; sufficient to enable the Commission to investigate the claims, and provide notice to the respondent of potential liability;
. . .
(d) Appropriate identification of the complainant(s) and the person(s) alleged to have committed unlawful discriminatory acts, unless proceeding by use of pseudonym pursuant to 804 [Mass. Code Regs §] 1.04(7); and
(e) Factual allegations sufficient to support the claim.
!
804 Mass. Code Regs. § 1.04(6).

which occurred approximately two weeks after Plaintiff filed the Charge, Estes indicated that he planned to meet with Trial Court counsel later that day to address the allegations in the Charge (Dkt. No. 84-7; Dkt. No. 100 at 74 ¶¶ 378, 379).[9]  Because the Trial Court's Position Statement contained intimate details of Plaintiff's and Estes' inappropriate sexual relationship – which would only have been known to Estes (and Plaintiff) – it is fair to infer that Estes was aware of his potential liability based on the allegations in the Charge, participated in crafting the Trial Court's response, and had an opportunity for conciliation while the case was pending at the MCAD (Dkt. No. 100-42 at 10-23).  In addition, his affirmance under the penalties of perjury that the "factual information" contained in the Position Statement was truthful to the best of his knowledge is further evidence that he had notice of his potential liability and an opportunity to participate in conciliation during any investigation and conciliation process conducted by the MCAD (Dkt. No. 100-42 at 24).  *See Chapin*, 977 F. Supp. at 77 ("it is reasonable to infer that, as chief of the UML Police Department, [the defendant] was significantly involved in the preparation of UML's response to the MCAD and therefore had knowledge of and was involved in the MCAD's investigation, and that he had an opportunity during that investigation to conciliate the claims made by [the plaintiff].").

Although (unsurprisingly) the self-represented Plaintiff did not use the term "joint employer" in the Charge, the statement describing the alleged harassing conduct was sufficient to give the MCAD notice that the Trial Court might have functioned as Plaintiff's joint employer for purposes of Chapter 151B and that its employee, Estes, might have functioned as a supervisor

---

[9] In his response to Plaintiff's Statement of Additional Material Facts, Estes lodged a general objection saying that "[t]his is inadmissible evidence" (Dkt. No. 115 at 71-72 ¶¶ 378, 379). However, statements of a party opponent are not hearsay.  *See* Fed. R. Evid. 801(d)(2).

responsible for creating a hostile work environment.  "[F]or the claim to fall within the scope of the investigation, the plaintiff must 'describe the essential nature of the claim and . . . identify the core facts on which it rests.'"  *Windross v. Vill. Auto. Grp., Inc.*, 887 N.E.2d 303, 308 (Mass. App. Ct. 2008) (quoting *Lattimore,* 99 F.3d at 464). !The Charge stated that Estes "had control over [Plaintiff's] tasks and could control [her] employment status" (Dkt. No. 84-7 ¶ 2).  In fact, the Trial Court's Position Statement, which Estes affirmed, attempted to repudiate Plaintiff's allegation of a joint employment relationship (Dkt. No. 100-42 at 20-21 ["[Estes] Had Neither Actual Nor Apparent Authority Over [Plaintiff]"]).  Consequently, the allegation of joint employment was well within the "scope of the investigation."  *Pelletier,* 939 N.E.2d at 727.  This is not a case where the plaintiff was "'permitted to allege one thing in the administrative charge and later allege something entirely different in a subsequent civil action.'"  *Davis v. Lucent Techs., Inc.*, 251 F.3d 227, 231 (1st Cir. 2001) (quoting *Lattimore,* 99 F.3d at 464). !

Finally, Estes apparently argues that Plaintiff is barred from alleging that he is personally liable for discrimination because that claim is based on Mass. Gen. Laws ch. 151B § 4(4A) and the Charge only alleged violations of § 4(1) and (16A) (Dkt. No. 84-7 at 2).  However, § 4(1) and (16A) were cited as support for *Beaupre's* holding that Chapter 151B permits "individual personal liability."  *See Beaupre,* 738 N.E.2d at 757 n.3 & 764 n.16.  Moreover, the potential for individual liability is apparent from the Charge, which described the inappropriate relationship and alleged that Plaintiff performed oral sex in exchange for Estes' promise to help her with the "problems" she was having with Probation (Dkt. No. 84-7 ¶¶ 4-7).  *See id.* at 765 (defendant had "ample notice of the specific allegations made against him personally by the plaintiff.");  *Gledhill v. Univ. of Mass. Med. Sch.,* No. 042021C, 2007 WL 3012904, at *2 (Mass. Super. Ct. Sept. 17,

2007) (finding that defendant had adequate notice of individual liability where the MCAD complaint particularly described the allegations against her).

There are no deficiencies in the MCAD Complaint that would support granting summary judgment to Estes.

V.    CONCLUSION

For the reasons stated above, Estes' motion for summary judgment (Dkt. No. 82) is DENIED.  The parties are directed to appear at a status conference on April 28, 2021 at 11:00 a.m.   If that date is not convenient, the parties are to confer with the Clerk's Office to select an alternative mutually convenient date and time.

It is so ordered.

March 31, 2021                                          /s/ Katherine A. Robertson
                                                       KATHERINE A. ROBERTSON
                                                       U.S. MAGISTRATE JUDGE